**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS - BOSTON**

IN THE MATTER OF:               :   Case No. 19-14142

BRIAN W. COUGHLIN,          :   Boston, Massachusetts
                               **Tuesday, September 22, 2020**
     Debtor.             :   2:04:53 p.m.

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

**TRANSCRIPT OF HEARING ON:**
**[73] MOTION FILED BY CREDITOR, LAC DU FLAMBEAU BAND**
**OF LAKE SUPERIOR CHIPPEWA INDIANS, TO DISMISS**
**CONTESTED MATTER RE: 27 MOTION TO ENFORCE**
**AUTOMATIC STAY AND DEBTOR'S OBJECTION THERETO;**
**[#74] MOTION FILED BY CREDITORS, L.D.F. BUSINESS**
**DEVELOPMENT CORPORATION, LDF HOLDINGS, LLC,**
**NIIWIN, LLC D/B/A LENDGREEN, TO DISMISS CONTESTED**
**MATTER RE: 27 MOTION TO ENFORCE AUTOMATIC STAY**
**AND DEBTOR'S OBJECTION THERETO**
**BEFORE THE HONORABLE FRANK J. BAILEY, J.U.S.B.C.**

**APPEARANCES (via Zoom):**

For the Debtor:             RICHARD N. GOTTLIEB, ESQ.
                            Ten Tremont Street, Suite 11
                            Boston, MA   02108

                            Alfano Law Office, PLLC
                            BY:  TERRIE HARMAN, ESQ.
                                MICHAEL D. CAMERON, ESQ.
                            129 Water Street
                            Exeter, NH   03833

Audio Operator:            LISA BELANGER, ECRO

Transcript prepared by:    JANICE RUSSELL TRANSCRIPTS
                            1418 Red Fox Circle
                            Severance, CO   80550
                            (757) 422-9089
                            trussell31@tdsmail.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

```
 1   APPEARANCES (via Zoom):

 2   For Creditors, L.D.F. Business      Spencer Pane
     Development Corporation, LDF        BY   ZACHARY FAIRLIE, ESQ.
 3   Holdings, LLC, Niiwin, LLC          1000 Walnut St., Suite 1400
     d/b/a Lendgreen, and Lac du         Kansas City, MO  64106
 4   Flambeau Band of Lake Superior
     Chippewa Indians:                   Mintz Levin
 5                                        BY:  ADRIENNE WALKER, ESQ.
                                         One Financial Center
 6                                        Boston, MA  02111

 7   For Creditor Lac du Flambeau Band  PETER J. RADEMACHER, ESQ.
     of Lake Superior Chippewa Indians: 1935 County Rd B2 West, #460
 8                                        St. Paul, MN  55113

 9   .

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     P R O C E E D I N G S

2          THE COURT:  All right.  Good afternoon, everyone.

3          MS. WALKER:  Good afternoon, your Honor.

4          MR. GOTTLIEB:  Good afternoon, your Honor.

5          THE COURTROOM DEPUTY:  Judge Bailey, just to let you

6    know, one of the attorneys got dropped already, Attorney

7    Zachary Fairlie.  So I'll let him back in as soon as he tries

8    to get back in.

9          THE COURT:  Okay.  All right.  Well, let's give him a

10   second here.

11      (Pause)

12         THE COURTROOM DEPUTY:  Here we go.  Give me a second.

13         Okay, your Honor.  He is back in.

14         THE COURT:  Okay.  All right.

15         Mary, go ahead and call the case.

16         THE COURTROOM DEPUTY:  Thank you, your Honor.

17         19-14142, Brian W. Coughlin.  This is the hearing on

18   No.74, Motion filed by Creditors, L.D.F. Business Development

19   Corporation, LDF Holdings, Niiwin, LLC, to Dismiss Contested

20   Matter Regarding 27, Motion to Enforce the Automatic Stay.

21   It's also a hearing on No. 73, Motion filed by the Debtor -- by

22   the -- sorry.  Excuse me -- the Creditor, Lac du Flambeau Band

23   of Lake Superior Chippewa Indians, to Dismiss the Contested

24   Matter Regarding 27, Motion to Enforce the Automatic Stay.

25         Will the parties please state their names for the

**4**

1   record?

2         MR. GOTTLIEB:  Attorney Richard Neal Gottlieb

3   representing Brian W. Coughlin, your Honor.

4         MS. HARMAN:  Terrie Harman of Alfano Law Offices

5   representing the debtor, Brian Coughlin.

6         MR. CAMERON:  Attorney Mike Cameron from Alfano Law

7   Offices also representing Mr. Coughlin.

8         MS. WALKER:  Good afternoon, your Honor.  This is

9   Adrienne Walker on behalf of Niiwin, LLC d/b/a Lendgreen,

10  L.D.F. Business Development Corporation, and LDF Holdings as

11  well as local counsel to Lac du Flambeau Band of the Lake

12  Superior Chippewa Indians.  Your Honor, I'm going to let my co-

13  colleagues announce themselves.

14        MR. FAIRLIE:  Good afternoon, your Honor.  Zach

15  Fairlie on behalf of Niiwin, LLC d/b/a Lendgreen, L.D.F.

16  Business Development Corporation, and LDF Holdings, LLC.

17        MR. RADEMACHER:  And, your Honor, Peter Rademacher,

18  counsel for the Lac du Flambeau Band of Lake Superior Chippewa

19  Indians.

20        THE COURT:  Okay.  Is that everyone?  Sounds like it.

21  It looks like it.  Okay.

22        So who's going to be arguing for the debtor?

23        MR. GOTTLIEB:  I will be, your Honor.  Attorney

24  Richard Gottlieb.

25        THE COURT:  Okay.

1          And let's see.  So if we work our way through the,

2    through the list, I, will we hear from each of Ms. Walker,

3    Mr. Fairlie, Mr. Rademacher?

4          MS. WALKER:  Your Honor, this is Adrienne Walker.  And

5    I think we -- we discussed before the hearing how best to

6    proceed and if we could just suggest a bit of an agenda as well

7    as who's going to be taking some of the different arguments.

8          So we do have the two matters on, the motion to strike

9    as well as the substantive motion to dismiss.  I'm going to

10   address the motion to strike and then the main motion to

11   dismiss, there are two primary arguments, one more on sovereign

12   immunity and jurisdiction.  And Mr. Rademacher's going to take

13   lead on that and Mr. Fairlie is going to take lead on the, on

14   the failure to state a claim and those related arguments.

15   Those arguments and issues do overlap by all the parties on the

16   respondents' side.

17         So they're available to address any questions and, of

18   course, any particulars relating to their client groups.

19         THE COURT:  Okay.  Let me, let me just repeat some of

20   that.  So, Ms. Walker, you're handling the motion to strike;

21   Mr. Rademacher is handling the sovereign immunity/

22   jurisdictional issue, which applies equally to, to all parties

23   or is briefed on behalf of all parties; and Mr. Fairlie is

24   going to handle what issues?

25         MS. WALKER:  The failure to state a claim.  So the,

1   whether or not the, those parties ought to be in there, you

2   know, the 12 -- the 12 --

3          THE COURT:  The 12(b)(6).  The 12(b)(6) arguments?

4          MS. WALKER:  Yes.

5          THE COURT:  Okay.  All right.

6          Okay.  Okay.  Any other preliminaries?

7          MR. GOTTLIEB:  I don't believe so, your Honor.

8          THE COURT:  Very good.

9          All right.  So I, I have this preliminary.

10   Jurisdiction always comes first, right?  So ultimately, I, I

11   need to make a determination about -- I -- I -- we looked at

12   whether sovereign immunity, you know, is, in fact, a

13   jurisdictional issue, and it is.  It does appear to be in the

14   First Circuit, at least, a jurisdictional issue.  If, if the

15   entity is immune under that doctrine, then I lack jurisdiction

16   to handle it.

17          So that may not matter so much except that it

18   certainly ought to come first and I have to decide that first.

19          But let's turn, then, I guess, to the procedural issue

20   of the motion to strike the most recent filing.  And I

21   recognize that I allowed that brief to be filed, just one of

22   those things, you know.  Came, came flying in and I sent the

23   order flying out, so.  But now I have a motion to strike it,

24   and I will tell you this.  When I saw the motion to strike, I

25   decided not to read it.  So I haven't read it yet, okay?

1          MS. WALKER:  Thank you.

2          THE COURT:  All right.

3          MS. WALKER:  Yes, your Honor.  Again, Adrienne Walker

4    for the respondents.

5          And, and, your Honor, it, it is atypical to file a

6    motion to strike and I think it is, generally, appropriate if

7    there is a discrete issue that needs, perhaps, needs to be

8    clarified, but it is usually within the four corners of the

9    reply.  So if the reply needed some point or, or some

10   particular response to a particular issue in the reply, that,

11   perhaps, is appropriate.

12         So I can understand and we understand why that would

13   be, generally, allowed and moved on.  Yet, when you take a look

14   at the surreply, you'll notice that for the first time after a

15   month of briefing that the debtor introduces new arguments and

16   new allegations and new theories, perhaps, as to the merits of

17   the underlying arguments, didn't prove it, came up with

18   additional arguments.

19         So this is an extraordinary measure on a Friday before

20   a hearing to introduce new allegations, new theories, and, in

