UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

In re
BRIAN W. COUGHLIN,
                              Debtor

IN PROCEEDINGS UNDER
CHAPTER 13
CASE NO. 19-14142-FJB

## SECOND AMENDED MOTION OF THE DEBTOR TO ENFORCE THE AUTOMATIC STAY AND FOR SANCTIONS

The Debtor, Brian W. Coughlin, hereby moves, pursuant to 11 U.S.C. §§ 362(a)(6) and 362(k)(1), for an Order enforcing the automatic stay as against Niiwin, LLC doing business as Lendgreen and its parent entities, LDF Holdings, LLC, Lac du Flambeau Business Development Corporation and the Lac du Flambeau Band of Lake Superior Chippewa Indians; and 4Finance, S.A. of Latvia, together with its putative subsidiaries or affiliates Vivus Servicing, Ltd., GMLA Trading, Ltd. of Malta, and 4Finance Malta, Ltd. The Debtor requests that the Court determine that the the Tribal Respondents and the Non-Tribal Respondents have willfully violated the automatic stay, and award the Debtor compensatory damages, punitive damages, and attorneys' fees and expenses as the Court deems appropriate under the circumstances. As grounds therefor, the Debtor states as follows:

## IDENTIFICATION OF PARTIES AND BASIS OF JURISDICTION

1.      The Debtor, Brian W. Coughlin, filed his Voluntary Petition under Chapter 13 of the Bankruptcy Code on December 4, 2019.

2.      Niiwin, LLC, which does business under the name "Lendgreen," is a direct creditor of the Debtor.  Upon information and belief, Lendgreen is a business

entity formed under the laws of the Lac Du Flambeau Band of Chippewa Indians (the "Tribe").  Lendgreen's mailing address, as shown in communications to the Debtor, is P.O. Box 221, Lac Du Flambeau, Wisconsin 54538.

3.      LDF Holdings, LLC ("Holdings"), holds itself out as Lendgreen's parent entity. Upon information and belief, Holdings is a business entity formed under the laws of the Tribe.  For reasons set forth below, the Court should disregard the putative separateness of Holdings and Lendgreen under the doctrine of alter ego liability, or should attribute Lendgreen's actions to Holdings under the doctrine of agency or otherwise.  Accordingly, Holdings is a direct and/or indirect creditor of the Debtor.

4.      Lac du Flambeau Business Development Corporation ("BDC"), holds itself out as Holdings' parent entity.  Upon information and belief, Holdings is a business entity formed under the laws of the tribe.  For reasons set forth below, the Court should disregard the putative separateness of BDC and Holdings under the doctrine of alter ego liability, or should attribute Holdings' actions to BDC under the doctrine of agency or otherwise.  Accordingly, BDC is a direct and/or indirect creditor of the Debtor.

5.      The Tribe is a federally-recognized tribal entity, located in Lac Du Flambeau, Wisconsin, which holds itself out as the owner of BDC.  For reasons set forth below, the Court should disregard the putative separateness of the Tribe and BDC under the doctrine of alter ego liability, or should attribute BDC's actions to the Tribe under the doctrine of agency or otherwise.  Accordingly, the Tribe is a

direct and/or indirect creditor of the Debtor.  Upon information and belief, the

offices of the Tribe that relate to this matter have an address of 597 Peace Pipe

Road, 2nd Floor, Lac du Flambeau, Wisconsin 54538.

6.     The Tribe, and, to the extent they are deemed to be separate entities, each of

Lendgreen, Holdings, and BDC (collectively, the "Tribal Respondents"), are

"governmental units" within the meaning of 11 U.S.C. § 101(27).  By operation

of 11 U.S.C. § 106(a)(1), none of the Tribal Respondents enjoys any form of

common-law sovereign immunity from this proceeding under 11 U.S.C. § 362.

7.     4Finance, S.A. of Latvia ("4Finance") is a corporate entity engaged in the

business of Internet-based high-interest rate small-loan lending, with its primary

place of business at Lielirbes iela 17A–46, in Riga, LV-1046, Latvia.