21   essence, trying to argue rather than the discrete issues that

22   we have before you on, on, on the two issues brings in an

23   additional layer that, that is just beyond, beyond the four

24   corners of, of what we had before.  So we, we do think it is

25   inappropriate.

1          And, and bear with you, myself, as I move my little

2   piece of paper over.

3          So our arguments really framed two points.  The

4   respondents are entitled to tribal immunity and the stay motion

5   fails to allege claims for the willful violations of the stay.

6          So in the, in the surreply for the first time the

7   debtors argue this new theory of whether or not there's a

8   single entity, whether or not there's a unity of interests

9   amongst the parties and brings back and brings in for the first

10  time this <u>Breakthrough Management</u> case and its standard.

11         So it is precisely because we're dealing with new

12  items that should have been briefed a month ago, if they were

13  to be appropriate, but certainly not at the last hour and

14  certainly beyond the scope of the motion to dismiss.  So it's

15  precisely for those discrete issues, which warranted the unique

16  response on the motion to strike, that, perhaps, would have not

17  otherwise been a typical course.

18         THE COURT:  So would you say that what's argued in

19  that surreply is not responsive to what had gone on before it?

20         MS. WALKER:  Exactly.  So the surreply raises these,

21  an entirely additional theory as to bringing in the parties and

22  goes beyond whether or not the, the parties and their

23  independent actions on the motion.  The stay violation motion

24  itself never raised any of these unity of interests arguments

25  and it's really for this first time that it's raised.

1        So it's, it's precisely because it's a new and

2    different allegation and theory.

3        THE COURT:  Okay.

4        All right.  Mr. Gottlieb.

5        MR. GOTTLIEB:  Your Honor, I believe that my sister

6    counsel loses the forest for the trees.  This is a motion to

7    enforce the automatic stay.  They, they filed an objection to

8    it asserting, among other things, the right of sovereign

9    immunity or tribal immunity, more appropriately.  I then file

10   a, a responsive brief basically saying that they don't have

11   sovereign immunity in this situation and furthermore, that they

12   are, in fact, an arm of the tribe and that there is, in fact, a

13   unity of interests which is in part of my response to their

14   motion to dismiss.  They file a response to my response

15   basically arguing now for the first time factors that had not

16   been raised in their prior objection.  It seemed only fair in

17   light of the fact that they raised for the first time new case

18   law in the form of the Bay Mills decision as well as the Kiowa,

19   the Kiowa case before the Supreme, that was before the Supreme

20   Court that I go forth and explicate the rationale that they

21   are, or at least defending my rationale that all of these

22   entities, in fact, are one entity for all important legal

23   purposes under the circumstances.

24       So I don't believe in the, in the larger scheme of

25   things that this is, this should be stricken from the record

1   because it's merely there to assist the Court in making a

2   determination in the first instance whether there is sovereign

3   immunity and, therefore, court jurisdiction, as the Court

4   points out, to entertain a motion to enforce the automatic stay

5   under Title 11 of the United States Code.  Under those

6   circumstances, your Honor, I believe that this does not raise

7   any new arguments, *per se*, because the point that we're making

8   is that they violated the automatic stay.  It is they,

9   themselves, that are raising the issue of sovereign immunity.

10  I'm merely responding to their allegation of sovereign immunity

11  as against this Court.

12          THE COURT:  See, I'm, I'm quite mindful that in this

13  instance -- in this -- with respect to this motion your motion,

14  Mr. Gottlieb --

15          MR. GOTTLIEB:  Yes.

16          THE COURT:  -- for, for a 362(k) violation.  And then

17  we had what amounted to a preliminary hearing and at that

18  hearing I outlined what the briefing schedule would be.  I went

19  so far as to, in an effort to keep control of the briefing, I

20  did the extraordinary, somewhat extraordinary step for me at

21  least, to, to, to provide page limits, but I didn't add a

22  surreply.

23          MR. GOTTLIEB:  Granted, your Honor.  That's why we

24  filed a motion for leave to file it in the first instance.  It

25  was only -- there had been -- we felt that under the

1   circumstances that it was appropriate, given their reply to my

2   response, that I provide a surreply to it that ex, further

3   explicates the point of view that I made in my earlier

4   response.  I did not add anything that I had not already argued

5   before.

6         THE COURT:  Well, why do we need more, then, if what

7   you filed does nothing more than, doesn't add anything?

8         MR. GOTTLIEB:  It adds one thing which I believe is

9   important in the larger scheme of things towards the future of

10  this particular case and that is, that is preserving my

11  client's rights specifically with respect to an appeal that

12  will likely come upwards to the First Circuit and the question

13  is whether or not -- and this was the point of the exercise

14  from my side's point of view -- that we assert that,

15  notwithstanding the Supreme Court's decision in Kiowa, that

16  tribal immunity ought to be revisited and upon being revisited

17  invalidated.

18        THE COURT:  Why did you think that you needed to say

19  more in order to preserve your rights on appeal?

20        MR. GOTTLIEB:  Because it's been -- the case law is

21  fairly legion that those matters that are not specifically set

22  forth in the pleadings or in the matter below are deemed to be

23  issues that are waived, ultimately, on appeal before the First

24  Circuit or Supreme Court, as the, the case may be, your Honor.

25  That's the reason it was done.

1            THE COURT:  All right.  I, you know, I haven't, again,

2     I haven't read it because I saw the motion to strike and I

3     thought, then I looked at my order setting forth the briefing

4     schedule, realized that, you know, this really exceeded what I

5     had allowed.

6            Let's do this.  Well, first, I'll just ask 'cause I

7     don't know.

8            Ms. Walker, would the obvious curative response here,

9     other than striking it, is to offer your side an opportunity to

10    further respond to it.  Is that something that you'd like to

11    do?  Would that cure it from your standpoint?

12            MS. WALKER:  Your Honor, it truly goes beyond the

13    scope of the, the issues.  If you look back to the gating issue

14    of, on the stay motion, it just lists parties and doesn't bring

15    up any facts or any theories and it's only after all of that

16    briefing that now we have this new veil piercing unity of

17    interests which I don't think that there are enough even

18    allegations in the underlying to now get to this point and how

19    can we possibly respond to it.

20            So to me, it's just, actually, just adding an argument

21    without any basis to do so as a potential saving for a future

22    appellate argument.  So I --

23            THE COURT:  Well, you lost me, you lost me there,

24    though.  When you say -- so a -- my order allowing you some

25    time to respond wouldn't cure the, the unfairness of what's

1  been done?

2  MS. WALKER:  Well, to, to be candid, of course if we

3  had more time, then we could respond and, and then illustrate

4  to your Honor why those arguments are inappropriate here.  We

5  could do that, but it still loses sight of the underlying

6  stayed motion violations by -- there were no allegations as to

7  this unity.  It's just an entirely new theory of liability that

8  wasn't in the original issue before your Court.

9  So if you come back to what -- the, the substance of

10 the allegations are now being twisted to this new veil piercing

11 unity of interests without the substance behind it and,

12 perhaps, you know, he could bring other motions, but we could

13 certainly articulate.  I just think at this stage, your Honor,

14 we've already had a month of briefing.

15 THE COURT:  Yeah.

16 MS. WALKER:  And -- and it's -- it feels like a little

17 bit of fishing net here.

18 THE COURT:  Okay.  All right.

19 I'm going to go forward with everything else and I'll

20 come back to this at the end, but I'll -- I -- I -- I recognize

21 the issue.  Again, I haven't read the brief.  I was told first

22 that it was, didn't add anything new and then told that it was

23 critical, so.  And that, otherwise, appellate rights might not

24 have been preserved.  Anyway, problematic.

25 It also smacks, frankly, of two other things, in my