8.     Vivus Servicing, Ltd ("Vivus") is a corporate entity engaged in the business of

loan servicing, with its primary place of business located at 1320 Cornwall Road,

Suite 204 in Oakville, Ontario, L6J7W5 in Canada.  Upon information and belief,

to the extent that it is deemed to be a separate entity from Vivus, 4Finance owns

Vivus directly or indirectly.  For reasons set forth below, the Court should

disregard the putative separateness of 4Finance and Vivus under the doctrine of

alter ego liability, or should attribute BDC's actions to the Tribe under the

doctrine of agency or otherwise

9.     GMLA Trading, Ltd. of Malta ("GMLA"), upon information and belief, is a

corporate entity formed under the laws of Malta and engaged in the business of

lending.  Upon information and belief, GMLA is registered with the nation of

Malta as having an address of 40, Villa Fairholme, Sir Augustus Bartolo Street, in Ta' Xbiex XBX 1095, in Malta.

10.     4Finance Malta, Ltd. ("4Finance Malta"), upon information and belief, is a corporate entity owned and controlled by 4Finance.  Upon information and belief, 4Finance Malta is registered with the nation of Malta as having the same address and same legal representative as GMLA.

11.     The Court's jurisdiction is authorized under 28 U.S.C. §§ 1334(b) and 157(b)(1), as matters concerning the administration of the bankruptcy estate are specifically designated as "core proceedings", pursuant to 28 U.S.C. § 157(b)(2)(A).

## STATEMENT OF FACTS APPLICABLE TO ALL COUNTS

### a. *Background Concerning the Tribal Respondents*

12.     On or about August 27, 2012, according to the Tribe's Resolution No. 370(12), attached as Exhibit "A," and BDC's Articles of Incorporation, attached as Exhibit "B", the Tribe incorporated BDC, listing the Tribe as the "owner" of BDC, and listing the business mailing address and principal office of BDC as 418 Little Pines Road, P.O. Box 67, Lac du Flambeau, Wisconsin 54538.

13.     On or about December 17, 2012, according to the Tribe's Resolution No. 550(12), attached as Exhibit "C" on or about December 17, 2012, the Tribe approved the creation of Holdings and Lendgreen, among other entities.  Upon information and belief, the purpose of the creation of Holdings and Lendgreen was to engage in Internet pay-day lending operations.

(a)      Resolution No. 550(12) states that the creation of Holdings and

Lendgreen, among other entities, is an exercise of the Tribal Council's power to

"create subordinate business entities cloaked with sovereign immunity as an arm

of the Tribe."

(b)      Resolution No. 550(12) defines the term "Corporation" to refer to BDC

and states that Lendgreen shall be "wholly owned by the Corporation for purposes

of operating one or more Tribal lending business(es) and any activity directly

related to such purpose."

14.      On or about January 9, 2013, the Tribe and BDC issued "Articles of

Organization" for Niiwin, LLC (that is, Lendgreen), attached as Exhibit "D".  As

set forth below, the Articles of Organization contemplated that the Tribe and BDC

would directly incorporate and control Lendgreen, with no mention of Holdings.

(a)      The preamble of the Articles of Organization states that the "incorporator"

of Lendgreen is the "undersigned."  The only signature on the Articles of

Organization is that "Tom Maulson," who is identified as the "President" of the

"Lac du Flambeau Band of Lake Superior Chippewa Indians."

(b)      Article 2 of the Articles of Organization identifies the "registered office"

of Lendgreen is "418 Little Pines, PO Box 67, Lac du Flambeau, WI 54538,"

which is the address of BDC.

(c)    Articles 3 and 7 of the Articles of Organization identify BDC as the

"Member" and "statutory agent" for Lendgreen.  Article 7 also repeats the same

address for BDC as that given for Lendgreen's "registered office."