```
 1   mind.  One is we got new counsel and, and they decided, told me
 2   I better do more, Mr. Gottlieb.  And secondly, I went first and
 3   I want to go last.  That's what it sounds like.  So it's not,
 4   you know, everybody always wants to help me by giving me more
 5   argument --
 6             MR. GOTTLIEB:  There --
 7             THE COURT:  -- and more paper.  It's always in my best
 8   interest to have that, but -- so --
 9             MR. GOTTLIEB:  I -- I -- again, it's not a question
10   from our point of view, your Honor, from my side's point of
11   view, that we're trying to sandbag anyone.  If the opposing
12   side wishes to make a, a further submission and I'll stand pat
13   exactly where I am insofar as that's concerned.
14             But this was not the question of me getting the last
15   word in.  I, I recognize, your Honor, and from my experience
16   with your Honor that that doesn't always work for me, in any
17   event.  And I can honestly say that, again, part of the
18   rationale behind this was the raising of issues that were
19   raised in the, the reply briefs of the respondents, both of
20   them, particularly, as I said, the Kiowa decision and the Bay
21   Mills decision, that made me feel as though the, what I had
22   submitted previously did not -- that may -- may -- that wasn't
23   explicit enough in that regard to preserve whatever appellate
24   rights my client may have with respect to those discrete legal
25   issues whether or not Kiowa stands as good case law at this
```

1  | moment in time.

2  |        And I'll leave it at that, your Honor.

3  |        THE COURT:  Well, you could have found those cases and

4  | you could have argued them in one of your earlier briefs, no?

5  |        MR. GOTTLIEB:  I was not necessarily -- I could have,

6  | I suppose, but it wasn't really brought to the fore until the

7  | reply briefs were actually submitted and I had a chance to

8  | review them.

9  |        THE COURT:  All right.

10 |        All right.  Let's, let's keep moving here.  So I --

11 | any other preliminaries?

12 |    (No response)

13 |        THE COURT:  If not, let's turn to Mr., is it

14 | Rademacher?

15 |        MR. RADEMACHER:  Rademacher, your Honor.

16 |        THE COURT:  Rademacher, okay.

17 |        Mr. Rademacher, you want to get us started on the

18 | sovereign immunity issue here?

19 |        MR. RADEMACHER:  Thank you, your --

20 |        THE COURT:  And I'll, I'll tell everyone.  I've read,

21 | I've read everything except for the very last brief.  I, I

22 | actually also read some of the, several of the cases, certainly

23 | the three divergent, two and one divergent views of, the

24 | circuits have taken on what appears to be a circuit split.

25 |        So I have read everything, but go ahead,

1  | Mr. Rademacher.

2  |        MR. RADEMACHER:  Thank you, your Honor.  And may it

3  | please the Court:

4  |        I, along with Andrew Adams, III, represent the

5  | respondent, the Lac du Flambeau Band of Lake Superior Chippewa

6  | Indians, a federally recognized Indian tribe organized under

7  | Section 16 of the Indian Reorganization Act of 1934.

8  |        Your Honor, this is a case of baseless and unlawful

9  | overreach.  As his claim plainly demonstrates, the debtor asked

10 | the Court for recourse against the Tribe for the alleged acts

11 | of one of its economic arms and he does so in complete

12 | disregard of the Tribe's sovereign immunity, immunity supported

13 | by generations of Supreme Court precedent.  The Tribe

14 | respectfully asks this Court to reject this invitation and

15 | dismiss the claim against it.

16 |        Now as Ms. Walker previously indicated, the issues

17 | presented by both of the pending motions to dismiss largely

18 | overlap and today, Mr. Fairlie's and my arguments will also

19 | overlap in some ways, but in the interest of judicial economy

20 | Mr. Fairlie will focus on deficiencies in the debtor's claim

21 | and I intend to focus on the application of tribal sovereign

22 | immunity.  Specifically, I intend to cover two points with my

23 | time.  One, tribal sovereign immunity is properly raised under

24 | Rule 12(b)(1) and, two, Congress did not unequivocally express

25 | its intent to abrogate tribal sovereign immunity in the

1  Bankruptcy Code.  I'll now briefly turn to my first point.

2        Relying on <u>Ninigret Development Corp. v. Narragansett</u>

3  <u>Indian Wetuomuck Housing Authority</u>, the debtor makes a passing

4  remark that the First Circuit does not view sovereign immunity

5  as a challenge to subject matter jurisdiction under Rule

6  12(b)(1).  The debtor is wrong.  The <u>Ninigret</u> court simply

7  explained that before it addresses an assertion of sovereign

8  immunity a court must first determine if it has independent

9  subject matter jurisdiction.  The point that the court was

10 making is that when a party sues a tribe for, say, a state

11 common law tort, the case cannot be brought to federal court

12 simply because the tribe asserts sovereign immunity.  There

13 must be an independent basis for the federal court's

14 jurisdiction.

15       But contrary to the debtor's arguments, the <u>Ninigret</u>

16 court never posited that sovereign immunity is not an attack on

17 the court's subject matter jurisdiction.  In fact, the court

18 observed that, "Sovereign immunity is jurisdictional in

19 nature," and it later explained in <u>Valentin v. Hospital Bella</u>

20 <u>Vista</u> that Rule 12(b)(1) is a "large umbrella overspreading the

21 variety of different types of challenges to subject matter

22 jurisdiction," including sovereign immunity.

23       As we have noted in our brief, other courts in this

24 Circuit have applied Rule 12(b)(1) in cases involving sovereign

25 immunity and the debtor has provided no reason for this Court

1 | to deviate from that sound practice.  The Tribe's motion is

2 | proper under Rule 12(b)(1).  I'll now turn to my second point.

3 |      The Supreme Court has long recognized that Indian

4 | tribes are separate sovereigns pre-existing the Constitution

5 | and that they retain aspects of their inherent sovereign

6 | authority.  Among the core aspects of this sovereignty is the

7 | common law immunity from suit traditionally enjoyed by

8 | sovereign powers.  This, the Supreme Court has explained, is a

9 | necessary corollary to Indian sovereignty and self-governance,

10 | policies at the very heart of the ongoing relationship between

11 | Indian tribes and the Federal Government.  While Congress does

12 | retain plenary authority to abrogate that aspect of tribal

13 | sovereignty, the Supreme Court has been clear and has

14 | instructed that it must unequivocally express that purpose.  It

15 | can't be implied.  It can't be deduced, that it, it must be

16 | unmistakably clear.  That is the law.  That is the standard.

17 | That is the rule of construction that governs this case and we

18 | have examples of when Congress has made this showing.

19 |      For those, I'd like to Share my screen.  Is everyone

20 | seeing a PDF file right now?

21 |      THE COURT:  Yes.  I, I see it.

22 |      MR. RADEMACHER:  Thank you, your Honor.

23 |      This first slide shows the relevant text of the

24 | Resource Conservation and Recovery Act of 1976.  Note that the

25 | abrogation of sovereign immunity applies to municipalities

1  which the Act specifically defines to include Indian tribes,

2  among a host of other types of governmental entities.

3      This slide shows the relevant text of the Safe Water

4  Drinking Act of 1974.  Again, note that the abrogation of

5  sovereign immunity applies to municipalities which the Act

6  specifically defines to include Indian tribes.  These statutes

7  were enacted in the years immediately preceding passage of the

8  Bankruptcy Code and Congress has continued this practice in

9  more recent years.

10     This slide shows the relevant text of the Indian

11 Gaming Regulatory Act of 1988.  This entire Act pertains to

12 tribal gaming and the abrogation pertains to gaming conducted

13 in violation of any tribal state compact to which a tribe must

14 be a party.

15     As you can see, in each of these cases Congress

16 referenced Indian tribes in order to effectuate an abrogation

17 of their immunity.  Congress knows full and well how to

18 abrogate tribal sovereign immunity.  It knows how to

19 unequivocally express that intention and it has not done so in

20 the Bankruptcy Code.  That is the conclusion reached by two of

21 the three circuit courts to rule on the very issue now pending

22 before this Court, those being the Sixth Circuit in In re

23 Greektown Holdings, LLC and the Eighth Circuit in In re

24 Whitaker.  And it is also the position shared by the Seventh

25 Circuit in Meyers v. Oneida Tribe of Indians of Wisconsin, a

1  case involving FACTA, which has a very similar provision to

2  that in the Bankruptcy Code, and the Tenth Circuit in In re

3  Mayes where it, where it in *dicta* that the Bankruptcy Code

4  probably does not abrogate tribal sovereign immunity.

5        The debtor asks this Court to simply disregard this

6  Supreme Court precedent, these Circuit Court decisions, and the

7  policies they stand on.  In fact, on a number of occasions the

8  debtor goes so far as to outright disavow certain Supreme Court

9  decisions and cite dissenting opinions as persuasive authority.

10  This Court should not be persuaded.  Instead, it should see

11  these arguments for what they are, indicia of just how far

12  astray the debtor is from the law.

13        The debtor also points to -- I'm sorry.  Do you

14  have --

15        THE COURT:  Let me, let me ask a couple questions

16  here.  I -- I -- I read the cases, but I haven't researched it.

17  The Ninth Circuit, obviously, went the other way.  Is -- have,

18  have any courts followed the Ninth Circuit's lead in that -- in

19  -- in -- in -- in that determination?

20        MR. RADEMACHER:  Your Honor, the vast majority of

21  district courts to follow the Ninth Circuit's leads are courts

22  within the Ninth Circuit.  I do believe that there is one court

23  outside of the Ninth Circuit -- I believe it's in the Tenth

24  Circuit -- out of New Mexico that has ruled similar to Crystal

25  Energy.  I would say, your Honor, that that decision is in

1 direct conflict with the position that the Tenth Circuit has

2 taken, at least in *dicta*.

3      THE COURT:  I see.  Okay.

4      And the Sixth Circuit case and the Eighth Circuit

5 case, did they involve 362(k) violations?

6      MR. RADEMACHER:  Your Honor, I don't recall off the

7 top of my head -- I apologize -- what specific provisions that

8 they involved as far as, if they were violations of the

9 automatic stay.  I can tell you that they did involve the

10 specific question of whether or not sections 101 and 106

11 abrogate tribal sovereign immunity and those are the provisions

12 that apply for a 362 violation claim.

13      THE COURT:  But you would say it doesn't matter.  They

14 -- they -- they arose -- they're cases that arose under the

15 Bankruptcy Code?

16      MR. RADEMACHER:  Yes, your Honor.  And ultimately, the

17 same, the same provisions regarding abrogation of immunity

18 would apply.

19      THE COURT:  Right.

20      If I look at 101, 11 U.S.C. § 101, section 27, that,

21 the critical definition of "governmental unit" here and I get

22 to the last few words of that statute and it, it includes the

23 words "or other foreign or domestic government," what does

24 "foreign government" mean?

25      MR. RADEMACHER:  Your Honor, it could mean a host of

1    things.  It could mean, obviously, foreign states.  It could

2    mean, perhaps, international governmental organizations, such

3    as the EU.  It -- there's a, there's quite a bounty of case law

4    on that question and there are a variety of answers to it.

5           THE COURT:  And so here, you're saying that the

6    failure to include Indian tribes by name is enough to say that

7    it's not unequivocally stated that sovereign immunity is

8    abrogated but if some arm of the Canadian government were to

9    have done what the debtor alleges was done here, that entity

10   would fall within the ambit of this abrogation statute.  Is

11   that fair to say?

12          MR. RADEMACHER:  Your Honor, I'll have to admit that

13   that question sort of exceeds my scope of expertise a little

14   bit.  I have not read a number of cases regarding abrogation of

15   immunity for foreign nations.  My, my primary specialty is in