(d)    Article 6 of the Articles of Organization states that "[m]anagement of the

limited liability company is vested in a single Manager as appointed or hired by

the Member," but with the proviso that "[t]his role may also be filled by a

management contractor should the Company so desire," and that the "[d]uties and

responsibilities of the Manager shall [be] defined by the Company's Operating

Agreement."  There is a Manager named in the Articles of Organization, but the

name of the originally named Manager is not known to the Debtor because it has

been redacted from the only version of the Articles of Organization that the

Debtor has been able to obtain.

15.    On July 17, 2013, Holdings and Lendgreen entered into an Operating

Agreement, attached as Exhibit "E".  As set forth below, the Operating

Agreement contains inconsistent references to the entities that owned and

controlled Lendgreen, referring at times to ownership and/or control by each of

the Tribe, BDC, and Holdings.

(a)    Section 1.2 of the Operating Agreement states that Lendgreen "shall be

treated as a 100% tribally-owned and operated company, for federal and state law

purposes, including all tax purposes, under the exclusive ownership, control and

jurisdiction of the Lac Du Flambeau Band of Lake Superior Chippewa Indians"

and "[n]o Member or Manager shall take any action inconsistent with the express intent of the parties thereto."

(b)     Section 1.7 of the Operating Agreement states that Holdings is the "sole Member" of Lendgreen.

(c)     Section 1.9 of the Operating Agreement defines the term "Member" to "mean the Lac du Flambeau Business Development Corporation," that is, BDC.

(d)     Section 1.9 also names a "Manager" of Lendgreen, but the name of the Manager has been redacted from the only version of the Operating Agreement that the Debtor has been able to obtain.  Other documents produced by the Tribal Respondents identify Lendgreen's Manager as Triaxx Management, LLC.

(e)     Section 2.1 of the Operating Agreement states that Lendgreen was capitalized with only the sum of $100.00.

(f)     Section 2.4 of the Operating Agreement further states that "[n]o Manager shall have the right to withdraw or distribute Capital Contributions except as specifically provided in this Agreement."

(g)     Section 3.2 of the Operating Agreement states that certain actions shall require "written consent from the Member, and in some instances its parent corporation the LDF Business Development Corporation," that is, BDC.

(h)     Section 6.2 of the Operating Agreement, entitled "Mandatory Distributions," states that "[t]here shall at all times remain $500 in [Lendgreen's]

cash accounts." and that "[w]henever the cash account balance exceeds said amount there shall be an immediate Distribution declared and paid unless the liabilities of [Lendgreen] are in excess of the assets."

(i)      Section 7.1 of the Operating Agreement states that Lendgreen "at all times shall be owned exclusively by the Lac du Flambeau Business Development Corporation," that is, BDC.

16.   At oral argument before the United States Supreme Court, counsel for the Tribe, BDC, Holdings, and Lendgreen, in response to a question from Justice Alito about "the relationship between the tribe and Lendgreen loans," stated that Lendgreen was "a true tribal business" with its "headquarters on the reservation," with "50 to 60 employees," and with "money [that] comes from the tribe, tribal accounts."  An except from the transcript is attached as Exhibit "F".

### b.   *Background Concerning the Non-Tribal Respondents*

17.   The dates of incorporation of 4Finance, Vivus, 4Finance Malta, and GMLA are not known to the Debtor.  Upon information and belief, 4Finance, Vivus, 4Finance Malta, and GMLA, to the extent they are deemed to be separate entities, are under common ownership and control.

18.   On or about August 5, 2013, Lendgreen and Vivus entered into a Servicing Agreement, attached as Exhibit "G".  As set forth below, the purpose of the Servicing Agreement was to authorize Vivus to make and collect high-interest, short-term loans over the Internet in Lendgreen's name, to retain almost all of the

profits from those loans, and to assert the Tribe's purported immunity in response to any legal or regulatory challenges to that conduct.

(a)      Section 1.2 of the Servicing Agreement describes the purpose of LDF and Lendgreen as being "to engage in internet-based consumer loan business and services."