16   Indian law and with respect to this case, abrogation of tribal

17   sovereign immunity.  What I can say is that the relationship

18   that the United States has with Indian tribes is unique to the

19   relationship that it has with other governments.  There are

20   generations of Supreme Court precedent that outline the

21   guardian-ward relationship that's in place and the ultimate

22   fiduciary duty that the Federal Government has to Indian tribes

23   to bolster their self-governance, to bolster their economic

24   developments.

25          And so it may or may not be the case that a agency of

1   Canada could be susceptible to liability under the Bankruptcy

2   Code separate from, or at different results from a Indian

3   tribe, but there is a basis for that in the ongoing

4   relationship between the Federal Government and tribes.

5            THE COURT:  I see.  All right.  So you take that head

6   on and, and say it could perfectly well be that an entity of,

7   an agency of Canada would have abrogated or would be deemed to

8   have abrogated its sovereign immunity under the Bankruptcy

9   Code, but an Indian tribe would not and that makes perfect

10  sense.

11           MR. RADEMACHER:  Yes.  And again, your Honor, I don't

12  know and I don't want to speculate too much about the specific

13  hypothetical, but I am comfortable saying that there is, there

14  is a policy basis for the special treatment of Indian tribes in

15  this particular arena.

16           THE COURT:  Okay.  So a, an Indian tribe here, you

17  know, is, it, it doesn't matter that the Indian tribe was

18  acting in a commercial pursuit, is that right?

19           MR. RADEMACHER:  It -- that is correct, your Honor,

20  and that comes out of Kia, _Kiowa_, which the debtor has, or is

21  seeking to reserve an appellate argument on.  It's also

22  reaffirmed in _Bay Mills_, which was briefed in our principal

23  brief, your Honor.  There is no distinction -- the Supreme

24  Court has determined that there is no distinction in the

25  capacity in which tribes are operating, whether that's what we

1  might view as a traditional government capacity or a commercial

2  capacity.  And one of the reasons for that, your Honor, is that

3  tribes are in a unique position that many governments aren't

4  really in.  This is pretty well fleshed out in <u>Bay Mills</u>.

5        One of the unique situations is that Indian tribes

6  don't have the types, types of tax basis that other governments

7  have.  And so they have to look to other types of sources of

8  revenue in order to keep themselves going, offering services to

9  their members and keeping their tribe, the future of their

10  tribes in a good way.  And so the Supreme Court has absolutely

11  rejected any type of distinction based on traditional

12  governmental actions and commercial actions of a tribe.

13        THE COURT:  The -- would a debtor like the debtor in

14  this case have any recourse in any court against an Indian

15  tribe who engaged in the alleged conduct alleged here?

16        MR. RADEMACHER:  Yes, your Honor.  And I, I did expect

17  you to ask that question today.  This is something that comes

18  up --

19        THE COURT:  I'm noth -- I'm noth -- I'm nothing if not

20  predictable.  That's for sure.

21        MR. RADEMACHER:  This is something that comes up in

22  the debtor's brief.  The debtor does share a parade of

23  horribles as a policy basis to deviate from Supreme Court

24  precedent suggesting that he and other debtors will have no

25  recourse against tribes or tribal economic arms otherwise, but

1  this is illusory.  Debtors still have both private and judicial

2  remedies.  For instance, debtors can procure waivers of tribal

3  sovereign immunity or other dispute resolution provisions in

4  their financing documents.  They can also ask for waivers or

5  direct remediation later on, depending on if something happens

6  during the life of their financial agreements.  And more to the

7  Court's question, if necessary, debtors can assert Ex Parte

8  Young claims against tribal officials and employees to enjoin

9  alleged unlawful conduct.

10         So, if, if the debtor in this case had concerns

11  initially about receiving calls in violation of the automatic

12  stay, he could have brought a claim under Ex Parte Young to

13  stop employees of the, of Lendgreen, of Niiwin, LLC from

14  continuing to violate that automatic stay.  He would not have

15  had direct access to monetary relief in that regard, but he

16  would have had a way to stop it in its tracks and move on.

17         THE COURT:  Okay.  All right.  And, and would I have

18  jurisdiction to entertain such a request?

19         MR. RADEMACHER:  I believe so, your Honor.  There may

20  be a question of personal jurisdiction, but I, in general, an

21  Ex Parte Young claim would raise a question of, particularly

22  when it involves a violation of federal law, it would raise a

23  federal question.

24         THE COURT:  Okay.  All right.  Well, I, I interrupted

25  you a number of times and I probably will again, but go -- why

1 | don't -- any, anything else you'd like to say on the

2 | jurisdictional issue?

3 |     MR. RADEMACHER:  Your Honor, the debtor also posits

4 | the Crystal Energy Company v. Navajo Nation is the seminal case

5 | on this issue.  It isn't.  Bay Mills v. Michigan is and the

6 | seminal, is the seminal case and are, as are the long line of

7 | Supreme Court decisions culminating in it.  In fact, Crystal

8 | Energy has been universally rejected by other circuit courts

9 | and a majority of district courts outside of those circuits and

10 | for good reason.  The Crystal Energy court did the very thing

11 | that the Supreme Court has said it cannot do, find an

12 | abrogation of tribal sovereign immunity by implication, or, as

13 | the debtor prefers to characterize it, by deduction.

14 |     Notwithstanding the authority rejecting Crystal

15 | Energy, the debtor argues that Ninigret and Narragansett Indian

16 | Tribe v. Rhode Island foreshadow the First Circuit's adoption

17 | of it.  Again, he is wrong.  The Nin, in Ninigret, a contractor

18 | sued a tribal housing authority under a development contract.

19 | The First Circuit concluded that the housing authority had

20 | waived its immunity for the claims.  In reaching this decision,

21 | the court honed in on a tribal ordinance that authorized

22 | contractual waivers in an arbitration provision in the

23 | development contract that said -- that -- that said it "shall

24 | be specifically enforceable under prevailing law."  Coupling

25 | these passages, the court correctly found the housing

1   authority's unequivocal intent to waive its own sovereign

2   immunity.  Our case doesn't involve a tribal ordinance

3   authorizing a waiver of sovereign immunity, nor does it involve

4   a privately agreed-to arbitration provision.  In fact, it

5   doesn't involve a single passage agreed to by the Tribe or that

6   even references Indian tribes.

7           In Narragansett Indian Tribe, the tribe engaged in

8   decades of litigation with the state which culminated in a

9   memorandum agreement that provided the tribe 1800 acres of

10  settlement land in return for an agreement that "all laws of

11  the State of Rhode Island shall be in full force and effect on

12  the settlement lands."  The spirit of that provision was

13  adopted into the Rhode Island Indian Claims Settlement Act,

14  which provided that the settlement lands would be "subject to

15  the civil and criminal laws and jurisdiction of the State of

16  Rhode Island."  Again, the First Circuit found a waiver and an

17  abrogation of tribal sovereign immunity, but in doing so it

18  read the passages in their "unique historical context."  It

19  noted that both the memorandum and the Settlement Act were

20  products of mutual consent and that the provisions represented

21  a *quid pro quo* for the 1800 acres of settlement land.

22          Again, our case doesn't involve a private agreement or

23  a *quid pro quo*, nor does it, nor does this case involve the

24  unique historical context on which the First Circuit rested its

25  decision, nor does this case involve a statute that specific,

1   specifically applies to a tribe.  In fact, the whole of Title

2   11 of the U. S. Code never once references the words "Indian"

3   or "tribe," not once.  These cases simply have no bearing on

4   the issue presented to this Court and they certainly can't be

5   viewed as foreshadows that the First Circuit will deviate from

6   the well-settled Supreme Court precedent on this point.

7           In closing, your Honor, the debtor asks this Court to

8   upset well-settled tribal sovereign immunity precedent, all in

9   a folly attempt to attain recourse from the Tribe for acts that

10  it had nothing to do with, but for the reasons Mr. Fairlie and

11  I discussed today and the reasons we have briefed, we

12  respectfully ask this Court to grant the Tribe's motion to

13  dismiss the claim against it.

14          Unless the Court has additional questions, I'll save

15  my comments, additional comments for rebuttal.

16          THE COURT:  All right.  I'll allow you that

17  opportunity.

18          Okay, Mr. Gottlieb, on jurisdiction and sovereign

19  immunity.

20          MR. GOTTLIEB:  Your Honor, there are a number of basic

21  problems with the argument being put forward by the Tribe today

22  as well as the other respondents.

23          In the first instance -- well, let me suggest at the

24  very outset, your Honor, that in considering what I am saying

25  and what the, the other parties are saying that the Court

1  should bear in mind that this may be a situation in the, while

2  you're listening, that 28 United States Code § 158(d)(2)(A)

3  may, may be worthy of consideration with respect to whether or

4  not the ultimate issues need to be adopt, need to be confronted

5  by the First Circuit.  But I'll merely state that in passing.

6        It's very clear, your Honor, that there really is

7  divergence of opinion between those entities, those cases that

8  look to finding that there is sovereign immunity to prevent the

9  prosecution of, say, as in this case, a, an objection, a motion

10  to enforce the automatic stay as against an Indian tribe and

11  those like Crystal Energy that say that an Indian tribe is part

12  of those listing of entities under section 10, 101(27) in the

13  last clause that encompasses that and as a result, section

14  106(a)'s abrogation provisions are, in fact, applicable.

15        But getting back to the, the, the nub of it, it really

16  comes down, I believe, to a question of, first of all, whether

17  or not there is sovereign immunity to be abrogated in the first

18  instance here.  And I am not entirely certain that that is, in

19  fact, the case.  In the -- but I will leave that, also, point

20  aside for the moment.

21        Section 106(a) was enacted in 1994 as a direct result

22  of the Supreme Court's decisions in both Hoffman and in Nordic

23  Village, which found that states, that the Bankruptcy Code's

24  then existing provisions under section 106 were insufficient to

25  abrogate sovereign immunity.  In its decision -- in its -- in

1   its wisdom confronting that, the legislative history behind

2   section 106(a) and 106, generally, takes a full-brush approach

3   to resolving that problem.  It doesn't mere, it doesn't merely

4   say that, if they had merely said all entities of any kind that

5   claim sovereign immunity is hereby abrogated, they went, they

6   were very, very broad in their brush in this regard.  They

7   defined every type of polity that one can possibly imagine,

8   both domestic on the one hand, and foreign on the other.

9           You asked my brother counsel regarding whether or not

10  there had ever been a case involving a foreign entity, such as,

11  as you, you posited, an arm of, say, the Canadian Government

12  violating the automatic stay.  There actually is a case,

13  believe it or not, that deals with the idea of foreign

14  sovereign immunity and section 106(a) and it's called _In re_

15  _Tuli_, T-U-L-I.  The cite for it is 172 F.3d 707 and the

16  specific cite to it is Page 712, which says that, "Iraq" -- in

17  this case it was Iraq -- "as a governmental unit, is not

18  entitled to sovereign immunity in this adversary proceeding."

19          So there actually is a situation where a foreign