(b)      Section 1.6 of the Servicing Agreement states that Lendgreen "desires to grant Servicing Agent [that is, Vivus] the exclusive right to administer and service . . . Loans on behalf of" Lendgreen."

(c)      Section 2.9 of the Servicing Agreement identifies GMLA as the "Lender" for the loans made under that Agreement.

(d)      Section 2.15 of the Servicing Agreement gives Vivus the right to approve all of Lendgreen's "Operating Expenses" in writing.

(e)      Sections 2.16 of the Servicing Agreement, together with Sections 5.1 through 5.3, gives Vivus the right to a "Servicing Fee" substantially equal to Lendgreen's entire "Gross Revenues less . . . Operating Expenses."  Beyond those expenses, Lendgreen receives a miniscule fee of $3.25 for each loan and each loan payment.

(f)      Section 4.1 of the Servicing Agreement declares "[a]ll business and affairs in connection with the administration and servicing of [Lendgreen's] Loans . . . [to] be the responsibility of" Vivus, and "grant[s]" to Vivus "the necessary power and authority to act, in order to fulfill its responsibilities under this Agreement."

(g)    Section 4.2.1 of the Servicing Agreement states that Vivus's "duties shall include, but not be limited to" matters including "collection of payments"; "collection and administration of delinquent Loans and bad debt"; and "respond[ing] or ensur[ing] a timely response to all customer, legal and regulatory inquiries."

(h)    Section 4.5.1 of the Servicing Agreement provides that Lendgreen "shall actively and vigorously prosecute or defend any and all regulatory or litigation proceedings that may challenge or affect the sovereign status of [Holdings] or [Lendgreen] and instrumentalities of the tribe."

(i)    Section 9.1 of the Servicing Agreement requires not only "the written approval of the Manager" but also a "duly enacted resolution of LDF and BDC" as "evidence[]" of any "approval or consent or other action" of Lendgreen.

(j)    The signature on behalf of Vivus on the Servicing Agreement is by Mark Bettiol, who is identified as Vivus's "President."

(k)    Exhibit "A" to the Servicing Agreement states that "the Tribe or . . . Holdings" will, "[i]n most cases" be the ones to provide "responses" to "any regulatory bodies" who make inquiries about Lendgreen's operations.

19.    The original term of the Servicing Agreement was for three years, with automatic renewals for periods of two years.  On September 8, 2017, Lendgreen and Vivus agreed that the Servicing Agreement would terminate on August 2, 2019.  The Amendment setting this termination date, which is attached as Exhibit "H"

identifies Holdings (not Triax Management, LLC as listed in Section 2.13 of the

Servicing Agreement) as Lendgreen's Manager.

20.     On October 22, 2019, Lendgreen and Vivus further agreed to retroactively extend

the termination date of the Servicing Agreement to December 31, 2021.  Holdings

again signed as Lendgreen's Manager.

21.     Upon information and belief, at or around the time that the Servicing Agreement

was signed, Lendgreen and Holdings entered into a Loan Agreement with GMLA

consisting of a revolving credit promissory note and security agreement, the

proceeds of which the Tribal Respondents used as working capital for Lendgreen.

22.     Upon information and belief, the management, personnel, and operations of

4Finance and Vivus are intertwined, and no real separation exists between the

two.  In particular, the following facts were revealed in discovery or discovered

by Counsel through research based on discovery responses:

(a)     A profile on recruitment site "indeed.com," apparently posted by 4Finance

to solicit employees, describes Vivus as "the Canadian/US Headquarters for

4Finance Group."  A copy of this profile is attached as Exhibit "I".

(b)     Mark Bettiol, who signed the Servicing Agreement for Vivus, is identified

in a Dun & Bradstreet Company Report as a or the "Principal" of 4Finance.  A

copy of this report is attached as Exhibit "J".