20  sovereign has been found to have, not to have sovereign

21  immunity, at least in the context of the Bankruptcy Code and

22  even in this particular case.  I think that more recent case

23  law from the Supreme Court also makes it even more problematic.

24  The nature of the problem that's being presented here from a

25  policy standpoint.

1        As the Court is probably aware, there was a, a

2   decision back in 2006 of the <u>Central Virginia Community College</u>

3   <u>v. Katz</u>, which dealt with the question of whether or not

4   section 106(a) abrogated a state's sovereign immunity for the

5   purpose of a trustee recovering a preferential transfer.

6   The -- rather than deal with section 106(a) at all, it

7   basically found that there was no sovereign immunity, *per se*,

8   that the state had because of the fact that they were --

9   they -- it was unnecessary to even look at section 106(a) in

10  that particular context because of the fact of the bankruptcy

11  clause provision of Article, Article 1, Section 8 of the

12  Constitution.

13       Now as a result of that, there was a very interesting

14  decision out of the Eleventh Circuit fairly recently called

15  <u>Omine</u>, O-M-I-N-E, which was out of the Eleventh Circuit 2007,

16  which basically found that the violation of an, the automatic

17  stay by, in this case a governmental entity -- in that

18  situation it was the State of Florida -- was, in fact,

19  recoverable because of the fact that the automatic stay is a

20  foundational provision of the Bankruptcy Code itself that

21  overrode and, in light of the Supreme Court's decision in <u>Katz</u>,

22  essentially overrode state sovereign immunity, altogether.

23       Now how does this relate in this particular case?

24  This relates in this particular case, your Honor, because what

25  the, what the respondents are effectively arguing is that they

1   have greater rights based upon, based upon their assertion of

2   tribal sovereign immunity than even states or foreign countries

3   or any other type of polity might otherwise enjoy on the basis

4   of the fact that it has not been -- they -- that Congress chose

5   not to use the phrase "Indian tribes" in the definition of, set

6   forth in section 101, subparagraph 27.

7          THE COURT:  But they take that head on.  They -- I

8   asked that very question and, and the answer that I received

9   was, yes, indeed.  Iraq may be deemed to have waived sovereign

10  immunity or -- I'm sorry -- may be deemed to have -- Congress

11  may have been, may be deemed to have abrogated sovereign

12  immunity as to Canada or Iraq.  Same thing for a state.  We

13  don't have to look too hard at the statute to figure that out

14  because it starts with United States, State.  So Florida, no

15  surprise there.

16         But what I'm hearing is that because of the unique

17  nature -- and none of us could say otherwise that Indian rights

18  or Indian tribes are not unique in, in this country, both

19  historically and as a matter of law -- that the Supreme Court

20  has required a more demanding approach to statutory

21  interpretation, that it has to be an unequivocal abrogation and

22  that isn't present here.  It could, apparently, only be done if

23  the words "Indian tribe" were present in the definition at

24  101(27).

25         How do you respond to that?

1          MR. GOTTLIEB:  I respond by saying that it is -- there

2     is no -- there are no magic words, no talismanic phrase that

3     need to be used in order to effectuate abrogation.  Bear in

4     mind, what Congress was doing all along -- and this -- you have

5     -- again, we're looking to a question of congressional intent.

6     If the question is one of congressional intent, it is

7     impossible to imagine a more comprehensive way in which

8     Congress expressed itself in 101(27).  Because they wanted to

9     be absolutely certain that every kind of governmental polity

10    that could be possibly conceived of, whether on this planet or

11    another planet, including Indian tribes, they first dealt with

12    a series of enumerated entities, municipality, state,

13    territory, district.  But even after they, if they had stopped

14    there, the, the Tribe in this particular case might have an

15    argument, but they didn't stop there.  Congress didn't stop

16    there.  They went on to state "or any other foreign or domestic

17    government."

18         Now even in the cases cited by the Tribe and by

19    Lendgreen, there is a plethora of Supreme Court cases that

20    describe Indian tribes as domestic, dependent nations.  Their

21    rights as a domestic, dependent entity is still a government,

22    but think of it in these terms.  If this entity is not a

23    governmental entity, then what is it if not?  And more

24    importantly, if, as they assert, that they're not a government,

25    governmental entity and this does not apply to them, then to

1   what does it apply?  I would say that that by itself violates

2   basic rules of statutory construction, notwithstanding the

3   special status that I believe is, I think that's a dubious

4   argument these days in light of the fact that there have been

5   numerous cases, a more recent one involving, if memory serves,

6   the St. Regis Tribe essentially exporting its claim of

7   sovereign immunity to Allergan so that it could utilize or

8   Allergan could utilize the tribe's claim of sovereign immunity

9   to stop any attempt to undermine the patents that the company

10  had developed by essentially renting them out to a tribe.

11          What you have in this particular case, your Honor, and

12  particularly in the context of a bankruptcy case, you're having

13  a, an Indian tribe choosing, perhaps, I think, with the

14  assistance of a third-party capital provider, to engage in

15  payday lending across state lines over the internet at

16  extremely high interest rates and essentially ignoring, for all

17  intents and purposes, the automatic stay.  They say that you'll

18  be able to still go in and make a request for a waiver of

19  sovereign immunity, but that's not a, that is not a remedy,

20  that is not a resolution for a violation that would otherwise

21  impact both a state or any other kind of governmental entity.

22  Surely Congress when it enacted in 1994 section 106(a) and

23  101(27) knew that by doing something so radical as including

24  all "other domestic or foreign governments," it knew that there

25  were Indian tribes at that point, but they chose to go and made

1   a superset of that as well.  And because there is no talismanic

2   or magic words that need to be added, nothing in any federal

3   statute of which I am aware, there is no constitutional

4   provision of which I am aware that says that you have to

5   include the words "Indian tribe" in order to include an Indian

6   tribe in a federal --

7        THE COURT:  No, no.  That, that may be true, but just

8   a few moments ago I saw on my screen, as did you, examples --

9        MR. GOTTLIEB:  Uh-huh (indicating an affirmative

10  response.)

11       THE COURT:  -- around the same time period of where

12  Congress know how to use those words because they did and,

13  and --

14       MR. GOTTLIEB:  But they -- the point here is that

15  Congress made its change in 1994.  All of the case, all of the

16  citations, the statutes that they're looking to are at least 20

17  years junior to that.  Congress wanted a superset that exceeded

18  the words "Indian tribe."

19       Back in 19, back in 1976, 1974, there was no

20  Bankruptcy Code.  It was the Bankruptcy Act of 1898 as changed

21  by the, the Chandler Act of 1938.  The Bankruptcy Code simply

22  did not exist.  In 1994, Congress changed the way it approached

23  this.  It wanted to overrule the idea that sovereign immunity

24  would somehow be utilized to the benefit of, of governmental

25  entities to basically undermine the Bankruptcy Code and the

1    bankruptcy court's jurisdiction.  That is precisely, let me

2    suggest to you, precisely what is being put forth here.  It is

3    precisely the same situation that Congress was looking to over

4    turn, to overrule in both <u>Hoffman</u> and in <u>Nordic Village</u>.

5          From my point of view, your Honor, <u>Ex Parte Young</u> as,

6    as a remedy is a very weak one.  If Congress wanted to do that,

7    if Congress wanted to merely say, "Oh, you can't enforce the

8    automatic stay," it might have said so in legislation.  In this

9    particular case, Congress spoke not only loudly, it spoke with

10   a megaphone saying all, all claims of sovereign immunity are

11   abrogated and essentially did so by using a superset

12   analysis --

13         THE COURT:  But it didn't -- but it didn't say that.

14   It, it made a list and I -- you keep talking about

15   congressional intent and I only get to congressional intent

16   when I can't perceive it from the words of the statute, itself.

17   And when I read this statute -- I, I think you'll agree with me

18   -- the words "Indian tribe" do not exist in the -- in -- in --

19   in 101(27), right?  We agree on that.

20         MR. GOTTLIEB:  Absolutely.

21         THE COURT:  All right.  So how do we -- then it's only

22   through inference or deduction or implication that one could

23   add a, a sovereign, we have to agree that Indian tribes are

24   sovereign, right?  Maybe you don't, but let's start with that.

25         MR. GOTTLIEB:  Okay.

1        THE COURT:  We have -- that -- I would have to infer

2   or imply that entity into that list, correct?

3        MR. GOTTLIEB:  No.  There's actually a case that

4   actually discusses that particular point, your Honor, called In

5   re Russell.  Let's see.  That would be from the District of

6   Arizona, 291 B.R. 34.  And to quote it, your Honor:

7            "Implication and inference are the rhetorical versions

8            of induction, drawing conclusions from examples.  For

9            example, if the last phrase were eliminated in section

10           106(a), one might draw the inference that because

11           sovereign immunity is expressly abrogated as to the

12           United States, the States, the Commonwealths, the

13           Districts, and foreign governments, Congress must have

14           intended to abrogate it as to all governments.  That

15           would be reasoning by implication or by inference.

16           While it might be equally as sound, and in fact how

17           all new knowledge is achieved, it nevertheless retains

18           a possibility of error."

19           However, "because the statute expressly abrogates

20           sovereign immunity as to all domestic governments, the

21           statute applies to Indian tribes by deduction rather

22           than by implication, so the conclusion is not

23           proscribed by the Court's limitations.  In other

24           words, the proscription against abrogation by

25           implication does not require the listing or naming of

1           each government as to which it applies so long as they

2           are unequivocally identified in the statute.":

3           And in this case, that's actually done.

4           THE COURT:  You -- this -- Indian tribes are

5  unequivocally identified in this statute?

6           MR. GOTTLIEB:  As put -- again:

7           "Since the meaning of 'or other foreign or domestic

8           government' cannot include the United States, or a

9           State, or a Commonwealth, Territory or District, or a

10          municipality, as a foreign state, a government or

11          department or any instrumentality, because all of them

12          are expressly mentioned, it is difficult if not to

13          imagine to come up with any other possible meaning for

14          the phrase 'other domestic government' other than

15          Indian tribes.  Without another reasonable plausible

16          alternative to the meaning, the abrogation of

17          sovereign immunity as to all domestic governments is

18          not equivocal. It could hardly be more absolute."

19          THE COURT:  Does -- does -- does the word -- I want to

20  get on to something else here soon, but --

21          MR. GOTTLIEB:  I understand.  I understand.

22          THE COURT:  -- does, does the word "foreign or

23  domestic government" include anything, "domestic government" --

24          MR. GOTTLIEB:  Yeah.

25          THE COURT:  -- include anything other than Indian

**39**