(c)     Lyubov Tsap, who is one of the individuals who made unlawful collection

attempts on behalf of Lendgreen (a function assigned to Vivus under the

Servicing Agreement) is publicly identified on LinkedIn and elsewhere as an employee of 4Finance.  Copies of documents so identifying Tsap are attached as Exhibits "K" and "L".

(d)      Emails produced by the Tribal Respondents in discovery show that to obtain information about Coughlin's allegations that he had been improperly contacted, representatives of Holdings (rather than Lendgreen) directly contacted representatives of 4Finance (rather than Vivus), with no one identified as an employee of Lendgreen or Vivus playing any role in the communications.  A copy of the relevant email chain is attached as Exhibit "M".

c.      ***The Debtor's Loan and Respondents' Violation of the Automatic Stay***

23.      Prior to the Debtor's Chapter 13 bankruptcy filing, the Debtor obtained an unsecured "payday" loan from Lendgreen, and owed,.as of the date of the commencement of this Chapter 13 case $1,594.91 (the "Claim").

24.      Lendgreen was listed on the Debtor's Schedule of Unsecured Debts (Schedule "E/F") as Item 4.17 listing the Creditor as "Lend Green", with a mailing address of P.O. Box 221, Lac Due Flambeau, Wisconsin 54538 and listed the last 4 digits of the account number relating to said claim of 3572.  The relevant portion of the Debtor's Schedule "E/F" is attached hereto as Exhibit "N".

25.      As a consequence of the Debtor's scheduling of Lendgreen's claim,  Lendgreen was properly listed on the Debtor's Mailing Matrix with a mailing address of P.O.

Box 221, Lac Due Flambeau, Wisconsin 54538.  The relevant portion of the

Debtor's Mailing Matrix is attached hereto as Exhibit "O".

26.     On December 4, 2019, Debtor's Counsel served the Debtor's Original Chapter 13

Plan upon Lendgreen at its mailing address of P.O. Box 221, Lac Due Flambeau,

Wisconsin 54538 and filed a Certificate of Service regarding the Debtor's

Original Chapter 13 Plan reflecting the same. The Certificate of Service for the

Debtor's Original Chapter 13 Plan is attached hereto as Exhibit "P".

27.     Despite receiving and having actual notice of the Debtor's Chapter 13 bankruptcy

filing on December 10, 2019, Lendgreen continued its collections efforts to

recover from the Debtor upon the Claim, by means of text messages, electronic

mail, telephone calls and voicemail messages.

28.     Lendgreen has represented in this litigation that these collections efforts were

made by "the Loan Servicer" that is, by Vivus.[1]  However, the individuals who

contacted the Debtor at all times identified themselves out as acting on behalf of

Lendgreen, including in the messages set forth below.

29.     On February 26, 2020, during this period of insessant and unrelenting telephone

calls, voicemail messages, emails and text messages from Lendgreen, the Debtor

called the number provided by Lendgreen and spoke with collection specialist

Linda Ehikpehale, telling her that he had filed for bankruptcy protection under

---

[1]     An example of such a representations may be found in Paragraphs 14, 15 and 16 of
"Creditor Lendgreen's Response to Debtor's First Amended Motion to Enforce the
Automatic Stay [DOC. 230]" as ECF Document No. 233, pp. 3.

Chapter 13 of the Bankruptcy Code in December of 2019 and that they had been

previously notified of his bankruptcy filing. Ms. Ehikpehale then immediately

sent an email to the Debtor acknowledging their conversation and stated "As

earlier discussed, the email address to send the Power Of Attorney documents for

your bankruptcy case is administration@lendgreen.com." A true and accurate

copy of the February 26, 2020 email is attached hereto as Exhibit "Q".

30.    Despite being notified directly by the Bankruptcy Court's Notice of Case

Commencement and Debtor's Counsel by means of the Chapter 13 Plan, and

despite the Debtor actually speaking with collection specialist Linda Ehikpehale

on February 26, 2020, on March 17, 2020, Lendgreen nonetheless continued with

its collection efforts against the Debtor and sent another email stating as follows:

### 150 DAYS OVERDUE AND IT IS BEING REPORTED TO CREDIT REPORTING AGENCIES
### CALL 1-877-689-1848 NOW TO MAKE
### A PAYMENT.