```
 1   tribes?

 2            MR. GOTTLIEB:  I think it could include if we created

 3   a new type of entity.  If, say, the State of, if the City of

 4   New York decided it was going to take over all of Long Island,

 5   let's say, and called it a, the new polity of Nuevo York, which

 6   is not part of the State of New York, but --

 7            THE COURT:  Well, wait, wait, wait.  Let's -- let's

 8   deal --

 9            MR. GOTTLIEB:  I -- I --

10            THE COURT:  Let's deal, let's deal with this planet

11   now --

12            MR. GOTTLIEB:  Okay.

13            THE COURT:  -- for a minute, okay?

14            MR. GOTTLIEB:  Granted, granted.

15            THE COURT:  All right?

16            MR. GOTTLIEB:  But the point of the matter is is that

17   the reason why I believe Congress utilized the language that it

18   chose is because of the fact that it is possible to create new

19   polities, that -- that not -- that a statute should be durable,

20   not just for the here and now in 1994, but for what may exist

21   in the future.  We may have something other than states.  We

22   may have some provinces.  Who knows.  Maybe we'll take over

23   parts of Canada, for all I know, in the future.  Congress --

24            THE COURT:  But right now, right now, or in '94 until

25   now --
```

1          MR. GOTTLIEB:  Yes.

2          THE COURT:  -- then you say that "domestic government"

3    here means nothing other than for, than Indian tribe?

4          MR. GOTTLIEB:  It can be, yes.  I believe it, it must

5    include, necessarily, Indian tribe.

6          THE COURT:  I didn't ask you if it included.  I said

7    is there anything it includes other than an Indian tribe.  And

8    I'm talking about existing entities.

9          MR. GOTTLIEB:  I can't -- well, let me think about

10   that for a moment.

11       (Pause)

12          MR. GOTTLIEB:  It's possible.  I could see -- there

13   are some places -- again, this is more of my own background,

14   your Honor -- but there are places in New York -- in -- upper

15   New York State where the Ashkenazi Jews of, ultra orthodox Jews

16   operate their own state, town governments, but they're not

17   really a town government.  They're actually part of the Rabbi

18   of that ultra orthodox community.  I'm thinking of the Town of

19   Monzi, New York, which is what it's called today, but they

20   don't call it Monzi, New York there.  They're also, they're

21   calling it by another name which is related to their synagogue

22   located in that.  That's based upon their, their religious

23   affiliation, but they treat it as if it were a governmental

24   polity.

25          And so, yes, I believe it can be extended beyond the

1    concept of an Indian tribe and does, in fact, extend beyond

2    that definition of an "Indian tribe" because it would encompass

3    any kind of religious organization that operates any kind of

4    physical control over a territory or a particular area in terms

5    of how it operates, how it grants divorces or family, engages

6    in domestic relations treatment.

7              So, yes, I believe that, that is one example that

8    would go beyond simply Indian tribes.

9              THE COURT:  All right.  Well, I -- I happened to -- I

10   grew up nearby there.  So I, I know --

11             MR. GOTTLIEB:  Ah.

12             THE COURT:  -- I know what you're talking about, but I

13   also know that they, they charge and pay taxes there --

14             MR. GOTTLIEB:  They do, indeed.

15             THE COURT:  -- like everybody else in New York.  So I

16   don't know that that's true.

17             MR. GOTTLIEB:  Well, I pay tax -- my mother pays taxes

18   to the City of New York as well as the State of New York as

19   well as to the Internal Revenue Service, but all those, all

20   three of those entities are separate from one another.  But

21   that -- so that doesn't prevent it.

22             THE COURT:  Why don't you wrap up?  Anything else --

23             MR. GOTTLIEB:  Okay.

24             THE COURT:  -- on, on this point?

25             MR. GOTTLIEB:  My -- I think the most important point

1   to be made here, your Honor, is that sovereign immunity in this

2   context, I think, has some tremendous implications for

3   mischief.  As I mentioned before, allowing the utilization of

4   sovereign immunity as a defense as against the Bankruptcy Code

5   sets up a problem, a systemic problem.  It allows other

6   entities such as pharmaceutical companies to avoid liability by

7   assigning their patents.  It will allow insurance companies and

8   reinsurance companies to avoid liability on a going-forward

9   basis if they resort or transfer or claim they have transferred

10  a certain amount of assets to an Indian tribe by essentially

11  allowing the purchase, if you will, of sovereign immunity.  And

12  if that's the case, your Honor, we're not dealing with

13  sovereign immunity, *per se*.  What we're really dealing with is

14  what sovereign immunity really ought to be about.  Sovereign

15  immunity is about -- if this is about helping Indian tribes, it

16  should be for and to the benefit of the, it should be limited

17  by who is affected by it, namely, the tribal member, and should

18  be limited to the tribal territory.

19          But here, what we're dealing with is a payday entity

20  that is engaging in interstate commerce outside of the, outside

21  of its tribe that does not involve a member of the Tribe.  If

22  my client, if Mr. Coughlin were a member of the Lac du Flambeau

23  Tribe in Wisconsin, he might have rights vis-à-vis that entity,

24  but he doesn't have those rights, quite frankly, with respect

25  to, if he tries to assert a violation of the automatic stay.

1  And I don't believe there is any, any decent reasonable

2  argument in the 21st century that we should pay such deference,

3  even to people that have been so poorly utilized as, as Native

4  Americans, that we should basically abrogate a, the single most

5  powerful consumer protection in the land on the grounds that,

6  well, because we treated these people badly, we can allow them

7  to treat our, the rest of the people that are seeking

8  bankruptcy protection badly.

9        Thank you, your Honor.

10       THE COURT:   Thank you.

11       All right.   You know, because I'll lose track of it in

12  a few minutes, Mr. Rademacher, if you have a response -- I'd

13  like to see it in about two minutes -- I'd give you that chance

14  now.

15       MR. RADEMACHER:   Thank you, your Honor.

16       Just as a clarification, the debtor seems to view the

17  Tribe's argument as the Tribe has more rights or greater rights

18  than other governmental entities.   And that's not, at the end

19  of the day, the argument that we're making.   The Tribe is

20  arguing and pulling from Supreme Court case law that it has a

21  unique relationship with the Federal Government, a, a guardian-

22  ward relationship with the Federal Government, and that because

23  Congress holds tribal sovereignty in its hands, that there

24  needs to be a heightened standard for abrogation of that

25  sovereignty and in the context of abrogation of tribal

1   sovereign immunity, the Supreme Court's test is unequivocal

2   expression of that intention.

3         That is not what we have in the Bankruptcy Code and as

4   the court in <u>Meyers v. Oneida Tribe of Indians of Wisconsin</u> to

5   this point states:

6             "There is not a single 'example in all of history

7             where the Supreme Court has found that Congress

8             intended to abrogate tribal sovereign immunity without

9             expressly mentioning Indian tribes somewhere in the

10            statute.'"

11        The last point I'll make, your Honor, the debtor

12   continues to come back to this argument that "other domestic

13   and foreign governments" must include Indian tribes.  That

14   argument was raised specifically in <u>Meyers v. Oneida Tribe of</u>

15   <u>Indians of Wisconsin</u> and the court responded, the Seventh

16   Circuit responded:

17            "Meyers argues that the district court dismissed his

18            claim based on its erroneous conclusion that Indian

19            tribes are not governments.  Meyers has lost sight of

20            the real question in this sovereign immunity case —

21            whether an Indian tribe can claim immunity from suit.

22            The answer to this question must be 'yes' unless

23            Congress has told us in no uncertain terms that it is

24            'no.'  And as any ambiguity must be resolved in favor

25            of immunity.  Of course Meyers wants us to focus on

1          whether the Oneida Tribe is a government so that we

2          might shoehorn it into FACTA's statement that defines

3          liable parties to include 'any government.'  But when

4          it comes to sovereign immunity, shoehorning is

5          precisely what we cannot do.  Congress' words must fit

6          like a glove in their unequivocality."

7          And, your Honor, they do not in this case.

8          I have nothing further.

9          THE COURT:  All right.  Thank you.

10          All right.  So let's move on, then, to -- Mr. Fairlie,

11  are you up next?

12          MR. FAIRLIE:  Yes, your Honor.  Good afternoon.  Zach

13  Fairlie on behalf of Lendgreen, L.D.F. Business Development

14  Corporation, and LDF Holdings.

15          Your Honor, I do have a PowerPoint presentation that

16  I'd like to put up on the screen, if that's, if that's all

17  right, so I can guide the Court through my argument.  Is that

18  acceptable to the Court?

19          THE COURT:  Yes, it's fine.

20          MR. FAIRLIE:  All right.  Can we see the PowerPoint

21  presentation?

22          THE COURT:  Yes, I see it.

23          Mr. Gottlieb, you can see it?

24          MR. GOTTLIEB:  Yes, I can, your Honor.

25          THE COURT:  All right.  Thank you.

46

1          MR. FAIRLIE:  All right.

2          Your Honor, as stated at the top, there are two

3    threshold issues here, the, the tribal immunity issue and then

4    the second issue, which is the, that the stay motion fails to

5    state a claim for a willful violation of the automatic stay.

6    Mr. Rademacher has, has really covered much of the ground on

7    that first issue and I would just reiterate his comments and

8    arguments, but I do want to add just a couple, a couple points

9    on that.

10          So the, the Tribe has immunity under Supreme Court

11   precedent and unless Congress has expressed an unequivocal

12   intent, the Tribe has immunity from suit. So there's two things

13   to take away from, from that Supreme Court precedent.  No. 1,

14   that the Tribe has immunity and, No. 2, that there's a high

15   standard there.

16          Now again, for the reasons addressed by

17   Mr. Rademacher, the Tribe has immunity.  Lendgreen, BDC, and

18   Holdings are arms of the Tribe.  These are distinct entities,

19   but they are arms of the Tribe and there is case law that

20   establishes that arms of the Tribe also enjoy the immunity of

21   the Tribe.  This is something that's not in dispute.  It's also

22   not in dispute that Lendgreen, BDC, and Holdings are arms of

23   the Tribe; therefore, Lendgreen, BDC, and Holdings are entitled

24   to the Tribe's immunity and the stay motion is subject to

25   dismissal on, on that issue alone.

1          Now, your Honor, putting the immunity issue to the

2    side, there's also an issue with respect to the stay motion in

3    that the, the stay motion fails to state a, a claim for a

4    willful violation of the automatic stay as against BDC,

5    Holdings, and the Tribe.  So, your Honor, to, to be successful

6    in this cause of action the debtor will have to prove by a

7    preponderance of the evidence three elements, No. 1, an act in

8    violation of the stay; No. 2, that the violation was willful;

9    and No. 3, that the debtor suffered damages as a result.

10         So on that third element, your Honor, that really gets

11   to the merits of this action and is something that if there's

12   anything left for this Court to adjudicate after today, there

13   are, there are several issues within that third, within that

14   third element.  But again, we're going to focus on the, the

15   first two elements today, given that we're testing the legal

16   sufficiency of the stay motion accepting the allegations as

17   true.

18         When we look at the stay motion, your Honor, it's

19   clear that it doesn't allege that BDC, Holdings, or the Tribe

20   had knowledge of the bankruptcy.  They weren't listed in the

21   schedules.  They weren't listed in the mailing matrix.  They

22   didn't otherwise receive notice of any of the filings.  In