RE: Lendgreen account #028083572-00

**Balance Due: $1,594.91**

Hi Brian,

Your loan is 150 past due. We have reported this issue to credit reporting agencies and your ability to receive a loan in the future may be impacted. **Call us now to set up a payment schedule**.

Alternatively, you can authorize a direct payment by sending the following email to

collections@lendgreen.com:

*"I, Brian, authorize Lendgreen to debit the sum of $ from my account on .*

*To verify my identity, the last 4 digits of my SSN are ; the last 4 digits of my routing number are*
*_____; and the last 4 digits of my account number are ."*

If you have any questions regarding this email, please do not hesitate to contact us. Log into your self-service account to review your loan details.

Regards,

Lendgreen Collections Department
collections@lendgreen.com
1-877-689-1848
www.lendgreen.com

A true and accurate copy of the Email sent by Lendgreen is attached hereto as Exhibit

"R".

31.     As a direct and proximate result of Lendgreen's actions in attempting to collect

upon the Claim after being notified and being fully aware of the commencement

of the Debtor's Chapter 13 bankruptcy case on December 10, 2019, the Debtor

became so depressed, despondent, and anxious, that, in an effort to escape the

unrelenting, harassing efforts to collect upon the Claim, the Debtor, who was

already suffering from severe clinical depression and Type-1 Diabetes, attempted

suicide by means of an overdose of prescription medications.

32.     Luckily, the Debtor's family was able to timely intervene to prevent the Debtor's

suicide attempt, and the Debtor was taken to the Emergency Department of

Massachusetts General Hospital where he was revived. The Debtor thereafter

spent the next eleven (11) days at the Massachusetts General Hospital recovering

and incurred as a result therefor hospital bills amounting to $76,828.33.

33.     Additionally, because of his hospitalization caused by the actions of Lendgreen,

the Debtor was forced to use sick leave and vacation time from his then-employer,

the City of Boston, amounting to a loss of salary in the sum of $9,011.55.

34.     Even while the the Debtor was recovering from his unsuccessful suicide attempt
at the Massachusetts General Hospital, he continued to receive telephone calls
and voicemail messages and other actions, all to collect upon the Claim.
Specifically, on March 18, 2020 at 2:06 pm, Lendgreen called the Debtor's
telephone number and left a voicemail for him to contact them about a "very
important matter". A true and accurate copy of the voicemail message is attached
hereto as Exhibit "S".

35.     The following day, on March 19, 2020 at 1:53 pm, Lendgreen again called the
Debtor's telephone number and left another voicemail for him to contact them
about a "very important matter". A true and accurate copy of the voicemail
message is attached hereto as Exhibit "T".

36.     Finally, Debtor's Counsel, Richard N. Gottlieb, directly spoke with an individual
identified as representing the collections department of Lendgreen, telling her that
the Debtor had attempted suicide as a result of their collections activities despite
his bankruptcy filings and demanded that all such activities stop.

37.     Although Debtor's Counsel believed at the time that he had contacted the
"collections department of Lendgreen", discovery has revealed that the person
answering was actually a representative of 4Finance and/or Vivus.

## BASIS FOR RELIEF REQUESTED
## WILLFUL VIOLATION OF THE AUTOMATIC STAY

38.     The provisions of 11 U.S.C. § 362(a)(6), state, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of—

> . . .

> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title; . . . .