23   fact, this Court had to direct the debtor to properly serve the

24   stay motion on these respondents per the requirements of Rule

25   9014.  Based on the Certificate of Service that the debtor

1   filed, that didn't happen until May 11, 2020.  And that's at

2   Docket 40.  This is well after any of the alleged acts that

3   form the basis of this stay violation.

4          So given that, your Honor, accepting these allegations

5   as true, the debtor can't prove a necessary element as it

6   relates to BDC, Holdings, and the Tribe.

7          Now when we look at the other element at issue, the

8   act that violates the stay, the stay motion does not allege

9   that BDC, Holdings, or the Tribe placed the alleged phone call

10  or sent the alleged e-mail.  In fact, when we take a closer

11  look at the stay motion it's clear that Lendgreen is the party

12  that the debtor contracted with for this loan.  Lendgreen is

13  the party that the debtor listed in his schedules, listed in

14  the mailing matrix, and sent various filing, filings, including

15  the chapter 13 plan.  These were sent to Lendgreen and

16  Lendgreen is the party that allegedly placed the phone call and

17  sent the e-mail.

18         So the alleged knowledge and, and actions are

19  attributable to Lendgreen, not BDC, not Holdings, not the

20  Tribe.  So accepting the, these allegations as true, the debtor

21  has not stated a claim for relief against BDC, Holdings, or the

22  Tribe.

23         Now in, in an apparent recognition of these fatal

24  flaws the, the debtor attempts to treat these four distinct

25  entities as one.  The problem is the stay motion doesn't state

1   a legal or factual basis for doing so.  In their response, the

2   debtor attempts to bring in entirely new allegations.  He

3   requests that the Court take judicial notice of filings in an

4   unrelated case from four years ago.  Now these filings make

5   allegations regarding Lendgreen's corporate structure and other

6   related structures and ownership of, of Lendgreen and other

7   tribal entities.  But, your Honor, the problem is is that

8   judicial notice is, is merely a shortcut for the introduction

9   of evidence.  It doesn't serve as a substitute for the failure

10  to allege the facts of an initial matter.  And, your Honor,

11  even if this Court were to take judicial notice of these

12  pleadings in an unrelated case, it's unclear what, what

13  relevance these, these facts would have to any sort of legal

14  theory that the debtor has.

15         Now the debtor has attempted to introduce two new

16  legal theories for why he can treat four distinct entities as

17  one.  No. 1, he makes an argument that if an arm enjoys

18  immunity with the Tribe, it can't also enjoy corporate

19  separateness and corporate form, that somehow these two

20  distinct legal, legal ideas are somehow mutually exclusive.

21  The problem is, your Honor, the debtor doesn't cite a single

22  case in support of this theory and the cases that he does cite

23  simply address when an arm of the tribe is entitled to

24  immunity.  They don't address corporate form and corporate

25  separateness should be disregarded, again two separate legal

1    issues that are not, that can't be conflated.

2          The debtor also makes some references to vicarious

3    liability in the response.  The problem is, your Honor, the

4    stay motion is completely devoid of any allegations that would

5    support application of vicarious liability.

6          So in sum, your Honor, there's, there's simply no

7    basis, whether factual or legal, for treating these distinct

8    entities as one.  So --

9          THE COURT:  Well --

10         MR. FAIRLIE:  -- we go back to --

11         THE COURT:  -- I, I don't know that it's been raised

12   directly, but it's, it's, to me, almost a judicial estoppel

13   kind of an argument, you know, that it can't be that the same

14   parties can say on the one hand, "We are arms of and,

15   therefore, enjoy the benefit of an immunity because we are so

16   closely connected to that entity to enjoy that immunity," but,

17   on the other hand, "We're not responsible for what those other

18   arms did."

19         Isn't that -- isn't that -- isn't that argument --

20   doesn't that run afoul of, of judicial estoppel?

21         MR. FAIRLIE:  Well, your Honor, my recollection of

22   judicial estoppel is, is, really, that a party is not allowed

23   to make a representation to a court that the court then relies

24   on and then the party in another action or in the same action

25   then takes a different position from the previous.  And really,

1   judicial estoppel is to prevent frauds on the court.  To me,

2   that, those seem like different, different ideas.

3          THE COURT:  I'm, I'm sorry.  I think, I think you did

4   a nice job of stating the principle, but I'm not seeing why it

5   doesn't apply here.

6          MR. FAIRLIE:  Well, your Honor, we're not asking the

7   Court to, to accept one position, one characterization of facts

8   and then get the Court to rule on that and then later coming

9   back to the Court and reversing course because it somehow

10  benefits the Tribe to do so.  In fact, we're, we're explaining

11  to the Court that there is, there is tribal immunity.  The

12  Tribe has immunity.  These entities are arms of the Tribe and

13  that's something that the debtor doesn't contest.  They are

14  arms of the Tribe and notwithstanding that tribal immunity

15  issue, there are also issues in the stay motion itself in that

16  he doesn't even allege that these other separate entities

17  committed these acts or had knowledge.

18         Now I understand that there is an argument that

19  because they're close for purposes of determining tribal

20  immunity that we, that maybe we should disregard corporate form

21  or corporate separateness.  The problem is there isn't a single

22  case that is cited for that proposition.  Again, these are two

23  separate issues and disregarding -- and there's a presumption

24  that entities retain their corporate form unless there is some

25  sort of justification for a court to disregard that form.  And

1    frankly, the stay motion doesn't even mention disregarding

2    corporate form or disregarding corporate separateness.

3         THE COURT:  Right, and the exception to that rule is

4    that where it would be inequitable to fail to recognize or

5    where it would be inequitable to allow separateness, then the

6    Court can ignore those, those, those lines.  That's what the

7    law is, right?

8         MR. FAIRLIE:  And, your Honor, my understanding of, of

9    examples of, of cases where there is inequity, it's cases where

10   the corporate form really wasn't even maintained or a, an

11   entity was purposely (distortion) to avoid liability.  And, and

12   frankly, those, those allegations are, again, completely

13   missing from, from this case.  There aren't any allegations

14   that it would be inequitable to, to allow these entities to

15   retain their corporate separateness.

16        THE COURT:  All right.  Go ahead.

17        MR. FAIRLIE:  Well, your Honor, with that, the, the

18   second issue of the failure to state a claim for relief against

19   these respondents, this is an additional issue that allows the

20   Court to dismiss the stay motion with respect to BDC, Holdings,

21   and the Tribe, but, of course, there's also the first issue,

22   which is tribal immunity which allows this Court to dismiss

23   this entire action with respect to all of the respondents.

24        THE COURT:  That's, you know, that's an interesting

25   point.  I led off with that today.  If I were to act to deny

**53**

1   the motion on the basis that you ask me to, aren't I exercising

2   jurisdiction?

3          MR. FAIRLIE:  Yes.

4          THE COURT:  So I wouldn't have to -- I would have to

5   find first that, that, that there is not immunity, that it's

6   abrogated.  Otherwise, I shouldn't even get to this, right?

7          MR. FAIRLIE:  That's correct, your Honor.  I think the

8   rule under 12(b)(6), there's, there's the initial step of, of

9   determining whether or not there is, there is subject matter

10  jurisdiction as --

11         THE COURT:  Right.

12         MR. FAIRLIE:  -- it's been raised under 12(b)(1).

13         So, yes, your Honor, I think that that, that framework

14  is correct.

15         THE COURT:  Okay.  All right.

16         All right, Mr. Fairlie.  Anything else?

17         MR. FAIRLIE:  Nothing from me, your Honor.

18         THE COURT:  All right.  Thank you.

19         Mr. -- Mr. --

20         Could you take that down so I get a better look at

21  Mr. Gottlieb.

22         There you are.

23         MR. GOTTLIEB:  I, I'm surprised that you want to get a

24  better look at me, your Honor.

25         THE COURT:  I want to keep an eye on you.

1        MR. GOTTLIEB:  Yes.  I, I know.  I know.  I'm, I'm

2   wayward.  I, I acknowledge my sins, your Honor.

3        Well, treating this as a motion to dismiss in the

4   classic 12(b)(6) sense of the, of the idea requires that the

5   Court make a determination as to whether or not my client has

6   proposed, or has submitted a, a plausible claim and in so doing

7   -- and again, I know I'm not telling you anything that you

8   probably don't already know -- the, you have to assume that all

9   of the allegations are true, even those that are doubtful, in

10  fact, and a well-pled case requires a complaint with enough

11  factual matter taken as true to have a claim to, a claim for

12  which relief can be sought.

13        In this particular case -- and I think this is the

14  interesting part -- on the one hand, you have Lendgreen, which

15  I have described as an arm of this Tribe and all of the

16  intermediate entities between the Tribe and Lendgreen.  It is

17  simply one single unified unit.  I believe -- and I think it's

18  appropriate under the circumstances -- to ask the question what

19  does it, in fact, mean to be an arm of the Tribe?  As it turns

20  out, the court, the First Circuit in <u>Ninigret</u> felt that being

21  an arm of the tribe was such an integral concept that they

22  basically treated the instrumentality -- in that case it was a

23  housing authority -- and the entity, and the tribe itself as

24  one entity for all the purpose, for all intents and purposes.

25  Indeed, your Honor --

1     THE COURT:  Let me, let me ask you this and see if it

2   cuts things short.

3     MR. GOTTLIEB:  Go right ahead.

4     THE COURT:  Do you concede -- boy, I hate to ask you

5   that -- but --

6     MR. GOTTLIEB:  Okay.  Don't ask me if it concedes.

7     THE COURT:  I won't ask you to concede anything,

8   but --

9     MR. GOTTLIEB:  Okay.

10     THE COURT:  -- if I find that sovereign immunity has

11  not been abrogated, if I find that, it, it, it follows, then,

12  from your other arguments that it applies to each of these

13  entities, right?

14     MR. GOTTLIEB:  It would seem to at that point, your

15  Honor, because I have made the argument -- I'm -- in this

16  particular case, it, it's interesting.  I have asserted that

17  all of these entities are, in fact, one entity for all intents

18  and, for all legal purposes in this proceeding.  So, yes, what

19  you're saying is, in fact, correct because I'm not

20  distinguishing between the Tribe on the one hand, BDC,

21  Lendgreen, or the intermediate entities on the other.  They're

22  all of a, they're all of a piece.

23     So if you were to find that sovereign immunity is not

24  abrogated and that the Tribe is entitled to sovereign immunity,

25  then, yes, I believe that that then goes to the question of

1   whether or not the bankruptcy court has jurisdiction.  I'm not

2   so certain that -- and I, with all due respect to, to my

3   brother, Mr. Rademacher -- I don't believe that the fact that

4   sovereign immunity may apply in this particular case deprives

5   this Court of subject matter jurisdiction under the

6   circumstances of this particular case.  I believe that there is

7   an independent basis for subject matter jurisdiction pursuant

8   to section 1334 of Title 28.  Because there can be no doubt

9   that a motion to enforce the automatic stay or a motion related

10  to the automatic stay or the granting of relief regarding the

11  automatic stay certainly is a core proceeding under section

12  157(b) of Title 28 and, therefore, is treated as a, a matter

13  that the bankruptcy court has, if not exclusive subject matter

14  jurisdiction, co-equal subject matter jurisdiction on an

15  independent basis with the United States District Court.

16         So I believe that in the final analysis, although they

17  can frame it as a motion under 12(b)(1) for lack of subject