39.     The debt collection activities taken by individuals holding themselves out as representatives of Lendgreen were overtly coercive in nature and sought to compel the Debtor to make direct payments.  Those individuals' statements about reports to "credit reporting agencies" and their demands for immediate payment on the Claim constitute acts to "collect, assess, or recover a claim against the debtor that arose before the commencement of the case" within the meaning of 11 U.S.C. § 362(a)(6).[2]

40.     With respect to the "willfulness" requirement of 11 U.S.C. § 362(k)(1),  a violation of the automatic stay will be deemed to be "willful" if the party engaging in such conduct knew or had reason to know of the bankruptcy case and acted intentionally in such a way that the stay was violated.[3]

41.     At the time of the debt collection activities set forth above, Lendgreen, the individuals holding themselves out as representatives of Lendgreen, and Vivus

---

[2]   Parenthetically, it is worth noting in this case is that, under the terms of the Debtor's Original Chapter 13 Plan, the Creditor and all other general unsecured creditors like it who file proofs of claim are to be paid 100% in full. Therefore, had Lendgreen bothered to file a Proof of Claim in this case by the bar date of February 12, 2020 (which it did not do), it would have been paid in full.

[3]   **In re Cordle**, 187 B.R. 1 (Bankr., N.D. Cal., 1995).

and/or 4Finance as the employer of those individuals, all knew or had reason to

know of the bankruptcy case because they had been notified by the Court, by

Debtor's Counsel through the submission of the Debtor's Chapter 13 Plan, and by

the Debtor directly.  The email sent by collection specialist Linda Ehikpehale on

February 26, 2020, further confirms that notice was actually given to and received

by an individual holding herself out as a representative of Lendgreen.

42.     As a direct and proximate result of the violation of the automatic stay, the Debtor

suffered extreme emotional distress from the belief that, despite his Chapter 13

bankruptcy filing, and despite making substantial Chapter 13 payments, he would

still be hounded by his creditors, at a particularly vulnerable time when the Debtor

was suffering from suicidal ideation, depression and anxiety.

43.     As a direct and proximate result of the violation of the Automatic Stay, the Debtor

incurred actual damages in the form of medical bills and lost vacation time and

sick leave from his employer amounting to more than $85,000.00.

## **ASSERTED LIABILITY OF THE NON-TRIBAL RESPONDENTS**

44.     Vivus, based on its duties and responsibilities set out in the Servicing Agreement,

is liable under principles of *respondeat superior* for the conduct of the individuals

who held themselves out as representatives of Lendgreen and who violated the

automatic stay.

45.     Alternatively, 4Finance, based on the facts set out above showing that it was the

actual employer of those same individuals, is liable under principles of *respondeat*

*superior* for their conduct that violated the automatic stay.

46.     Vivus and 4Finance are jointly and severally liable for one another's conduct

under principles of agency and alter ego liability based on their intertwined

personel and operations.

47.     Vivus, 4Finance, 4Finance Malta, and GMLA are jointly and severally liable for

the conduct of those same individuals because they formed a joint venture and/or

general partnership for the purpose of making high-interest consumer loans over

the Internet to vulnerable borrowers, and to avoid accountability for their conduct

by falsely depicting their actions as those of an entity with tribal sovereign

immunity from suit.

## ASSERTED LIABILITY OF THE TRIBAL RESPONDENTS

48.     Lendgreen is jointly and severally liable for the acts of its agents 4Finance and

Vivus taken in its name, including the violation of the automatic stay set out

above, either because 4Finance and Vivus were actually authorized to act on

Lendgreen's behalf by the Servicing Agreement, or because 4Finance and Vivus

had apparent authority because Lendgreen permitted them to hold themselves out

as its representatives.

49.     The facts set forth above show disregard for and abuse of the corporate form as

between Tribe, BDC, Holdings, and Lendgreen in the following ways:

(a)     As set forth above, the Articles of Incorporation and the Operating

Agreement contain conflicting statements as to the identity of the "exclusive

owner[ ]" and the "Member" of Lendgreen, attributing ownership and exclusive

ownership status to the Tribe, BDC, and Holdings interchangeably.

(b)      Upon information and belief, Lendgreen was at its inception grossly

undercapitalized, and remains grossly undercapitalized today.  The $100 specified

in Section 2.1 of the Operating Agreement is insufficient capital for a business of

any size.  The $500 that is specified by Section 6.2 of the Operating Agreement as

the maximum to be left in Lendgreen's cash accounts at any time would also be

insufficient to run a business of any size, and especially one with 50 to 60

employees and a physical headquarters.