18  matter jurisdiction, I think that under the circumstances, your

19  Honor, that it's best looked at not so much as a matter of

20  subject matter jurisdiction because I'm not asserting a state

21  law claim in a federal forum in that regard, which the, there,

22  there is no diversity of jurisdiction and no independent

23  federal question involved.

24         Here, there is an independent basis of jurisdiction

25  and for that reason I believe that it's more appropriate to

1   view the assertion of sovereign immunity or tribal immunity,

2   more appropriately, as an affirmative defense, as this Court

3   originally viewed when we had our preliminary hearing.

4          THE COURT:  Well, I think that's, you know, 1334

5   allocates, divides responsibility for bankruptcy matters, is

6   really what it does.  If there's immunity, then I can't take, I

7   can't go any further if there's an immunity that applies to a

8   particular entity.  It, it ends my ability to enter any orders

9   with respect to that entity.  What else could it mean?

10         MR. GOTTLIEB: It could mean, as I said, your Honor,

11   that although the Court has jurisdiction with respect to the

12   underlying cause of action, that the, the defense asserted of

13   sovereign immunity.  Sovereign immunity, as we, as I think that

14   even my, my opposing parties will agree, is something that's

15   waivable and because it's waivable, your Honor, it's not in the

16   nature, it's not jurisdictional, *per se*, but, rather, more in

17   the nature of an affirmative defense that can, in fact, be

18   waived.

19         THE COURT:  Well, I, I looked at that earlier.  I

20   don't know that it was raised very, very much, but I, or by

21   these papers, but I came -- I -- my, my independent research

22   came out -- has this been briefed?  Do I have this?

23         MR. GOTTLIEB:  I'm sorry.  I don't, I don't understand

24   your -- when you say "this," you're talking about the question

25   of whether or not this --

1          THE COURT:  It's jurisdictional.

2          MR. GOTTLIEB:  I don't believe it's actually been

3   briefed, your Honor.  I'm sorry.  At least I --

4          THE COURT:  Mr. Rademacher, is --

5          MR. GOTTLIEB:  -- I didn't write it in that regard.

6          THE COURT:  Mr. Rademacher, is that, it's been

7   briefed?

8          MR. RADEMACHER:  Your Honor, we did brief this in our

9   principal brief.  We cited to -- I'll have to look back at my

10  argument again -- but we cited to Valentin v. Hospital Bella

11  Vista and a number of district court cases that have assessed

12  questions of sovereign immunity under Rule 12b(1).

13         THE COURT:  Okay.  All right.

14         All right.  I don't know if you responded to that, but

15  you've just told me, otherwise.  I don't know if you have any

16  support for that, Mr. Gottlieb.

17         MR. GOTTLIEB:  At this point, your Honor, I have not

18  had a chance to do the legal research on that particular matter

19  or to look at the Valentin case that's being cited, your Honor,

20  because, to be perfectly honest, I thought this matter had, in

21  fact, been discussed by you with respect to the last hearing

22  that we had.

23         THE COURT:  I don't know what you mean by that.

24         MR. GOTTLIEB:  During the last hearing you had

25  commented when it was claimed, the assertion of sovereign

1 | immunity, they had said it was a 12(b)(1) subject matter

2 | jurisdiction matter and you had said, "No, no, no.  I, I

3 | believe that's more in the nature of an affirmative defense."

4 | I distinctly remember that from the, I believe it was early on

5 | in either late July or early August when we had our last

6 | hearing, your Honor.

7 |        THE COURT:  All right.  Well, I --

8 |        MR. GOTTLIEB:  Or maybe it was early July, now that I

9 | think about it.  It's been a while.

10 |        THE COURT:  Yeah.  I, I certainly didn't make a

11 | ruling.

12 |        MR. GOTTLIEB:  I understand.

13 |        THE COURT:  All right.  Anything else on, on this

14 | issue, the 12(b)(6) side of this question?

15 |        MR. GOTTLIEB:  The 12(b)(6) side of this, I believe

16 | that the, the information that I've been able to glean from the

17 | U. S. District Court case of <u>Walker v. Lendgreen</u> shows that as

18 | a practical matter, not just simply as a matter of simply being

19 | an arm of the Tribe, but as a practical matter, as a legal

20 | matter, these entities are, in fact, all of a piece.  They've

21 | said that it's -- I have -- that we haven't shown any evidence

22 | that there is anything inequitable about this kind of

23 | arrangement.  I beg to differ.  The way this, Lendgreen was

24 | created, as shown in the, my response brief, starting on Page

25 | 15, the Tribe was incorporated, you know, and created not under

1    any state law, but by, under tribal law and that it was to be

2    wholly owned by BDC, which, in fact, is wholly owned by the

3    Tribe, that it states in the, I guess, the Articles of

4    Organization, what we would call the Articles of

5    Organization/the operating agreement, that the, that:

6              "The company shall be treated as a 100 percent

7              tribally owned and operated company for federal and

8              state law purposes, including all tax purposes under

9              the exclusive ownership, control, and jurisdiction of

10             the Lac du Flambeau Band of Lake Superior Chippewa

11             Indians."

12             Moreover -- and I think this is, becomes very

13   important -- whenever there's a cash account balance of

14   Lendgreen that exceeds $500, all -- the -- Lendgreen is

15   required by its, by its operating agreement to upstream a

16   dividend back to the Tribe immediately.

17             So therefore, your Honor, at any given point in time

18   all of the money, save 500 bucks, is being transferred, all

19   profits are being transferred up to this Tribe so that in the

20   event that I were able to get a, a judgment against Lendgreen

21   itself, Niiwin, LLC, it would be worthless beyond $500 because

22   they operate this entity essentially all but, as a mere

23   instrumentality and to be able to assert sovereign immunity or

24   claim sovereign immunity and even under the loan agreement that

25   has been cited provides that:

1       "This loan agreement and all related documents are

2       being submitted as an economic arm, instrumentality,

3       and limited liability company of the Tribe.  Because

4       we and the Tribe are entitled to sovereign immunity,

5       you will be limited as to what claims, if any, you may

6       assert against the Tribe and us.  To encourage

7       resolution, any complaint may be submitted by you to

8       the Tribe for, as listed below."

9       For the provisions that talk about preservation of

10      sovereign immunity:

11      "It is the express intention of the Tribe and us as an

12      economic arm of the Tribe can fully preserve and not

13      waive, either in whole or in part, exclusive

14      jurisdiction," sovereign immunity -- "sovereign

15      governmental immunity" -- this is their language --

16      "and any other rights, titles, and privileges and

17      immunities to which we and the Tribe are entitled.  To

18      protect and preserve the rights of the parties, no

19      person may assume a waiver of sovereign immunity.  No

20      waiver is or can be made except by express written

21      declaration" -- and this is interesting -- "of the

22      Tribe's tribal council respecting, specifically

23      authorizing the waiver of the matter in question."

24      Well, if this entity is completely separate and

25 distinct from the Tribe, which I don't believe is the case,

1   then why is it that the, that the only entity that can waive

2   sovereign immunity happens to be not so much the arm of the

3   Tribe, if you will, not Niiwin, not Lendgreen, but, rather,

4   it's the Tribe's tribal council?

5         So, in any event, the Tribe in this particular case,

6   in all cases, actually, asserts overpowering control of this

7   entity.  It is, therefore, inequitable to say, well, gee whiz,

8   the Tribe has given them, has given Niiwin its *imprimatur* of

9   sovereignty.  So this Court can't exercise jurisdiction over

10  what, for all outward appearances, is a payday lender that's

11  engaging in interstate commerce.

12        Taking that as a whole, your Honor, I believe that

13  there is a plausible claim and that when you get past the

14  question of sovereign immunity *vel non* that in point of fact

15  there is a plausible claim to be made against all of these

16  entities precisely because of the fact that they are all of a

17  piece, that as an arm of the Tribe they cannot have their cake

18  and eat it, too.  They cannot claim corporate separateness on

19  the one hand and claim to be an arm of the Tribe for the

20  purposes of sovereign immunity on the other.  The factors set

21  forth in <u>Breakthrough Management</u>, which is cited in that small

22  brief, surreply brief that I sent on Friday, your Honor, sets

23  forth -- and if you just look at the factors themselves that

24  they're utilizing, it would be very similar to the same factors

25  that one would see if we were looking at a traditional piercing

1 | of the corporate veil.

2 | I will leave it at that, your Honor.

3 | THE COURT:  All right.  Thank you.

4 | Mr. Fairlie, anything, anything else?

5 | MR. FAIRLIE:  Your Honor, very quick.

6 | Regarding the, the suggestion that the corporate

7 | structure is somehow inherently inequitable as it relates to

8 | the debtor here, it's important to keep in mind that we're here

9 | to test the sufficiency of the stay motion.  There's absolutely

10 | nothing in the stay motion regarding the corporate structure

11 | of, of the entities here and how that structure is inequitable.

12 | In fact, the stay motion, I believe, acknowledges that these

13 | entities are wholly owned, but that's where it leaves it. It

14 | doesn't say that there's anything about that structure that is

15 | somehow inherently inequitable.

16 | And the idea that we can judicially notice that,

17 | several pages of, of exhibits in an unrelated case from four

18 | years ago, those aren't allegations.  Those aren't in the stay

19 | motion.  They shouldn't be considered.

20 | The, the other point that, this narrative of you can't

21 | have your cake and eat it, too, again, these are conflating two

22 | distinct concepts, tribal immunity of an arm on the one hand

23 | and corporate separateness and corporate form on the other and

24 | then, also, the exceptions of when those will be disregarded.

25 | These are being conflated and the debtor hasn't cited a single

64

1   case on that point where, that you can't have your cake and eat

2   it, too.  There's just, there, there isn't a single case cited.

3   The, the case cited by the debtor is only regarding when an arm

4   of the tribe is entitled to immunity.  It goes through that

5   analysis.  It doesn't address anything to do with disregarding

6   corporate form or disregarding corporate separateness.  Again,

7   there's a presumption that corporate entities are entitled to

8   separateness unless and until there is a legal and/or factual

9   basis for disregarding that separateness or form.  And when we

10  look at the stay motion, it's completely void of any legal or

11  factual basis for disregarding corporate form or disregarding

12  corporate separateness.

13          Thank you, your Honor.

14          THE COURT:  All right.  Thank you.

15          All right.  Is there anything else?

16          MR. GOTTLIEB:  I don't believe so, your Honor, unless

17  you want to take up the matter of the motion to strike.

18          THE COURT:  No.  I -- I'm -- I'm not going to go back

19  to that now.  I --

20          MR. GOTTLIEB:  Okay.

21          THE COURT:  I, I don't need to hear more on it.  I'll

22  issue a ruling with respect to it, okay?

23          MR. GOTTLIEB:  Very good, your Honor.

24          THE COURT:  All right.  Thank you all for attending

25  today.

1        MR. GOTTLIEB:  Thank you, your Honor.

2        MR. FAIRLIE:  Thank you, your Honor.

3        THE COURT:  All right.

4        MR. RADEMACHER:  Thank you, your Honor.

5        THE COURT:  Have a --

6        MS. WALKER:  Thank you, your Honor.

7     (Proceedings concluded at 3:46:34 p.m.)

8

9

10

11

12                        CERTIFICATE

13        I, court approved transcriber, certify that the

14    foregoing is a correct transcript from the official electronic

15    sound recording of the proceedings in the above-entitled

16    matter.

17    /s/ *Janice Russell*                    January 19, 2021

18    Janice Russell, Transcriber                    Date

19

20

21

22

23

24

25