(c)      Upon information and belief, the funding for Lendgreen's operations

comes from one or more of the Tribe, BDC, and Holdings and the Tribe, BDC,

Holdings, and Lendgreen commingle their assets to fund Lendgreen's operations

while minimizing the assets that remain in Lendgreen's control, as suggested by

counsel's statement quoted above that the money for Lendgreen's operations

comes "from the tribe" and from "tribal accounts."

(d)      Upon information and belief, the purpose and effect of this corporate

structure was to permit the Non-Tribal Respondents, operating in the name of

Lendgreen, to engage in Internet payday lending operations that violate, or may

violate, applicable federal and state laws; to convert funds of 4Finance and its

capital sources into accounts receivable collectible through loans putatively made

by Lendgreen, but in fact, actually made by 4Finance; and to frustrate federal and

state scrutiny of Lendgreen's activies by taking the the position that Lendgreen is,

in the words of Resolution 550(12), "cloaked with sovereign immunity as an arm

of the Tribe"; but, in case that immunity should prove insufficient, to avoid giving

Lendgreen ownership of the funds or assets actually needed to run a lending

business, all on behalf of the both the Tribal Respondents and the Non-Tribal

Respondents, in the furtherance of their joint venture and general partnership to

carry on the business of making Internet-based, high-interest loan products,

without the interference of otherwise applicable state- and federal- consumer

protection law and without the oversight of state and federal financial regulators.

50.    Based on the foregoing allegations, this Court should disregard the putative legal

separation between the Tribe, BDC, Holdings, and Lendgreen, and treat them as a

single unified entity, or as alter egos of one another, or as agents of one another,

such that:

(a)    notice of the Debtor's bankruptcy provided to Lendgreen was notice to the

Tribe, BDC, and Holdings;

(b)    the collection actions taken by Lendgreen in violation of the automatic

stay were actions of the Tribe, BDC, and Holdings; and

(c)    the Tribe, BDC, Holdings, and Lendgreen are jointly and severally liable

for the willful violation of 11 U.S.C. § 362(a)(6) set out above.

51.    The above allegations are made on the basis of information that is known to the

Debtor, that the Debtor has obtained through the efforts of his own counsel, or

that has otherwise become public.  The Debtor reserves the right to supplement or

amend his allegations based upon discovery in this action, including without

limitation the possibility that actions in violation of the automatic stay were

committed by non-tribal entities such as the "Manager" of Lendgreen or other

vendors, services, or contractors.

WHEREFORE, the Debtors request, pursuant to 11 U.S.C. §§ 362(a)(6) and 362(k)(1),

that the Court issue an Order:

1.  finding that both the Tribal and Non-Tribal Respondents willfully violated the

    provisions of 11 U.S.C. § 362(a)(6);

2.  awarding the Debtor (a) actual damages, including compensation for his medical

    bills, lost vacation time, and emotional distress; (b) punitive damages; and (c)

    attorneys' fees, to full the extent permitted by applicable law; and

3.  awarding such other and further relief as the Court deems just and proper.

BRIAN W. COUGHLIN, Debtor
By his attorneys,


Date:   1/19/2024                    */s/ Richard N. Gottlieb, Esq.*
                                     Richard N. Gottlieb, Esq. BBO # 547970
                                     Law Offices of Richard N. Gottlieb
                                     Ten Tremont Street
                                     Suite 11, 3rd Floor
                                     Boston, MA 02108
                                     (617) 742-4491
                                     rnglaw@verizon.net



                                     */s/ Terrie Harman, Esq.*
                                     Terrie Harman, Esq., *Pro Hac Vice*
                                     Harman Law Offices
                                     129 Water Street
                                     Exeter, NH 03883
                                     (603) 431-0666
                                     th@tharman.net