# Exhibit "A"

Case 8:16-cv-00862-JDW-AAS Document 121-1 Filed 07/03/19 Page 205 of 334 PageID 192
Case 8:19-14142 Doc 258-1 Filed 01/19/24 Entered 01/19/24 12:55:00 Desc
Exhibits A through G Page 2 of 63

## RESOLUTION NO. 370(12)

**WHEREAS,** the Lac du Flambeau Band of Lake Superior Chippewa Indians (hereinafter, "Tribe") is a federally recognized Tribe organized under a Constitution pursuant to the Indian Reorganization Act of 1934, 48 Stat. 984 25 U.S.C. § 476, et. Seq. as amended; and

**WHEREAS,** pursuant to Article III, Section 1, of the Tribal Constitution, the governing body of the Tribe is the Tribal Council; and

**WHEREAS,** the Tribe is a federally recognized Tribe with all inherent rights of Tribal Sovereignty possessing inherent powers of Tribal self-government and self-determination; and

**WHEREAS,** pursuant to Article VI, Section 1(o) of the Tribal Constitution, the Tribal Council has right and ability to create business corporations to stimulate economic growth and jobs for Tribal Members; and

**WHEREAS,** the Tribal Council deems it necessary to create the L.D.F. Business Development Corporation for the purpose of expanding business development, generating additional jobs and revenue for the tribe; now, therefore be it

**RESOLVED,** by this Council, in Regular Session assembled, hereby declares that:

1. The tribal Council hereby accepts the Articles of Incorporation for L.D.F. Business Development Corporation as filed with the Tribal Secretary.
2. The Tribal President and Secretary are hereby directed and authorized to issue a Certificate of Incorporation for the L.D.F Business Development Corporation and to affix thereto the Tribal Seal.
3. The Tribal Secretary shall retain an executed original of the Articles of Incorporation of the L.D.F. Business Development Corporation in the tribal records.

## CERTIFICATION

I, the undersigned, as Secretary of the Lac du Flambeau Band of Lake Superior Chippewa Indians, a tribal government operating under a Constitution adopted pursuant to Section 16 of the Indian Reorganization Act, 25 U.S.C., s. 476, do hereby certify that the Tribal Council of the Band is composed of twelve members, of whom twelve constituting a quorum, were present at a Regular Meeting, duly called, noticed, convened, and held on the 27th Day of August, 2012, and that the foregoing resolution was duly adopted at said meeting by an affirmative vote of eleven members, none against, none abstaining, and that the said resolution has not been rescinded or amended in any way.

Elizabeth Diver, Secretary
Lac du Flambeau Band of Lake
Superior Chippewa Indians

# Exhibit "B"

## ARTICLES OF INCORPORATION

OF

## L.D.F. BUSINESS DEVELOPMENT CORPORATION

The purpose of forming the L.D.F. Business Development Corporation is to stimulate economic development for the Lac du Flambeau Tribe within the Reservation boundaries and beyond. The goal is to increase revenue and employment for the Tribal membership. The Mission of the L.D.F. Business Development Corporation is to always serve in the best interest of the Tribal Membership.

These Articles of Incorporation are designed to cultivate stability for the Corporation, and confidence for our business partners, by limiting political influences and allow the Board of Directors to manage the Corporation as an independent economic development arm of the Lac du Flambeau Tribe. These Articles provide for oversight by the Tribal Council, as Owner, over a Board of Directors as is necessary to ensure accountability of the Corporation.

The Lac du Flambeau Band of Lake Chippewa Indian Tribal Council, as the Governing Body under Article III, Section 1 of the Lac du Flambeau Tribal Constitution, hereby adopts the following Articles of Incorporation for the purpose of chartering a Corporation.

ARTICLE 1:    AUTHORITY OF INCORPORATION

SECTION 1.01: The Incorporator is the Lac du Flambeau Band of Lake Superior Chippewa Indian Tribe, by the powers vested in the Tribal Council in Article VI, Section 1(o) of the Tribal Constitution.

SECTION 1.02: The registered agent of the Corporation shall be the President of the Board of Directors, located at 418 Little Pines Road, PO Box 67, Lac du Flambeau WI S4538.

ARTICLE 2:    CORPORATION NAME

SECTION 2.01: The Name of the Corporation is L.D.F. Business Development Corporation, hereafter referred to as the Corporation.

ARTICLE 3:    LOCATION

SECTION 3.01: The Corporation is registered and the principal office is located at 418 Little Pines Road, Lac du Flambeau, Wisconsin with the mailing address of Post Office Box 67, Lac du Flambeau, WI S4538.

ARTICLE 4:    PERPETUAL

SECTION 4.01: The Corporation shall be perpetual.

ARTICLE S:    PURPOSE

SECTION 5.01: The purpose of the Corporation is to promote the economic development of the Lac du Flambeau Band of Lake Superior Chippewa Indians through investment in and development of business

Case 19-14142    Doc 258-1    Filed 01/19/24    Entered 01/19/24 12:55:04    Page 190
Case 8:16-cv-00862-JDW-AAS    Document 121-2    Filed 07/05/16    Page 5 of 55    PageID 190
Exhibits A through G    Page 5 of 63

opportunities, and to engage in any lawful act or activity which may be necessary or appropriate for carrying out and accomplishing the foregoing objectives and purpose.

SECTION 5.02: The Corporation shall serve as a business development arm of the Lac du Flambeau Band of Lake Superior Chippewa Indians created solely for the purpose of developing tribal businesses and promoting economic growth and achieving greater employment for the Tribal membership.

ARTICLE 6:    CORPORATE OWNERHIP AND POWERS

SECTION 6.01: The Lac du Flambeau Band of Lake Superior Chippewa Indian Tribe is the sole owner of the corporation (the "Owner").

SECTION 6.02: The Corporation shall have authority to enter into contracts or agreements of every kind and nature with any person, association, corporation, municipality, country, nation, Indian tribe, state or body politic.

SECTION 6.03: The Corporation shall have no power to pledge the credit, encumber property or real estate, nor enter into any agreement, expressly or by implication, on behalf of the Lac du Flambeau Band of Lake Superior Chippewa Indians

SECTION 6.04: The Corporation has the power to incur debts and raise, borrow and secure the payment of any money in any lawful manner.

SECTION 6.05: The Corporation has power to sue and be sued in its corporate name in courts of competent jurisdiction within the United States for disputes arising out of contracts entered into by the Corporation, and has the power to waive the Corporation's immunity from suit. Provided, however, that any such waiver of the sovereign immunity of the Corporation be accompanied by a unanimous vote of all the Directors at a duly called meeting of the Board of Directors where all Directors were present.

ARTICLE 7:    BOARD OF DIRECTORS

SECTION 7.01: The business and affairs of the Corporation shall be managed at the direction of the Board of Directors, who shall possess substantial business skills and experience. The Board of Directors shall be appointed by the Lac du Flambeau Tribal Council for two-year staggered terms.

SECTION 7.02: The Board of Directors shall report to the Owner, the activities of the Corporation, as directed by the Owner or as otherwise provided for in the By-Laws.

ARTICLE 8:    ADOPT BYLAWS

SECTION 8.01: The Board of Directors of the Corporation shall have the power to adopt bylaws for the regulation of the internal affairs of the Corporation consistent with these Articles, subject to the approval of the Owner.

ARTICLE 9:    BOARD OF DIRECTOR LIABILITY

SECTION 9.01: The members of the Board of Directors shall perform their role in good faith and in a manner the Director serves the best interests of the Owner and with such care as an ordinary prudent person would use under similar circumstances in a like position. A Director while acting in the scope of their fiduciary duties shall have no liability for actions taken while serving as a Director in connection with the business of the Corporation.

ARTICLE 10:    LIMITATIONS

SECTION 10.01: Nothing contained within these Articles of Incorporation shall serve to waive the sovereign immunity of the Lac du Flambeau Band of Lake Superior Chippewa Indian Tribe.

SECTION 10.02: The Corporation shall have no authority to pledge, dispose, or otherwise encumber real or personal property of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

Executed on the 27th of August, 2012 on behalf of the Lac du Flambeau Band of Lake Superior Chippewa Tribal Council.

Thomas Maulson, Chairman

Lac du Flambeau Tribe

# Exhibit "C"

Case 19-14142 Doc 258-1 Filed 01/19/24 Entered 01/19/24 10:55:04 PageID 196
Case 8:16-cv-00862-JDW-AAS Document 12-1 Filed 07/05/16 Page 105 of 004 Page 8 of 63
Exhibits A through G Page 8 of 63

### RESOLUTION NO. 550(12)

**WHEREAS,** the Lac du Flambeau Band of Lake Superior Chippewa Indians (hereinafter, "Tribe") is a federally recognized Tribe organized under a Constitution pursuant to the Indian Reorganization Act of 1934, 48 Stat. 984 25 U.S.C. § 476, *et seq.* as amended; and

**WHEREAS,** pursuant to Article III, Section 1, of the Tribal Constitution, the governing body of the Tribe is the Tribal Council; and

**WHEREAS,** the Tribe is a federally recognized Tribe with all inherent rights of Tribal sovereignty possessing inherent powers of Tribal self-governance and self-determination; and

**WHEREAS,** pursuant to Article VI, Section 1(o) of the Tribal Constitution, the Tribal Council has the right and ability to create business corporations to stimulate economic growth and jobs for Tribal Members; and

**WHEREAS,** Tribal Council Resolution No. 370(12) approved the formation and organization of the L.D.F. Business Development Corporation (the "Corporation") and accepted the L.D.F. Business Development Corporation Articles of Incorporation for filing with the Tribal Secretary pursuant to Tribal law; and

**WHEREAS,** pursuant to Section 44a.201 of the Tribally Owed Business Organization Ordinance, the Tribal Council is empowered to create subordinate business entities cloaked with sovereign immunity as an arm of the Tribe; now, therefore be it

**RESOLVED,** by this Council, in Rescheduled Regular Session assembled, hereby approves the creation of LDF Holdings, LLC, Bezhig, LLC, Niizh LLC, Niswi LLC, Niiwin LLC, and Naanan LLC; business entities to be wholly owned by the Corporation for purposes of operating one or more Tribal lending business(es) and any activity directly related to such purpose.

### CERTIFICATION

I, the undersigned, as Secretary of the Lac du Flambeau Band of Lake Superior Chippewa Indians, a tribal government operating under a Constitution adopted pursuant to Section 16 of the Indian Reorganization Act, 25 U.S.C., s. 476, do hereby certify that the Tribal Council of the Band is composed of twelve members, of whom eleven constituting a quorum, were present at a Rescheduled Regular Meeting, duly called, noticed, convened, and held on the 17th Day of December, 2012, and that the foregoing resolution was duly adopted at said meeting by an affirmative vote of ten members, none against, none abstaining, and that the said resolution has not been rescinded or amended in any way.

Elizabeth Diver, Secretary
Lac du Flambeau Band of
Lake Superior Chippewa Indians

# Exhibit "D"

## ARTICLES OF ORGANIZATION
## OF THE
## Niiwin, LLC

The undersigned, acting as the organizer of a limited liability company pursuant to the powers vested in the Tribal Council, the governing body of the Lac du Flambeau Band of Lake Superior Chippewa Indians, Article VI, Section 1(o) of the Tribal Constitution, and as proscribed by Chapter 44 of the Lac du Flambeau Band of Lake Superior Chippewa Indians Tribal Code, the Lac du Flambeau Band of Lake Superior Chippewa Indians, hereby adopts the following Articles of Organization on January 9, 2013.

### ARTICLE 1 -NAME

The name of the limited liability company shall be the Niiwin, LLC (the "Company").

### ARTICLE 2 -KNOWN PLACE OF BUSINESS

The registered office of the limited liability company is 418 Little Pines, PO Box 67, Lac du Flambeau, WI 54538.

### ARTICLE 3- STATUTORY AGENT

The name and address of the statutory agent of the Company is:
LDF Business Development Corporation
Chief Operating Officer, Brent McFarland
PO Box 67
Lac du Flambeau, WI 54538__

### ARTICLE 4 -PURPOSE

The Company is being formed to engage in the business of operating one or more Tribal Lending business(es), and in any activities that are directly related to the accomplishment of such purpose which are lawful and consistent with these Articles.

### ARTICLE 5- DISSOLUTION

The existence of the Company shall be perpetual unless specifically set forth in the Company's Operating Agreement.

### ARTICLE 6- MANAGEMENT

Management of the limited liability company is vested in a single Manager as appointed or hired by the Member. This role may also be filled by a management contractor should the Company so desire. Duties and responsibilities of the Manager shall defined by the Company's Operating Agreement.

Case 19-14142   Doc 258-1   Filed 01/19/24   Entered 01/19/24 10:45:03   Page 11 of 34   PageID 195
Case 8:18-cv-00862-JDW-AAS   Document 121-1   Filed 07/05/18   Page 10 of 63
Exhibits A through G   Page 11 of 63

## ARTICLE 7- NAME AND ADDRESS OF EACH MANAGER AND MEMBER

The name and address of each person who is a Manager and Member of the Company is:

Manager:

███████████████
███████████████
███████████████
███████████████

Member:

Lac du Flambeau Business Development Corporation established pursuant to Tribal Council Resolution 370(12) whose offices are located at located at 418 Little Piries Road, PO Box 67, Lac du Flambeau WI 54538.

Dated: 1-9-13

Lac du Flambeau Band of Lake
Superior Chippewa Indians

By:

Tom Maulson, President

Approved pursuant to Tribal Council Resolution SSO

# Exhibit "E"

Case 19-14142   Doc 258-1   Filed 01/19/24   Entered 01/19/24 10:55:00   Page 198
Case 8:16-cv-00862-JDW-AAS   Document 121-2   Filed 07/09/16   Page 13 of 63
Exhibits A through G   Page 13 of 63

# OPERATING AGREEMENT
## of
## Niiwin, LLC

THIS OPERATING AGREEMENT (this "Agreement") made this 17ᵗʰ day of July, 2013, by and between LDF Holdings, LLC, a wholly owned and operated subsidiary of the Lac du Flambeau Business Development Corporation, a wholly owned and operated instrumentality of the Lac du Flambeau Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe (hereinafter "Member"), and Niiwin, LLC, a limited liability company (hereinafter "Company") each of which were formed pursuant to Tribal Council resolution and under the jurisdiction and laws of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

## Article I
### Formation, Name Purpose, Definitions

**1.1    Formation.** Pursuant to Resolution No. 550 (12) of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians ("Resolution"), the parties have formed a tribal limited liability company effective upon the filing of the Articles of Organization of this Company with the Secretary of the Tribal Council. The parties shall immediately and from time to time hereafter, as may be required by law, execute all amendments of the Articles of Organization, and do all filing, recording and other actions as may be appropriate to comply with the operation of the Company under the Resolution.

**1.2    Intent.** It is the intent of the Member that the Company shall be a manager-managed limited liability company. It shall always be operated in a manner consistent with its treatment as a tribal entity for federal and state law purposes. It is also the intent of the Member that the company shall be treated as a 100% tribally owned and operated company, for federal and state law purposes, including all tax purposes, under the exclusive ownership, control, and jurisdiction of the Lac du Flambeau Band of Lake Superior Chippewa Indians. No Member or Manager shall take any action inconsistent with the express intent of the parties hereto.

**1.3    Name.** The name of this Company shall be:

Niiwin, LLC

**1.4    Registered Office.** The initial registered office of the Company shall be 418 Little Pines, PO Box 221, Lac du Flambeau, WI 54538, within the geographical and jurisdictional boundaries of the Lac du Flambeau Band of Lake Superior Chippewa Indians reservation.

Approved by Tribal Council Resolution: 550(12)

{00071440.DOC / 2 }

**1.5    Purpose.** The Company has been formed to engage in the business of operating one or more Tribal Lending business(es), and in any activities that are directly related to the accomplishment of such purpose which are lawful and consistent with the Articles of Organization.

**1.6    Term.** This Company shall commence upon the filing of its Articles of Organization and shall continue until such time as it shall be terminated under the provisions of Article IX hereof.

**1.7    Members.** The names and addresses of each of the sole Member of the Company are:

LDF Holdings LLC
418 Little Pines Road
PO Box 231
Lac du Flambeau WI 54538.

**1.8    Agent for Service of Process.** The name and business address of the agent for service of process for the Company is William R. Beson, Chief Executive Officer- LDF Business Development Corporation, or such other person as the Company shall appoint from time to time.

**1.9    Definitions.** Whenever used in this Agreement, the following terms shall have the following meanings:

(a)    "Agreement" shall mean this written Operating Agreement. No other document or oral agreement shall be treated as part of or superseding this Agreement, unless it is reduced to writing and it has been signed by the Member(s).

(b)    "Articles" shall mean the Articles of Organization filed for the Company pursuant to Tribal Council Resolution 550(12), as such Articles of Organization may be amended from time to time.

(c)    "Business Affairs" shall mean the obligations and responsibilities of the Company pursuant to any and all transaction documents as executed between the Company, Manager, and any relevant third party.

(d)    "Code" shall mean the Lac du Flambeau Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code, as may be amended from time to time.

(e)    "Company" shall mean the limited liability company formed pursuant to the Articles and governed by this Agreement.

Approved by Tribal Council Resolution: 550(12)

{00071440.DOC / 2 }

Case 19-14142 Doc 258-1 Filed 01/19/24 Entered 01/19/24 12:55:03 Page
Case 8:16-cv-00862-3DW-AAS Document 121-7 Filed 07/03/18 Page 109 of 234 PageID 200
Exhibits A through G Page 15 of 63

(f)     "Controller" shall mean the bonded officer of the Company who is responsible for generally supervising the financial affairs and establishing and maintaining the Company accounting system. The Company may hire a third party to conduct this activity.

(g)     "Distributable Cash" shall mean all cash, revenues and funds received from the Company operations, less the sum of the following to the extent paid or set aside by the Member(s):

    (1) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders:

    (2) all cash expenditures incurred incident to the normal operation of the Company's business; and

    (3) such cash Reserves as the Manager deems reasonably necessary to the proper operation of the Company's business.

(h)     "Fiscal Year" shall mean the Company's fiscal year. Which shall be the calendar year.

(i)     "Losses" shall mean, for each Fiscal Year, the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year plus any expenditures described in the Internal Revenue Code of 1986, as amended.

(j)     "Manager" shall mean ███████████████████████████████ ███████ or any persons or person that the Member may otherwise appoint or engage to manage the Company pursuant to the Articles: The Manager shall conduct the business of the Company to the best of the Manager's ability and subject only to those restrictions set forth in the Resolution or this Agreement, shall have full and complete authority, power and discretion to make any and all decisions and to do any and all things which the Manager deems appropriate to accomplish the purpose of the Company. The Manager may also contract with a company or companies to manage the Company, if it so desires.

(k)     "Member" shall mean the Lac du Flambeau Business Development Corporation.

(1)     "Profits" shall mean, for each Fiscal year the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year under the cash basis method of accounting and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes plus any income described in the Internal Revenue Code of 1986, as amended.

Approved by Tribal Council Resolution: 550(12)

{00071440.DOC / 2 }

(m)   "Person" shall mean any individual and any legal entity and their respective heirs, executors, administrators, legal representatives, successors, and assigns.

(n)   "Resolution" shall mean the Resolution No. 550(12), of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

## Article II
## Capitalization of the Company

**2.1   Capital Contributions.** The Member has  made contribution of funds of ONE HUNDRED US DOLLARS ($100.00) on behalf of or to the Company.  These contributions shall be considered as equity contributions to the Company in exchange for the Member's 100% ownership of the Company.

**2.2   Additional Capital Contributions.**

(a)     The Member, in its sole discretion, may provide additional Capital Contributions to the capital of the Company based on the Company's obligations as provided in its other transaction documents.

(b)     Prior to the adoption of this Operating Agreement the Member has expended certain funds which may have been expended on behalf of the Company.  This may include, but is not exclusive to attorney fees, consultant fees and other regular expenses of the Company.  The Member shall review past funding of the Member to determine whether these amounts shall also be attributable to the Company as Company expenses. To the extent they are Company expenses they shall also treated as Capital of the Company.

**2.3   Use of Capital Contributions.** All Capital Contributions shall be expended only in furtherance of the business purpose and intent of the Company as set Forth in Sections 1.2 and 1.5.

**2.4   Unauthorized Withdrawals of Capital Contributions.** No Manager shall have the right to withdraw or distribute Capital Contributions except as specifically provided in this Agreement.

**2.5   Third Party Rights.** Nothing contained in this Agreement is intended or will be deemed to benefit any creditor of the Company, nor will any creditor of the Company be entitled to require the Manager to solicit or demand Capital Contributions from the Member. The Company shall not assign the Member's obligation to make Capital Contributions to the Company, if any, to creditors of the Company without the consent of the applicable Member.

Approved by Tribal Council Resolution: 550(12)

{00071440.DOC / 2 }

**Article III**
**Management**

**3.1    Management.**

(a)    Once hired or appointed by the Company, the Manager may have the power and authority to do and perform all actions as may be necessary or appropriate to the conduct of the Company's business. Management of the Company's Business Affairs and objectives shall be vested solely in the Manager, except as limited specifically within this Agreement and in Section 3.2.  The power and the authority of the Manager shall be further limited to the Business Affairs.

(b)    Any change in Management shall be immediately reported to the Member.

(c)    Any successor Manager shall be appointed by the Member acting as sole member of the Company.

(d)    The Manager may be removed as Manager, by majority vote of the Member if it is found that the Manager has committed an act constituting willful misconduct, fraud, or gross negligence.

(e)    The Manager shall have strict fiduciary relationship to the Company and Member and shall at all times carry out business of the Company in this capacity.

(f)    The Manager will abide by all requirements of the Code, including reporting requirements.

**3.2    Certain Restrictions on Business Powers.**  While Manager has general and broad authority under Section 3.l (a), the Manager shall require express written consent from the Member, and in some instances its parent corporation the LDF Business Development Corporation, to do the following:

(a)    to borrow pledge, assign, convey, encumber, grant security interest in,  guaranty, or otherwise restrict assets of the Company;

(b)    to sell or otherwise dispose of all or substantially all of the assets of the Company;

(c)    waive the sovereign immunity of the Company which may only be waived in accordance with written consent of the LDF Business Development Corporation ("BDC"), the parent corporation, in accordance with Section 6.05 of the BDC's Article of Incorporation as approved by Tribal Council Resolutions 370(12), 80(13) and 134(13).

Approved by Tribal Council Resolution: 550(12)

{00071440.DOC / 2 }

5

Case 19-14142   Doc 258-1   Filed 01/19/24   Entered 01/19/24 12:55:03   Page ID 203
Case 8:16-cv-00662-JDW-AAS   Document 12-1   Filed 07/08/16   Page 18 of 63
Exhibits A through G   Page 18 of 63

**3.3   Indemnity of Manager, Officers, Employees and Other Agents**

(a)      The Company shall indemnify the Manager and make advances for expenses to the maximum extent permitted under the Code and the Management Agreement.  The Company shall indemnify its officers and employees and make advances for expenses to the maximum extent permitted under the Code.

(b)      (i)      Notwithstanding any other provision of this Agreement, neither the Manager, nor any officer, or employee of the Manager shall be liable to any Member or to the Company with respect to any act performed or neglected to be performed in good faith and in a manner which such Person believed to be necessary or appropriate in connection with the ordinary and proper conduct of the Business or the preservation of its property, and consistent with the provisions of this Agreement.

(ii)      The Company shall indemnify the Manager and its officers, or employees for and hold them harmless from any liability, whether civil or criminal, and any loss, damage, or expense, including reasonable attorneys' fees, incurred in connection with the ordinary and proper conduct of the Business and the preservation of the Business and the Company's property, or by reason of the fact that such Person is or was a Manager, officer, or employee; and that with respect to any criminal action or proceeding, the Person to be indemnified had no reasonable cause to believe the conduct was unlawful. The foregoing indemnification of the Manager and its officers and employees shall extend not only to the activities of the Manager as the manager of the Company, but also to the activities of the Manager and its officers and employees as the manager of any entities owned, directly or indirectly, by the Company.

(iii)      The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent shall not of itself create a presumption that indemnification is not available hereunder.  The Company's obligation to indemnify the Manager, officer, employee, or agent hereunder shall be satisfied out of the assets of the Company and any subsidiary entities of the Company and if the Company's assets are insufficient to satisfy its obligation to indemnify the Manager, such Person shall not be entitled to contribution from any Member or, for the avoidance of doubt, the Lac du Flambeau Band of Lake Superior Chippewa Indians.

(c)      No amendment of this provision for indemnification or advancement of expenses shall have the effect of limiting the rights of any person previously serving as a Manager, officer, employee or agent of the Company to indemnification or advancement of expenses pursuant to this section or in accordance with the Code.

(d)      All expenses, fees and other costs incurred in connection with the provisions of this Section shall constitute operating expenses of the Company.

Approved by Tribal Council Resolution: 550(12)

{00071440.DOC / 2 }

Case 19-14142 Doc 258-1 Filed 01/19/24 Entered 01/19/24 12:55:00 Desc
Case 8:16-cv-00862-JDW-AAS Document 127 Filed 01/05/18 Page 115 of 134 PageID 204
Exhibits A through G Page 19 of 63

**3.4    Financial Accounts.**

(a)    Opening and closing of financial institution accounts and disbursement of all Company funds shall require joint approval of the Manager and Controller.

(b)    A financial institution shall be able to rely upon a resolution duly adopted and approved by the Member specifically authorizing the opening, closing, or transacting of business for that specific account or activity.

**3.5    Books and Records.** The Manager, at the expense of the Company shall keep or cause to be kept adequate books and records for the Company, which shall contain an accurate account of all business transactions arising out of and in connection with the conduct of the Company. The financial books and records of the Company shall be kept in the method of accounting determined by the Manager, which shall be the method of accounting followed by the Company. Additionally, at the expense of the Company, the Manager shall maintain or cause to be maintained, for a period of not less than three (3) years, the following records at the Company's known place of business:

(a)    Revenues, expenses, assets, liabilities and equity;

(b)    Daily transactions;

(c)    Contracts, correspondence and other transaction documents relating to all vendors of the Company;

(d)    Customer complaints and their disposition;

1. Enforcement activities pertaining to the Company by the Tribal Lending Regulatory Authority.

2. All audits prepared by or on behalf of the Company.

(e)    A list of the full name and last known business, residence or mailing address of each Member and Manager of the Company, both past and present;

(f)    A copy of the organizational documents for the Company and all amendments thereto;

(g)    Copies of the Company's currently effective Agreement and all amendments thereto, copies of any prior Agreements no longer in effect, and copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property, or services to the Company;

Approved by Tribal Council Resolution: 550(12)

{00071440.DOC / 2 }

(h)    Minutes of every meeting of the Members; and,

(i)    Any written consents or approvals obtained from Members for actions taken by the Manager.

**3.6    Confidentiality.** The Company's information and records are confidential and may not be disclosed to any Person except the Member as sole member of the Company, and in accordance with the regulations that may be established by Tribal Consumer Financial Services Regulatory Authority, and/or any other Person authorized by applicable Tribal or federal law or contract to have access to such information and records.

**3.7    Record Inspection.** The Manager(s) shall be responsible to ensure that the premises, books and records of the Company are available for inspection during normal business hours by the Tribal Lending Regulatory Authority.

**3.8    Salaries.** The salaries and other compensation of the Manager and other employees of the Company shall be fixed from time-to-time by the Member.

**Article IV**

**Rights and Obligations of Members**

**4.1    Limitation of Liability.** The debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the Company, and the Member shall not be obligated for any such debt obligation, or liability of the Company solely by reason of being a Member. Nothing herein shall be construed as a waiver of the Company or Member's Sovereign Immunity.

**4.2    Approval of Sale of All Assets.** The Members shall have the right, by the affirmative vote of the Tribal Council, to approve the sale, exchange or other disposition of all or substantially all of the Company's assets which is to occur as part of a single transaction or plan.

**4.3    Right to Inspect Company Documents.** The Member shall have the right and the Manager shall permit, the Member to inspect and copy, at the Member's expense, any and all Company documents, including those required to be maintained pursuant to Section 3.1.

**4.4    All other Rights.** The Member shall have and reserve all other rights not specifically limited within this Agreement.

Approved by Tribal Council Resolution: 550(12)

{00071440.DOC / 2 }

8

Case 8:18-cv-00862-JDW-AAS   Document 12-1   Filed 07/09/18   Page 21 of 34 PageID 206
Case 19-14142   Doc 258-1   Filed 01/19/24   Entered 01/19/24 12:55:00   Desc
Exhibits A through G   Page 21 of 63

## Article V
## Meetings of Member

**5.1    Annual Meeting of Member.**  The Member shall hold an annual meeting as required under Tribal law.

## Article VI
## Profits, Losses; Distributions

**6.1    Allocation of Profits and Losses.**  All profits and losses of the Company will be allocated to the Member.

**6.2    Mandatory Distributions.**  There shall at all times remain $500 in the Company's cash accounts.  Whenever the cash account balance exceeds said amount there shall be an immediate Distribution declared and paid unless the liabilities of the Company are in excess of the assets.

**6.3    Loans to Company.**  Nothing in this Operating Agreement shall prevent the Member from making secured or unsecured loans to the Company by agreement with the Company.

**6.4    Accounting Period.**  The Company's accounting period shall be the calendar year.

## Article VII
## Restrictions on Transferability

**7.1    Restrictions on Transferability.**  The Company at all times shall be owned exclusively by the Lac du Flambeau Business Development Corporation. No transfer of interest in the Company shall be permitted without the express written consent of the Member.

For purposes of this Article VII "transfer" shall include:

(a)    Transfers by sale;
(b)    Transfers by gift;
(c)    Involuntary transfers, including transfers by operation of law,
(d)    Any other form of transfer.

Transfers and pledges in breach of the terms of this Article VII shall be void and of no effect.

Approved by Tribal Council Resolution: 550(12)

{00071440.DOC / 2 }

## Article VIII
## Additional Members

**8.1**  No additional Members shall be permitted.

## Article IX
## Dissolution and Termination

**9.1**  **Dissolution.** The Company shall be dissolved upon the occurrence of any of the following events:

    (a)  by the unanimous written agreement of the Member;

    (b)  upon the entry of any decree of dissolution of the Tribe; or

    (c)  upon the issuance of an order of dissolution by a court of competent jurisdiction or by the Lac du Flambeau Band of Lake Superior Chippewa Indians Tribal Court.

**9.2**  **Effect of Dissolution.** Upon the dissolution of the Company, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until Articles of Termination have been filed with the Secretary of the Tribe or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

**9.3**  **Winding Up and Dissolution of** Assets.

    (a)  Upon the dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Member shall immediately proceed to wind up the affairs of the Company.

    (b)  If the Company is dissolved and its affairs are to be wound up, the Member shall (1) sell or otherwise liquidate all of the Company's assets as promptly as practicable, unless the Member determines to distribute assets in kind, (2) allocate: any profits or loss resulting from such sales to the Member's Capital Accounts, (3) discharge all liabilities of the Company, other than to Member, including all costs relating to the dissolution, 4) establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Member, the amounts of such reserves shall be deemed to be an expense of the Company), (5) discharge any liabilities of the Company to the Member other than on account of their interests in Company capital or profits, and (6) distribute the remaining assets in the following order:

Approved by Tribal Council Resolution: 550(12)

(1) If any assets are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by appraisal or by agreement of the Member. Such assets shall be deemed to have been sold as of the date of dissolution tor their fair market value.

(2) The positive balance of the Member's Capital Account as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs, shall be distributed to the Member, either in cash or in kind, with any assets distributed in kind being valued for this purpose at their fair market value.

(c)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation, if any Member has a negative deficit Capital Account balance, such Member shall have no obligation to make any contribution to the capital of the Company, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other person for any purpose whatsoever.

## Article X
## Licensing

**10.1    License.** The Company shall obtain a duly authorized Consumer Financial Services License, or other licenses as may be required under the Tribal Consumer Financial Services Regulatory Code, before engaging in any Lending activities.

## Article XI
## Miscellaneous Provisions

**11.1    Application of Law.** This Operating Agreement and its application and interpretation shall be governed exclusively by its terms and by the laws of the Lac du Flambeau Band of Lake Superior Chippewa Indians, where applicable.

**11.2    Amendments.** This Agreement may not be amended except by a resolution duly adopted by the Member and express approval of the Tribe.

**11.3    Execution.** The Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any law, rules or regulations.

**11.4    Severability.** If any provision of this Operating Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

Approved by Tribal Council Resolution: 550(12)

{00071440.DOC / 2 }

**11.5   Non-waiver of Sovereign Immunity.**   Nothing in this Operating Agreement shall be construed to be a waiver of the Company, the Member's, or the Tribe's Sovereign Immunity to suit.

**11.6**   **Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

LDF HOLDINGS, LLC, Member

By: _____

Name: William R. Beson
Title: CEO, LDF Business Development Corp.

Approved by Tribal Council Resolution: 550(12)

{00071440.DOC / 2 }

12

# Exhibit "F"

# SUPREME COURT
# OF THE UNITED STATES

---

```
          IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - -

LAC DU FLAMBEAU BAND OF            )

LAKE SUPERIOR CHIPPEWA INDIANS,    )

ET AL.,                           )

          Petitioners,           )

          v.                     ) No. 22-227

BRIAN W. COUGHLIN,                )

          Respondent.            )

- - - - - - - - - - - - - - - - - -
```

Pages:  1 through 70

Place:  Washington, D.C.

Date:   April 24, 2023

---

### HERITAGE REPORTING CORPORATION

*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.   20005
(202) 628-4888
www.hrccourtreporters.com

1

```
 1        IN THE SUPREME COURT OF THE UNITED STATES

 2   - - - - - - - - - - - - - - - - - -

 3   LAC DU FLAMBEAU BAND OF              )

 4   LAKE SUPERIOR CHIPPEWA INDIANS,      )

 5   ET AL.,                             )

 6                 Petitioners,           )

 7              v.                       ) No. 22-227

 8   BRIAN W. COUGHLIN,                  )

 9                 Respondent.            )

10   - - - - - - - - - - - - - - - - - -

11

12                   Washington, D.C.

13               Monday, April 24, 2023

14

15        The above-entitled matter came on for

16   oral argument before the Supreme Court of the

17   United States at 11:03 a.m.

18

19

20

21

22

23

24

25
```

1    in the text -- but perhaps they thought:  Okay,

2    well, it doesn't -- it's not as fair to abrogate

3    the sovereign immunity of Indian tribes, who

4    weren't part of that deal or bargain struck in

5    the Constitutional Convention.

6              JUSTICE ALITO:  Mr. Shah --

7              JUSTICE SOTOMAYOR:  Counsel --

8              JUSTICE ALITO:  -- just out of

9    curiosity, could I ask you a few questions about

10   the relationship between the tribe and Lendgreen

11   loans?

12             MR. SHAH:  Yes.

13             JUSTICE ALITO:  Who actually operates

14   this?

15             MR. SHAH:  The tribe does, Your Honor.

16   This is not a rent-a-tribe situation.  The other

17   side has never alleged it.  Actually, this is a

18   true tribal business.  The headquarters is on

19   the reservation.  They have 50 to 60 -- this is

20   all outside the record, but I'm just answering

21   your question -- 50 to 60 employees.  The money

22   comes from the tribe, tribal accounts.  This is

23   a fully tribal operation.

24             Of course, they use third-party

25   vendors, servicers and all, like any other

1    business that may not be tribal lenders, but

2    this is not one of those situations that the

3    amicus brief talks about in other cases about

4    renting tribes' immunity.  This is a tribal

5    business.

6            JUSTICE ALITO:  Well, what -- what

7    percentage of the people who are actually

8    running this business are tribal members?

9            MR. SHAH:  Again, this is outside the

10   record.  My knowledge -- and I -- I -- if you

11   take out the outside vendors, 100 percent is my

12   knowledge.  It's got 50 to 60 employees who

13   operate out of a headquarters located.

14           Now I can't tell you whether all of

15   those 50, 60 employees who work in the

16   headquarters on the tribal reservation are

17   tribal members, but that's the -- that --

18   that -- that -- that's the extent of my

19   knowledge on that.

20           JUSTICE ALITO:  Do you dispute the --

21   the facts that are set out in Respondent's brief

22   about what was done to --

23           MR. SHAH:  Your Honor -- Your Honor,

24   the --

25           JUSTICE ALITO:  -- his client that

# Exhibit "G"

# SERVICING AGREEMENT

# BETWEEN

# NIIWIN, LLC d/b/a LENDGREEN

# AND

# VIVUS SERVICING LTD

### Dated:  August 5, 2013

{00071425.DOCX / 2 }

1

*DEN 98226807v7*

Confidential-Subject to Protective Order

**Niiwin_000164**

# Table of Contents

**Page**

1.    Recitals. ....................................................................................................... 1

2.    Definitions. ................................................................................................... 2

3.    Covenants. .................................................................................................... 4

4.    Business and Affairs in Connection with Company. ...................................... 5

5.    Servicing Fee Reimbursement and Disbursement ........Error! Bookmark not defined.

6.    Warranties. ................................................................................................... 11

7.    Termination. ................................................................................................. 22

8.    Rights of Servicing Agent Upon Conclusion of Term. ................................. 12

9.    Consents and Approvals. .............................................................................. 13

10.    Disclosures. ................................................................................................. 15

11.    Indemnification. .......................................................................................... 16

12.    Limited Waiver of Sovereing Immunity. ...................................................... 16

13.    Tribal Assets. ............................................................................................... 23

14.    Dispute Resolution. ..................................................................................... 17

15.    Performance During Disputes. ..................................................................... 25

16.    Confidential Information. ............................................................................ 18

17.    General Provisions. .........................................................Error! Bookmark not defined.


Exhibit A Guidelines, Policies and Procedures .........................Error! Bookmark not defined.

Exhibit B Due Diligence Questionnaire ....................................Error! Bookmark not defined.

*DEN 98226807v7*

Confidential-Subject to Protective Order

Niwiin_000165

## SERVICING AGREEMENT

**THIS SERVICING AGREEMENT** ("Agreement") is made and entered into effective as of the 5th day of August, 2013 (the "Effective Date"), by and between NIIWIN LLC d/b/a LENDGREEN (the "Company"), a wholly owned subsidiary of L.D.F Holdings, LLC ("LDF"), a limited liability company wholly owned and operated by the Lac du Flambeau Business Development Corporation ("BDC"), a sovereign economic arm, enterprise and instrumentality of, and created under the laws of and for the benefit of, the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin ("Tribe"), a federally-recognized sovereign American Indian tribe, and VIVUS SERVICING LTD, a company organized under the laws of British Columbia ("Servicing Agent").

1. **Recitals.**

    **1.1.**   The Tribe is a federally-recognized Indian tribe. The Tribe possesses inherent sovereign governmental powers.

    **1.2.**   The Tribe has established BDC as an instrumentality of the Tribe to advance the economic development of the Tribe and its members. The Tribe has organized LDF as an instrumentality of BDC formed as a limited liability company under the laws of the Tribe and is wholly owned by BDC. BDC has organized Company as an instrumentality of BDC, wholly-owned by LDF, formed as a limited liability company under the laws of the Tribe. The purpose of BDC, LDF, and Company is to promote the self-sufficiency of the Tribe and its members and families, and to address the socio-economic and cultural needs of the Tribe, its members, and its community. The Tribe and its members have routinely suffered from economic depression and slow economic growth. This has impaired the Tribe's economic growth, self-determination policies, autonomy, and cultural survival. For these reasons, the Tribe established BDC to build capital within the tribal community. This capital will subsequently be dispersed to the Tribe, and used in the Tribe's governmental discretion for the benefit of its members, and the community through tribal initiatives and tribal governmental programs. The increase of such capital, as well as the initiatives and programs funded by the increase in capital, will guarantee that the Tribe can continue to care for itself, its members, and its community by promoting greater self-determination, political and social autonomy and cultural rejuvenation and survival. LDF, on BDC's behalf, has the exclusive right to develop and operate the Tribe's financial services business that will provide small-denomination, short-term loans ("Loans") to consumers through its internet and call-center operations ("Business") and has been directed and authorized by BDC to take any and all action as is deemed necessary or desirable in connection with such business and services. BDC, through LDF, desires to engage in internet-based consumer loan businesses and services. It is intended that LDF's endeavors will improve the economic conditions of Tribal members; enable the Tribe to better serve the social, economic, educational and health needs of the Tribe and its members and community; increase Tribal revenues; enhance the Tribe's economic self-sufficiency and self-determination; and provide positive, long-term social, environmental and economic benefits to tribal members.

    **1.3.**   BDC, through LDF, desires to establish separate lending operations and loan portfolios with approved agents so as to provide for the diversification of LDF's business and to

{00071425.DOCX / 2 }

1

promote the success of LDF's overall operation so that it can serve the social and economic purposes for which it has been established and enabled by BDC.

**1.4.** Through the cooperation of and assistance by BDC, Company has been organized by BDC under the Tribe's laws and is indirectly wholly owned and controlled by the Tribe through BDC and LDF.

**1.5.** Company will make and own from time to time certain Loans in accordance with underwriting guidelines and lending practices and policies as shall be from time to time established by LDF and having general applicability to all parties similarly engaged in the Business. Such guidelines, policies and procedures in effect on the Effective Date of this Agreement are set forth in Exhibit A attached hereto.

**1.6.** Company desires to grant Servicing Agent the exclusive right to administer and service the Loans on behalf of Company, and Servicing Agent desires to perform such services, and the obligations associated therewith, for Company, all as set forth in and subject to this Agreement.

**2.** **Definitions.** Unless otherwise specified in this Agreement, as they are used in this Agreement, the terms listed below shall have the meaning assigned to them in this Section:

**2.1.** **Affiliate.** "Affiliate" means as to Servicing Agent or Company, any corporation, partnership, limited liability company, joint venture, trust, department or agency or individual controlled by, under common control with, or which controls, directly or indirectly Servicing Agent or Company. "Control" means (i) ownership, control, or power to vote twenty-five percent (25%) or more of the outstanding shares of any class of voting securities, directly or indirectly or acting through one or more persons, (ii) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions), or (iii) the power to exercise, directly or indirectly, a controlling influence over management or policies.

**2.2.** **Authorized Debt.** "Authorized Debt" shall mean all obligations incurred by Company under the Loan Agreement and any other debt incurred with respect to Company with the mutual agreement of Servicing Agent and the Manager, which approval shall not be unreasonably withheld, delayed or conditioned, and any extensions or renewals of such debt.

**2.3.** **Company.** "Company" is the instrumentality and commercial subdivision of the Tribe as provided in the first paragraph of this Agreement. Company shall not include BDC or LDF, or any commercial enterprise conducted by the Tribe or any other instrumentality of the Tribe other than as set forth immediately above in this Section.

**2.4.** **Effective Date.** "Effective Date" shall have the meaning given to it in the first paragraph of this Agreement.

**2.5.** **Fiscal Year.** "Fiscal Year" shall mean each twelve month period, or portion thereof, ending on December 31 of each year, or on such other date as may be adopted by Company in the future as the ending date of its fiscal year.

{00071425.DOCX / 2 }

2

Confidential-Subject to Protective Order

**2.6.**    **Governmental Action.**    "Governmental Action" shall mean any resolution, ordinance, statute, regulation, order or decision regardless of how constituted having the force of law or legal authorization of the Tribe or any instrumentality or agency of the Tribe, including of BDC.

**2.7.**    **Gross Revenues.**    "Gross Revenue" shall mean all cash received from or on behalf of borrowers on account of the Loans or the proceeds from the sale or other disposition of the Loans (whether in the ordinary course of business or otherwise) less any amount(s) necessary to be maintained and reserved as provided in this Agreement or as authorized by the Manager and agreed to by Servicing Agent.

**2.8.**    **Legal Requirements.**    "Legal Requirements" shall mean singularly and collectively all applicable laws including without limitation all applicable tribal and federal law, pertaining to the Loans and to the operations of Company.

**2.9.**    **Lender.**    Lender" shall mean GMLA TRADING LTD, a company organized under the laws of Malta, or such other lender as Company may hereafter enter into a loan agreement with.

**2.10.**    **Litigation Reserve Fund.**    "Litigation Reserve Fund" shall have the meaning given to it in Section 4.5.

**2.11.**    **Loan Agreement.**    "Loan Agreement" shall mean the loan agreement of even date herewith between Company and Lender and all other documents to be executed and delivered in connection therewith, including a revolving credit promissory note and security agreement, as same may be revised or extended from time to time, the loan proceeds of which are to be used exclusively for providing working capital for Company.

**2.12.**    **Loans.**    "Loans" shall have singularly and collectively the meaning as set forth in Section 1.2.

**2.13.**    **Manager.**    "Manager" shall mean Triax Management, LLC, a Delaware limited liability company and the entity designated as Manager of Company pursuant to the Articles of Organization of Company.  Except as specifically delegated to Servicing Agent in this Servicing Agreement, Manager shall maintain all operational and managerial responsibilities of Company.

**2.14.**    **Operating Account.**    "Operating Account" shall have the meaning given to it in Section 4.4.

**2.15.**    **Operating Expenses.**    "Operating Expenses" shall mean all of the expenses incurred in the operation of the Business of the Company as approved by Servicing Agent in writing, and specifically includes any and all amounts payable to contractors, consultants, vendors and other equipment and service providers for software, equipment, leads, banking and other services used in the operation of the Business of Company as well as any amounts paid to fund any proceedings, rulings or settlements under Section 4.5.3 or to restore the Litigation Reserve Fund to $35,000 pursuant to Section 4.5.4.

{00071425.DOCX / 2 }

3

Confidential-Subject to Protective Order    Niwiin_000168

**2.16. Servicing Fee.** "Servicing Fee" shall mean an amount equal to the balance of Gross Revenues less all Operating Expenses and other amounts paid pursuant to Section 5.1 through 5.3 plus any and all additional compensation payable to Servicing Agent upon the termination of the relationship hereunder in accordance with Section 7.5.

**2.17. Term.** "Term" shall have the meaning given to it in Section 3.2 hereof.

**3.    Covenants.** In consideration of the mutual covenants contained in this Agreement, the parties agree and covenant as follows:

**3.1. Engagement of Servicing Agent.** Company hereby retains and engages Servicing Agent as its exclusive independent contractor for the purposes of performing the administrative and servicing functions of originating, renewing, servicing and collecting the Loans as set forth in this Agreement. Nothing contained herein grants or is intended to grant Servicing Agent a titled interest to or in Company.  The Servicing Agent hereby accepts such retention and engagement.

**3.2. Term.** The term of this Agreement shall begin on the Effective Date of this Agreement and continue for a period of three (3) years thereafter (such term, as same may be extended pursuant to the following sentence, the "Term"). The Term shall automatically renew for additional periods of two (2) years unless either party hereto shall give written notice at least ninety (90) days, but no greater than one hundred fifty (150) days, prior to the end of the Term.

**3.3. Servicing Agent's Compliance With Law; Licenses.** Servicing Agent covenants that it will at all times comply with all Legal Requirements and any licenses issued by the Tribe or its instrumentalities.  Company shall advise Servicing Agent, and provide reasonable assistance to Servicing Agent at Servicing Agent's cost in obtaining, any and all applicable tribal licensure requirements prior to the commencement of the Business to be conducted by Company as contemplated hereby or, if such requirements arise after such Business has commenced, as promptly as possible thereafter.

**3.4. No Pre-existing Contracts.** Company covenants that there are no pre-existing contractual impediments to the entry by Company into this Agreement. Company agrees to indemnify Servicing Agent and hold harmless its affiliates for any loss, cost, judgment, settlement or other compromise related to any claim arising out of or related to any alleged pre-existing contractual relationship.  Servicing Agent shall be limited to recovery of such indemnification from assets of Company and shall have no right to indemnification from other assets of BDC, LDF, the Tribe or any of Tribe's other Affiliates.

**3.5. Agreement Scope.** The scope of this Agreement covers all aspects of the administrative and servicing functions related to lending operations and Loans of Company.

**3.6. Registration Fee.** In consideration for the expenses associated with the organization of the relationship between Company and Servicing Agent, Servicing Agent shall pay to Company the sum of $17,500, $7,500 of which Company acknowledges and agrees has already been paid to it and the balance of which, being $10,000, shall be paid to Company on or

{00071425.DOCX / 2 }

4

Confidential-Subject to Protective Order

before the Effective Date.

**4.    Business and Affairs in Connection with Company.**

**4.1.    Servicing Agent's Authority and Responsibility.** All business and affairs in connection with the administration and servicing of the Loans of Company shall be the responsibility of Servicing Agent. Servicing Agent is hereby granted the necessary power and authority to act, in order to fulfill its responsibilities under this Agreement.

**4.2.    Duties of Servicing Agent.** In the administration and servicing of the Loans, Servicing Agent's duties shall include, without limitation, the following:

**4.2.1.    Management.** Consistent with such guidelines, rules and policies as shall be established from time to time by Company as described in Section 1.5 hereof (as same may be revised from time to time), Servicing Agent shall use commercially reasonable efforts for the orderly administration and servicing of the Loans. Without limiting the generality of the foregoing, but in furtherance thereof, Servicing Agent duties shall include, but not be limited to:

(a)    responsibility to advertise, market and promote the business of Company consistent with any suggested guidelines established by Company;

(b)    maintain, in accordance with commercially reasonable standards customarily in place in the loan servicing industry, offsite back-up storage for all electronic data and other information pertaining to the performance of the services hereunder and each Loan serviced by Servicing Agent for Company pursuant to the Agreement;

(c)    maintain at its expense an errors and omissions policy and a general comprehensive liability policy, each of at least $500,000, and workers compensation insurance in such amounts as required by applicable law, each with a financially sound and reputable insurer reasonably acceptable to Company, and naming LDF and Manager as additional insureds. Servicing Agent shall provide copies of such insurance policies to Company and provide to Company such evidence as it may reasonably request concerning the continued existence of such coverages during the term of this Agreement;

(d)    purchase leads in accordance with the guidelines of Company for purposes of making the Loans;

(e)    establish underwriting criteria in accordance with guidelines of Company for purposes of making the Loans;

(f)    provide loan administration, including but limited to, collection of payments, distributing payments, distributing amounts to Company as provided in this Agreement, reporting and accounting as required by this Agreement, maintenance of good business relations with and supervision over third-party vendors and agents retained by Servicing Agent, collection and administration of delinquent Loans and bad debt, regulatory management, customer service and processing of renewed Loans;

(g)    with the written consent of Lender, sell Loans and/ or loan portfolios, in whole or in part, to a third party;

{00071425.DOCX / 2 }

Confidential-Subject to Protective Order                    Niwiin_000170

(h)    respond or ensure a timely response to all customer, legal and regulatory inquiries in strict accordance with guidelines of Company and immediately provide a written report of such inquiries and responses to Manager; and

(i)    maintain proper authority, supervision and administration over Company bank accounts designated for Loans and loan repayments.

The parties agree and acknowledge that Servicing Agent shall be permitted to retain third parties to provide some or all of the foregoing services; provided, however, Servicing Agent shall remain ultimately responsible for their performance in conformity with the terms of this Agreement.

**4.2.2.**    **Operating Expenses.**    All Operating Expenses shall be paid by the Servicing Agent on behalf of Company from the Primary Account of Company.    All Operating Expenses shall be the sole responsibility of Servicing Agent.

**4.2.3.**    **Compliance.**    Servicing Agent shall comply and assure that all third party vendors shall comply with all rules and policies as shall reasonably be established from time to time by Company and with all present and future Legal Requirements, including all statutes, regulations and ordinances of the Tribe having general applicability to parties engaged in the Business, provided that all such rules, policies and Legal Requirements shall not be inconsistent with the terms and conditions of this Agreement.    Without limited the foregoing, but in furtherance thereof:

(a)    Servicing Agent, and any third-party service provider retained by Servicing Agent, shall have in place and employ appropriate measures designed to meet the objectives of the security and confidentiality guidelines of the federal banking agencies' Interagency Guidelines Establishing Standards for Safeguarding Consumer Information and 12 C.F.R. Part 332, et seq., adopted in connection with the federal Gramm-Leach-Bliley Act of 1999.    Servicing Agent shall immediately disclose to Company any breaches in security with respect to its or any third-party service provider's operations, the identity of a customer of Company or information regarding a loan, or any breach relating to databases or information maintained by Servicing Agent or any third-party service provider with respect to the loans or business of Company.    Servicing Agent and any third-party service provider shall immediately report to Company when any such material intrusion has occurred, the estimated effect of the intrusion on Company and any customers of Company who maintain a relationship with Company, and the specific corrective actions taken or planned to be taken.    Servicing Agent must ensure that any third-party service provider to whom Servicing Agent transfers or provides access to customer information (i) signs a written contract restricting its use of customer information to the use specified in the agreement between Company and/or Servicing Agent, as the case may be, and the third-party service provider, which must be consistent with the terms of this Agreement; (ii) agrees to comply with all governmental requirements and the privacy policies relating to the loans and business of Company; (iii) agrees to implement and maintain appropriate administrative, technical and physical safeguards to protect the security, confidentiality and integrity of all customer

{00071425.DOCX / 2 }

6

Confidential-Subject to Protective Order

Niwiin_000171

information as provided herein; and (iv) complies with the requirements of this Section 4.2.3(a).  Company shall be provided a copy of all such agreements;

(b)     Servicing Agent shall ensure that it complies with all terms and conditions set forth in Section 16 of this Agreement.  Servicing Agent shall immediately notify Company of any situation which may result in the loss or unauthorized disclosure of customer information related to the Loans or business of Company and shall immediately provide Company with (i) a list of the names of persons whose customer information has been disclosed or that may be disclosed, (ii) a description of the type and categories of the customer information that has been or may be disclosed, and (iii) the circumstances underlying the unauthorized or potentially unauthorized disclosure.  Servicing Agent shall cooperate with Company and at the direction of Company shall assist in notifying such customer or customers and shall take any other remedial action recommended by Company and/or required by applicable law.  Servicing Agent shall bear the expense of this notification, any out of pocket costs incurred by Company including outside counsel fees, and any other costs related thereto;

(c)     Servicing Agent shall ensure that any third-party service provider retained by Servicing Agent will obtain any necessary licenses to perform the services and its obligations under this Agreement required by Legal Requirements.  Upon Company's request, Servicing Agent shall provide a copy of any necessary license or certificate of authority.  Throughout the term of this Agreement, Servicing Agent shall ensure that any third-party service provider retained by Servicing Agent will obtain and maintain all other licenses, permits, and registrations necessary under Legal Requirements to perform its obligations under this Agreement or as otherwise required by Legal Requirements;

(d)     All actions taken by Servicing Agent, any third-party service provider retained by Servicing Agent, its and their employees, its and their agents and its and their contractors, and Servicing Agent shall require and ensure that all third-party service providers retained by Servicing Agent, shall comply with all Legal Requirements related to: (i) the terms and conditions set forth in the agreements and documents evidencing the Loans and business of Company (including, without limitation, the interest rates, fees and charges), (ii) the services specified by Company, including without limitation, any collections procedures provided by Company, and (iii) all laws and regulations applicable to all other acquisition and collection activities relating in any way to the Loans and business of Company, including, without limitation, all websites and links which make any reference to the Loans and business of Company and all activities involving disclosure to, or use or disclosure by, Servicing Agent or any third-party under arrangement with or by Servicing Agent, of any information relating to any customer of Company;

(e)     Unless waived in writing by Company, Servicing Agent shall at all times utilize a loan management software program approved by Company to fund and service Loans; and

(f)     The management of Company shall be under the authority of the Manager, acting through its manager and officers, and Servicing Agent shall be responsible to adhere to and comply with all directives and requests of and as given from time to time

Confidential-Subject to Protective Order                    Niwiin_000172

by the Manager to the extent such directives and requests are consistent and made in accordance with this Agreement.

**4.2.4. Required Filings.** Servicing Agent shall comply with all applicable provisions of the Internal Revenue Code including, but not limited to, the prompt filing of any cash transaction reports and W-2 reports that may be required by the Internal Revenue Service.

**4.2.5. Contracts in Company's Name.** Consistent with the guidelines, rules and policies as shall reasonably be established from time to time by Company and except as otherwise expressly provided in this Agreement (i.e., Servicing Agent's right to contract with third parties to provide services and otherwise assist it in performing its duties as set forth in Sections 4.2.1, 4.2.3 and 4.3), contracts necessary or reasonably desirable for the operations of Company and for the administration and servicing of the Loans shall be entered into in the name of Company and signed by the Manager; provided, however, that with Manager's prior written approval Servicing Agent shall be authorized to enter into contracts necessary or reasonably desirable for the operations of Company in its name to the extent deemed necessary due to unreasonable impediments outside the reasonable control of Servicing Agent and Company to have such contracts, including contracts for automated clearinghouse services, in the name of Company. Notwithstanding anything to the contrary, Servicing Agent shall deliver copies of all contracts executed by it in its name on behalf of Company to the Manager on a monthly basis.

**4.2.6. Loan Covenants and Agreements.** Servicing Agent shall assist the Manager with the compilation and provision of information and reports (financial and otherwise) as may be reasonably requested by the Manager in connection with the business of Company or as required under the Loan Agreement or any other Authorized Debt, including any required to comply with the covenants and agreements contained therein. Servicing Agent will administer and service the Loans in a manner consistent with the rules and policies as shall reasonably be established from time to time by Company. Servicing Agent shall promptly advise the Manager in the event that Servicing Agent becomes aware of any matter that may cause a default by Company under the Loan Agreement or any other documents evidencing any other indebtedness of Company or any of the Loans.

**4.3. Vendors.** Consistent with the rules and policies as shall reasonably be established from time to time by Company, Servicing Agent shall have the exclusive responsibility and authority to direct the engagement of third party providers performing regular services for the making, collecting, administration and servicing of the Loans.

**4.4. Bank Accounts.** Servicing Agent shall, with approval of the Manager, select a bank or banks for the exclusive and sole use, deposit and maintenance of the funds of Company and shall establish such bank accounts for the benefit of Company as Servicing Agent deems appropriate and necessary in the course of business and as consistent with this Agreement, including, but not limited to an account to serve as the primary operating account of Company for funding Loans, depositing receipts from the repayment thereof and making payments pursuant to Section 5 of this Agreement (the "Operating Account"), an account to maintain the Litigation Reserve Fund, and such other accounts deemed necessary or appropriate by Servicing Agent to maintain and service any reserves required by this Agreement. In no event shall any funds of

{00071425.DOCX / 2 }

8

Confidential-Subject to Protective Order

Servicing Agent or Lender that may be unrelated to this Agreement be commingled with any bank accounts established pursuant to the foregoing sentence. No bank account of Company shall be opened without prior written notice to the Manager and approval of LDF and BDC. Except as set forth in Section 4.5.2 with respect to the Litigation Reserve Fund and unless otherwise mutually agreed in writing by Servicing Agent and Company, Servicing Agent shall have sole signatory and transfer authority over such bank accounts so long as Servicing Agent is not in any monetary default or is not in breach of any material provision of this Agreement.

### 4.5.    Litigation Reserve Fund.

**4.5.1.  Litigation.**  Servicing Agent acknowledges that Company shall actively and vigorously prosecute or defend any and all regulatory or litigation proceedings that may challenge or affect the sovereign status of LDF or Company as instrumentalities of the Tribe. Subject to the other provisions of this Section 4.5, the expense of any litigation or regulatory proceedings shall be an Operating Expense. The selection of counsel to represent Company shall be made by Manager, subject to the reasonable consent of Servicing Agent, which consent shall not be unreasonably withheld or delayed.

**4.5.2.  Establishment and Purpose of Fund.**  In furtherance of the foregoing, Company shall establish and maintain a separate and segregated bank account of Company ("Litigation Reserve Fund") that shall contain a balance equal to Thirty Five Thousand Dollars ($35,000). The Manager shall have the exclusive right to draw upon the Litigation Reserve Fund for the purposes described herein. The Litigation Reserve Fund shall be funded by Company with ten percent (10%) of the Origination Fees paid in accordance with Section 5.1 until fully funded. The exclusive purpose of the Litigation Reserve Fund is to provide funding of the costs of any litigation, defense, responses to regulatory inquiries, litigation and other similar expenses arising out of the business of Company.

**4.5.3.  Procedure for Funding Litigation.**  If any claim or legal action is brought against Company, Servicing Agent, Lender, BDC, the Tribe, Manager, LDF, or any subsidiary or any Affiliate or any employee or director thereof, or any official of the Tribe by any person arising out of the operations of Company, Servicing Agent or Lender within the scope of this Agreement, Company, in collaboration and coordination with Servicing Agent, shall defend such action using such counsel as selected by the Manager, subject to the consent of Servicing Agent, which consent shall not be unreasonably withheld or delayed. Any cost of such claim or legal action, including any judgment rendered in an action arising out of the operation within the scope of this Agreement of Company, Servicing Agent or Lender and the cost of any legal action brought by Company against any third party, shall be paid by the Manager from the Litigation Reserve Fund to the extent funds are at the time of payment available therein. If funds are not available at the time such payment is to be made, the Servicing Agent shall pay such costs out of the Operating Account and such amounts shall constitute Operating Expenses. Any such excess amounts shall be paid within five (5) business days of written notice from Manager to Servicing Agent.

**4.5.4.  Replenishment of Fund.**  In the event any funds are expended from the Litigation Reserve Fund, the fund shall be restored to Thirty Five Thousand Dollars ($35,000) as

an Operating Expense pursuant to Section 5.2 hereof.

**4.5.5.** **Willful and Wanton Conduct.** Notwithstanding the foregoing, neither party shall be entitled to the benefit of any funds in the Litigation Reserve Fund to the extent it has acted in a willful or wanton manner, in which case, such party will be solely responsible for such acts.

**4.5.6.** **No Waiver of Sovereign Immunity.** Nothing in this Section 4.5 shall be construed to waive, in whole or in part, the Tribe's, BDC's, LDF's or Company's sovereign immunity.

**4.6.** **Internal Control Systems.** Consistent with the rules and policies as shall be established from time to time by Company, Servicing Agent shall implement accounting procedures and systems that are customary and/or required by accounting standards applicable to the industry. These systems shall be reviewed at least annually.

**4.7.** **Disbursements from and Daily Deposits to Bank Account.** Consistent with the rules and policies as shall reasonably be established from time to time by Company, Servicing Agent shall collect, or cause to be collected, all proceeds connected with or arising from the repayment of Loans and all other operations of Company and deposit, or cause to be deposited, the related cash daily into the Operating Account at least once during each banking day. Consistent with the rules and policies as shall reasonably be established from time to time by Company, Servicing Agent shall have responsibility and authority for paying all Origination Fees, Operating Expenses, amounts to fund the Litigation Reserve Fund, debt service under the Loan Agreement or other Authorized Debt, and the Servicing Fee from the Operating Account. In the event that Company shall receive any payments directly, it shall immediately forward same to Servicing Agent for deposit to the Operating Account.

**4.8.** **No Cash Disbursements.** Any and all payments or disbursements by Servicing Agent shall be made by check or electronic fund transfer debit to the Operating Account or such other account as may have been established pursuant to Section 4.4.

**4.9.** **Accounting and Books of Account.** Servicing Agent shall prepare and provide to Company and BDC operating reports on a monthly, quarterly, and annual basis, and operating statements which after the full year of operation will include comparative statements of all revenues, number of new Loans and renewed Loans and all other amounts collected and received, and all deductions and disbursements made therefrom in connection with Company. The monthly and quarterly operating reports shall be delivered by the twenty-first day of the following month, with the annual operating report delivered within sixty (60) days of the year end and shall be in form satisfactory to meet all requirements under the Loan Agreement or any Authorized Debt. Servicing Agent shall keep or make available complete books and records at the office of Company, setting forth a true and accurate account of all business transactions arising out of and in connection with the conduct of Company's business. Manager shall have access to such reporting elements of the loan management software utilized by the Servicing Agent as Manager shall reasonably request so as to ensure compliance with the terms of this Agreement.

**4.10.** **Operating Standards.** Servicing Agent shall administer and service the Loans in

{00071425.DOCX / 2 }

10

Confidential-Subject to Protective Order

a proper, efficient and competitive manner consistent with the rules and policies as shall reasonably be established from time to time by Company, which rules and policies shall be consistent with the operating standards of the industry generally.

**5.**     **Servicing Fee Reimbursement and Disbursement.**  No later than 21 days or such other time period as provided in this Agreement after the end of each calendar month of operations, Servicing Agent shall calculate and report to the Manager, Gross Revenues, Operating Expenses and details regarding the number of new Loans and number of renewed Loans of Company for the previous month's operations and the year's operations to date.  Gross Revenues shall be disbursed on a monthly basis from the Operating Account in the following order of priority:

**5.1.**    An amount shall be paid to an account of Company separate from the operating account maintained by Servicing Agent in the manner directed by Company, equal to three dollars and 25/100 ($3.25) for each new Loan and for each renewed Loan made, and, with respect to loans that provide for regular periodic payments, three dollars and 25/100 ($3.25) upon payment of each such periodic payment (collectively, the "Origination Fees"), *provided, however,* that the following shall apply to Origination Fees:

(a)     no Origination Fees shall be payable to Company in respect of payments obtained after default of any Loans pursuant to Servicing Agent's collection efforts;

(b)     in no event shall the Origination Fees be less than the following amounts regardless of volume: (i) for any partial month beginning on the date of commencement of Company operations and the first full calendar month of operations of Company thereafter, the minimum Origination Fee shall be $0; (ii) for the second full calendar month of operations of Company, the minimum Origination Fee shall be $5,000; and (iii) for the third month of operations of Company and thereafter, the Origination Fee shall be not less than $10,000 per month; and

(c)     ten percent (10%) of all Origination Fees payable to Company shall be deposited into the account holding the Litigation Reserve Fund as described in Section 4.5 until the balance of such account equals $35,000.

**5.2.**    all Operating Expenses, including any amounts necessary to replenish the Litigation Reserve Fund pursuant to Section 4.5.4, to the extent the same have not been paid during the regular course of business during each such month;

**5.3.**    all interest and any principal then due (or agreed to be pre-paid by the parties) under the Loan Agreement, to be paid in accordance with the terms thereof; and

**5.4.**    to Servicing Agent, the Servicing Fee.

Servicing Agent acknowledges that the principal and interest due and owing pursuant to the Loan Agreement is fixed, and is not dependent upon the success of the business activities of Company. Servicing Agent is responsible for recommending and servicing the Loans, and acknowledges that the failure to collect on any Loans will directly reduce the amount of the Servicing Fee otherwise payable to Servicing Agent. Servicing Agent acknowledges and agrees that the

{00071425.DOCX / 2 }

11

foregoing is a fair and reasonable allocation of the risk associated with the failure or inability to collect on any Loans.

**6.     Warranties.**

**6.1.     Warranties.**  Servicing Agent and Company each warrant and represent that they shall not act in any way whatsoever, directly or indirectly, to cause this Agreement to be amended, modified, canceled, or terminated, except pursuant to Section 17.24.  Servicing Agent and Company warrant and represent that they shall take all actions necessary to ensure that this Agreement shall remain in full force and effect at all times.

**6.2.     Interference in Tribal Affairs.**  Servicing Agent agrees not to interfere in or attempt to influence the internal affairs or government decisions of Tribal government by offering cash incentives, by making written or oral threats to the personal or financial status of any person, or by any other action, specifically including actions in the normal course of business of Servicing Agent that only affect the activities of Company, except for contact with the Manager or authorized Company employees.  For the purposes of this Section 6, if any such undue interference in Tribal affairs is alleged in writing and through arbitration it is found that Servicing Agent has unduly interfered with the internal affairs of the Tribal government and has not taken sufficient action to cure and prevent such interference, that finding of interference shall be grounds for termination of the Agreement. All communications regarding Company business operations shall be conducted exclusively through Company.

**6.3.     Prohibition of Payments to Members of Tribal Government.**  Servicing Agent represents and warrants that no payments have been or will be made to any member of the Tribal government, any Tribal official, any relative of a member of Tribal government or Tribal official, or any Tribal government employee for the purpose of obtaining any inappropriate privilege, gain, advantage or consideration.

**6.4.     Prohibition of Financial Interest in Company.**  No member of the Tribal government or relative of a member of the Tribal government shall have a direct or indirect financial interest in Company greater than the interest of any other member of the Tribe, nor shall any such person have any direct or indirect financial interest in Servicing Agent, its parents, subsidiaries or affiliates.

**6.5.     Definitions.**  As used in this Section, the term "member of the Tribal government" means any member of the Tribal Council, any officer or director of BDC, or other tribal elected official, or any independent board or body created to oversee any aspect of Company or its business and any Tribal court official. The term "relative" means an individual residing in the same household who is related as a spouse, father, mother, son or daughter.

**6.6.     No Warranty as to Liability.**  Servicing Agent acknowledges that neither Company nor any other person or entity has made any representation or warranty as to any liability that Servicing Agent or its officers, directors, employees, members, shareholders, affiliates or agents may have under any state or federal law by virtue of the business activities of Servicing Agent, Lender, Company, LDF, Manager or any other party.

{00071425.DOCX / 2 }

12

Confidential-Subject to Protective Order                     **Niwiin_000177**

## 7.    Termination.

**7.1.    Voluntary Termination.** This Agreement may be terminated upon the mutual written consent and approval of the parties.

### 7.2.    Termination for Cause by Either Party.

**7.2.1.** Either of the parties may terminate this Agreement:

(a)    upon written notice to the other party if either party fails to pay any monetary obligation to the other within ten (10) days of when due, or

(b)    if the other party fails to perform any nonmonetary material duty or obligation set forth in this Agreement and such failure continues un-remedied for a period of thirty (30) days after notice thereof, which notice shall identify with reasonable specificity the nonmonetary material duty or obligation that is not being performed; provided, however, that if the party in breach has commenced taking substantial steps to remedy the failure during such thirty (30) day period, such party shall have an additional thirty (30) days to fully remedy the failure.

**7.2.2.** Either party may also terminate this Agreement by written notice to the other party, effective upon receipt, if:

(a)    Any Federal or State authority, where approval is required, fails to approve this Agreement or otherwise objects to the performance by Servicing Agent of any obligation imposed on it under this Agreement; or

(b)    Company or Servicing Agent has, based on an opinion of legal counsel, reason to believe that the performance by it or Servicing Agent of any obligation imposed under this Agreement may reasonably be expected to result in the breach of any applicable law.

### 7.3.    Termination by Company.

**7.3.1.** Company may terminate this Agreement upon written notice to Servicing Agent, effective immediately, if Servicing Agent, or a principal, director or officer of Servicing Agent, has (a) committed an act of personal dishonesty or breach of fiduciary duty to Company that results or was intended to result in a personal profit to the Servicing Agent or such individual, or (b) been convicted of a criminal felony or misdemeanor offense directly that adversely affects, impedes or interferes with the performance of the obligations of Servicing Agent hereunder.

**7.3.2.** Company may terminate this Agreement notwithstanding any provision to the contrary if it has provided Servicing Agent with thirty (30) days prior written notice that the actions of Servicing Agent have or will create a material reputation risk to Company, BDC or the Tribe and Servicing Agent has not mitigated such risk in accordance with best commercial practices as determined by Company.

{00071425.DOCX / 2 }

13

Confidential-Subject to Protective Order    **Niwiin_000178**

**7.4.** **Involuntary Termination Due to Changes in Legal Requirements.** It is the understanding and intention of the parties that the establishment and operation of Company conforms to and complies with all Legal Requirements in effect on the Effective Date. If during the Term of this Agreement, Company, or any material aspect of the Business as proposed to be conducted by Company on the Effective Date or at any other time during the Term of this Agreement, becomes prohibited by operation of law or is determined by final judgment of a court of competent jurisdiction, after all appeals thereof, to be unlawful under applicable law, the obligations of the parties hereto shall cease, and this Agreement shall be of no further force and effect.

**7.5.** **Consequences of Termination.** Subject to Section 7.6 and Section 8, upon any termination of this Agreement:

(a)    Company shall cease making any further Loans;

(b)    Servicing Agent and Company shall retain all money previously paid to them pursuant to Section 5 of this Agreement;

(c)    all accrued revenues which have not been distributed under Section 5 of this Agreement and any other funds of Company in any account, including the Operating Account and any other reserve accounts, shall be paid and distributed as provided in Section 5 of this Agreement; provided, however, that if this Agreement shall terminate or expire on a date other than the last day of a calendar month, the minimum Origination Fee for the month in which such termination or expiration occurs shall be calculated by prorating such Origination Fee based on a per diem of $10,000/number of actual days in the month of termination or expiration or Origination Fees due and owing the Company in accordance with Section 5.1, whichever is greater;

(d)    all amounts in the Litigation Reserve Account that have been funded out of Origination Fees pursuant to Section 5.1(c) shall be distributed to the Company and all other amounts in the Litigation Reserve Account that have not been funded out of Origination Fees shall be distributed in accordance with the provisions of Sections 5.2 through 5.5;

(e)    Subject to the rights of any holder of Authorized Debt, including the Lender, and except as may be otherwise governed by any applicable loan documentation applicable to such Authorized Debt, including the Loan Agreement, as well as any subordination or priority agreements among holders of Authorized Debt, the Company shall transfer and assign all of its right, title and interest in all Loans, including all related documents and instruments, as well as any and all customer information (including but not limited to names, addresses, telephone numbers, social security numbers and financial information), and whether stored in written form, electronically or otherwise, to Servicing Agent or Servicing Agent's designee as directed by Servicing Agent in respect of its Servicing Fee, provided, however, that to the extent any of the foregoing have been transferred to any holder(s) of Authorized Debt in repayment thereof or otherwise pursuant to the terms of the applicable loan documentation, the Company shall permit

{00071425.DOCX / 2 }

14

Confidential-Subject to Protective Order

Niwiin_000179

and direct such holder(s) to transfer and assign to Servicing Agent any and all amounts realized by such holder(s) in excess of the amount owed to it or them by the Company together with any remaining Loans not yet repaid, including all related customer information, as its Servicing Fee which would otherwise be due from the Company hereunder;

(f)    For the avoidance of doubt, in connection with the distributions contemplated by Section 7.5(e), Company shall not use, distribute, sell or transfer any Loans, including any related documents and instruments, or any customer information to any other third party except as contemplated by Section 4.2.1(g) and Section 7.5(e); and

(g)    Company shall retain its interest in the title to all other (non-Loan or related information) Company assets, fixtures, supplies and equipment subject to any security interests or options held by any other party, including the Lender or Servicing Agent, in such assets.

Nothing contained in this Section shall be read to preclude either or both parties from contesting any actions which could lead to the involuntary cessation of business by Company.

**7.6.    Consequences of Servicing Agent's Breach.** Servicing Agent shall indemnify and hold Company harmless against all liabilities of any nature whatsoever for any breach of this Agreement by Servicing Agent or its agents or created by the termination of this Agreement by Company pursuant to this Section. The parties acknowledge and agree that termination of this Agreement may not be a sufficient or appropriate remedy for breach by Servicing Agent, and further agree that pursuant to the other provisions of this Agreement, Company shall, upon breach of this Agreement by Servicing Agent, have the right to pursue such remedies (in addition to termination) at law or equity as it determines are best able to compensate it for such breach, including, without limitation monetary compensation, specifically the Origination Fees pursuant to Section 5.1 for a term equal to the then remaining Term.

**7.7.    Pursuit of Remedies.** An election to pursue damages or to pursue specific performance of this Agreement or other equitable remedies while this Agreement remains in effect shall not preclude the injured party from providing notice of termination pursuant to this Section 9. Neither shall termination preclude a suit for damages.

**8.    Transition Upon Termination.** If termination of this Agreement occurs upon conclusion of the Term, Servicing Agent shall take such actions as are necessary or appropriate to wind-up the business of the Company and effect the consequences of termination contemplated by Section 7.5 by the conclusion of the Term. If termination of this Agreement occurs at any time other than upon conclusion of the Term, Servicing Agent shall be entitled to a reasonable period of not less than ninety (90) days to take all actions necessary or appropriate to wind-up the business of the Company and effect the consequences of termination contemplated by Section 7.5. In either case, the Company shall reasonably cooperate with, and assist, Servicing Agent in taking such actions.

{00071425.DOCX / 2 }

Confidential-Subject to Protective Order

Niwiin_000180

9. **Consents and Approvals.**

**9.1.** **Company.** Where approval or consent or other action of Company is required, such approval shall mean the written approval of the Manager evidenced by a duly enacted resolution of LDF and BDC. Any such approval, consent or action shall not be unreasonably withheld or delayed.

**9.2.** **Servicing Agent.** Where approval or consent or other action of the Servicing Agent is required, such approval shall mean the written approval of Servicing Agent evidenced by a duly enacted resolution thereof. Any such approval, consent or other action shall not be unreasonably withheld or delayed.

10. **Disclosures.**

**10.1.** **Members and Directors.** Servicing Agent shall provide Company with information as to the Affiliates, principals, directors and officers of Servicing Agent, and any changes thereto, and any information reasonably requested by Company with respect to such parties for the purpose of verifying compliance with the provisions of this Section 10.

**10.2.** **Warranties.** Servicing Agent represents and warrants as follows: (i) no person or entity has any beneficial ownership interest in Servicing Agent other than as set forth in the Due Diligence Questionnaire and the letter to BDC prepared by Servicing Agent and attached hereto as "Exhibit B"; (ii) no officer, director or owner of 5% or more of the stock of Servicing Agent has been indicted for, convicted of, or pleaded nolo contendere to any felony related to the business of payday loans or the payday loan industry in general, or had any association with individuals or entities known to be connected with organized crime; and (iii) no person or entity listed in the Due Diligence Questionnaire, including any officers and directors of Servicing Agent, has been indicted for, convicted of, or pleaded nolo contendere to any felony or any offense described in subsection (ii) above, or had any association with individuals or entities known to be connected with organized crime.

**10.3.** **Disclosure Amendments.** Servicing Agent agrees that whenever there is any material change in the information disclosed pursuant to this Section 10 it shall notify Company. All of the warranties and agreements contained in this Section 10 shall apply to any person or entity who would be listed in this Section 10 as a result of such changes.

**10.4.** **Breach of Servicing Agent Warranties and Agreements.** The material breach of any representation, warranty or agreement of Servicing Agent contained in this Section 10 shall be grounds for immediate termination of this Agreement; provided that if a breach of the representation contained in clause (ii) of Section 10.2 is discovered, and such breach was not disclosed but all officers and directors of Servicing Agent sign sworn affidavits that they had no knowledge of such breach, then Servicing Agent shall have 30 days after notice from Company to terminate the interest of the offending person or entity and, if such termination takes place, this Agreement shall remain in full force and effect.

Confidential-Subject to Protective Order

## 11.    **Indemnification.**

**11.1.**    Servicing Agent hereby indemnifies and agrees to hold harmless the Tribe, BDC, LDF, Company and Manager, and their respective Affiliates, and their and their respective Affiliate's officers, directors, members, employees, representatives, shareholders, agents and attorneys (the "Company Indemnified Parties") against any and all claims, losses, liabilities, damages, penalties, demands, judgments, settlements, costs and expenses ("Losses") suffered or incurred by such Company Indemnified Parties as a result of, or with respect to, or arising from (a) the origination, renewal, servicing or collection of the Loans, whether such Losses arise from consumer or regulatory claims; (b) any breach by Servicing Agent of its obligations under this Agreement or the inaccuracy of any warranty or representation of Servicing Agent set forth herein; (c) the negligence or intentional misconduct of Servicing Agent or its employees, agents, or representatives; (d) any negligent act or omission of any third-party service provider retained by Servicing Agent, the material inaccuracy of any warranty or representation made for the benefit of Company by any third-party service provider retained by Servicing Agent, or the breach of any obligation owed to Company by any third-party service provider retained by Servicing Agent; or (e) any Losses resulting from the theft of personal identifying information with regard to any Loan from any facilities (physical or electronic) controlled by Servicing Agent or any third-party service provider retained by Servicing Agent; provided, however, none of such Losses are attributable to (i) any breach by Company of its obligations under this Agreement or the inaccuracy of any warranty or representation of Company set forth herein, (ii) the negligence or intentional misconduct of Company or any of its employees, agents, or representatives, including the Manager and its employees, agents, and representatives, or (iii) the theft of personal identifying information with regard to any Loan from any facilities (physical or electronic) controlled by Company; and provided, further, however, that with respect to Servicing Agent's indemnification obligations under this Section, Servicing Agent shall not be required to provide any indemnification to the extent coverage for such claims is to be provided out of the Litigation Reserve Fund.

**11.2.**    Any Indemnified Party seeking indemnification hereunder shall promptly notify the Servicing Agent, in writing, of any indemnified Loss hereunder, specifying in reasonable detail the nature of the Loss, and, if known, the amount, or an estimate of the amount, of the Loss, provided that failure to promptly give such notice shall only limit the liability of the Servicing Agent to the extent of the actual prejudice, if any, suffered by the Servicing Agent as a result of such failure. The Indemnified Party shall provide to the Servicing Agent as promptly as practicable thereafter information and documentation reasonably requested by the Servicing Agent to support and verify the claim asserted. The Servicing Agent shall pay any Indemnified Party for any indemnified Loss upon receipt of such notice. Attorneys' fees and costs shall be paid by the Servicing Agent as incurred.

**11.3.**    This Section 11 shall survive any termination or expiration of this Agreement.

## 12.    **Limited Waiver of Sovereign Immunity.** Company hereby grants to Servicing Agent a limited waiver of sovereign immunity with respect to the following purposes and for no others:

{00071425.DOCX / 2 }

17

Confidential-Subject to Protective Order

**12.1.**  For the purpose of allowing Servicing Agent to take any and all actions necessary to enforce the provisions of this Agreement pursuant to the alternative dispute resolution procedures set forth below, including those which seek injunctive or declaratory relief, damages (limited solely to recover from the personal property assets and future revenues of Company), specific performance or other legal and equitable remedies in the court or courts authorized by this Agreement and to effect enforcement of any remedy granted therein;

**12.2.**  Subject to this Section 12, pursuant to its limited waiver, Company expressly waives its immunity from suit and consents to be sued in any of the following: the Lac du Flambeau Indian Community Tribal Court, the Circuit Court for Vilas County, State of Wisconsin, and the United States District Court for the Western District of Wisconsin, and appellate courts therefrom for any claims by the Servicing Agent arising out of this Agreement.

**12.3.**  Company agrees that it shall not plead or raise as a defense the requirement of exhaustion of tribal court remedies as to any claims brought by Servicing Agent in any of the forums identified in Section 12.2 above.

**12.4.**  The limited waiver of sovereign immunity granted herein does not include any waiver, either express or implied, to any third party.  The limited waiver of sovereign immunity granted herein is of Company only and does not include a waiver, either express or otherwise, by the Tribe, LDF or otherwise.

**13.**  **Tribal Assets.**  Servicing Agent understands and agrees that notwithstanding anything to the contrary herein, the obligations of Company hereunder are unsecured obligations and no recourse may be made against any assets of the Tribe, BDC or LDF, and recourse may only be made against the revenues and personal property of Company after entry of a judgment in a court of competent jurisdiction as provided by the applicable law and the provisions of this Agreement related to an arbitration.

**14.**  **Dispute Resolution.**  All disputes, controversies or claims between the parties arising out of or relating to this Agreement, including without limitation any dispute, controversy or claim between the parties regarding the rights, duties, adequacy of performance, breach, or liabilities of a party under any provision of this Agreement or the validity or enforceability of this Agreement ("Dispute"), shall be resolved by binding arbitration conducted in accordance with the provisions of this Section ("Arbitration Proceedings") and per the limited waiver of tribal sovereign immunity contained in Section 12 above.  If a party ("Complaining Party") concludes that the other party ("Responding Party") has failed to comply with, or is proposing to take action which is inconsistent or will breach any term or condition of this Agreement, and the parties informal efforts to resolve the Dispute as set forth in Section 14.1 below have been unsuccessful , the Complaining Party may give written notice to the Responding Party ("Notice of Dispute"), which notice shall specify: (a) the nature of the Dispute; (b) the corrective action which must be taken to remove, or, where appropriate, to commence removal of, the Dispute, if the Dispute is susceptible to cure ("Corrective Action"); (c) a reasonable time limit within which the Corrective Action must be taken ("Time Limit"); and (d) the amount of damages or losses asserted to have arisen from the Dispute.  Except in the case of emergencies, no Arbitration Proceedings of a Dispute may be commenced by a party unless prior Notice of Dispute and

{00071425.DOCX / 2 }

18

Confidential-Subject to Protective Order                    **Niwiin_000183**

opportunity to take Corrective Action have been given as provided in this Subsection. If, within the Time Limit, the Responding Party fails in the reasonable judgment of the Complaining Party to take the Corrective Action then either party may initiate Arbitration Proceedings under Section 14.2 with respect to the asserted Dispute. Each of the parties hereby agrees that this arbitration provision is valid and enforceable and therefore waives any defense or assertion to the contrary.

**14.1. Negotiations/Mediation.** Before Arbitration Proceedings are commenced, the parties shall use their best efforts to settle the Dispute by negotiating with each other in good faith and, recognizing their mutual interests, attempting to reach a just and equitable solution satisfactory to both parties. Should the parties' good faith efforts to resolve a Dispute be unsuccessful, the parties agree that prior to resorting to judicial or arbitral avenues of relief, they may engage a mutually-acceptable mediator to assist them in resolving the Dispute. If the parties do not reach a solution within a period of 30 days from the date on which the Dispute was first asserted in writing, then the provisions in Section 14.2 below shall apply.

**14.2. Binding Arbitration.** Subject to the requirements and limitations of Section 14.1, either party shall have the right to have the Dispute decided by Arbitration Proceedings in the manner provided in this Section 14.2.

**14.2.1. Notice of Intent.** A party intending to demand arbitration shall first serve written notice of that intent ("Notice of Intent to Arbitrate") on the other party and shall promptly thereafter file the Notice of Intent to Arbitrate with any arbitration organization of its choosing in accordance with that arbitration organization's rules and pay the required fees. A Notice of Intent to Arbitrate shall specify: (a) the matters to be submitted to arbitration; (b) the nature of the relief to be sought in the arbitration; and (c) the name of the "Selector Arbitrator" to be appointed by the party.

**14.2.2. Response.** Within ten (10) days after the service of a Notice of Intent to Arbitrate, the other party shall serve a written response ("Response") specifying (a) the name of the Selector Arbitrator it will appoint, (b) any additional matters it intends to submit to arbitration relating to the Dispute, and (c) the nature of any relief it intends to seek in the arbitration. The Responding Party shall promptly thereafter file the Response with the arbitration organization that received the Notice of Intent and pay any required fees.

**14.2.3. Arbitrators.** The two Selector Arbitrators identified by the parties shall select a single "Decider Arbitrator" within ten (10) days of the identification of the second Selector Arbitrator in the Response described in Section 14.2.2. Any Arbitration Proceedings shall take place exclusively before the single Decider Arbitrator; the Selector Arbitrators' sole role is to identify a single neutral arbitrator, the Decider Arbitrator, to preside over any Arbitration Proceedings. Any Decider Arbitrator shall be competent and professionally experienced in the matter being arbitrated. The parties further agree that no arbitrator shall be an officer, agent, employee, stockholder or contractor of any party or its Affiliates, nor shall any arbitrator be a member or descendent or spouse of a member or descendent of the Tribe. If a party fails to appoint an arbitrator, or fails to appoint a successor arbitrator within 10 days after the incapacity or resignation of its previously appointed arbitrator, or if the first and second

{00071425.DOCX / 2 }

19

Confidential-Subject to Protective Order

Selector Arbitrators fail to appoint a Decider Arbitrator within 10 days after the service of the Response, or fail to appoint a successor third arbitrator within 10 days after the incapacity or resignation of the previously appointed Decider Arbitrator, then the Decider Arbitrator to be appointed shall be selected by the arbitration organization that received the Notice of Intent. All arbitrators, no matter how designated or appointed, shall act as neutral arbitrators. All decisions, awards, and other rulings of the arbitrators, relief awarded, or other substantive or procedural matters ("Decisions") shall be made by only the duly-appointed Decider Arbitrator, shall be in writing signed by the Decider Arbitrator, and shall include the findings of fact and conclusions of law on which the Decision is based.

**14.2.4.**     **Conduct of Arbitration.**  After the Notice of Intent to Arbitrate has been delivered, arbitration shall be considered commenced as to all matters properly submitted under the foregoing provisions, and shall thereafter be prosecuted with diligence in accordance with the following provisions, unless the parties agree otherwise.  The Decider Arbitrator shall apply the governing law specified in Section 17.19, and shall follow the Federal Rules of Civil Procedure and Federal Rules of Evidence.  Within sixty (60) days of commencement of the arbitration actions, and after receiving evidence and hearing witnesses, if any, the Decider Arbitrator shall render his or her award, accompanied by findings of fact and a statement of reasons for the Decision.

**14.2.5.**     **Standard of Review.**  All Decisions rendered by the Decider Arbitrator shall be determined in light of the nature of the Dispute, the circumstances surrounding the Dispute, applicable laws, and the rights and interests of the parties, so as to do substantial justice to the parties.  No order in any Arbitration Proceedings may terminate this Agreement except upon (a) a determination that the Dispute on which the order is based constitutes a major and material default under this Agreement, or (b) upon a determination of repeated defaults sufficient to indicate callous indifference to a party's obligations under this Agreement; provided that in no event shall this Agreement be subject to termination for breach of a term or condition, the breach of which the parties have agreed shall not be the basis for termination of this Agreement.

**14.2.6.**     **Place of Arbitration.**  All hearings and other proceedings in the arbitration shall be held at Madison, Wisconsin, unless otherwise designated by the parties.

**14.2.7.**     **Relief Available.**  With respect to the matters submitted to Arbitration Proceedings, the Decider Arbitrator shall have authority to:

(a)     issue appropriate interlocutory orders to mitigate damage or prevent irreparable injury to a party; and

(b)     render a final decision which:

1.     determines or declares the rights, duties, adequacy of performance, breach or liabilities of a party under the Agreement;

2.     orders a party to specifically perform its obligations under the Agreement;

{00071425.DOCX / 2 }

20

Confidential-Subject to Protective Order

Niwiin_000185

3.    awards appropriate injunctive, declaratory or compensatory monetary relief for the benefit of a party; and/or

4.    contains such further relief and provisions as the arbitrators have jurisdiction and authority to grant.

The Decider Arbitrator shall not have jurisdiction or authority to assess special, consequential or punitive damages against either party.

**14.2.8.    Decision Binding; Enforcement.** The Decision of the Decider Arbitrator shall become a "Final Decision" at the time rendered. All Final Decisions shall be conclusive and binding on the parties with respect to the matters decided, and shall be complied with by the parties. A party may enter a Final Decision and institute judicial proceedings for the sole purpose of enforcing a Final Decision in any tribunal specific in Section 12.2 above. In such judicial proceedings, neither party, without consent of the other party, shall be entitled to contend that the Final Decision should be vacated, modified or corrected and the parties hereby expressly waive all other rights and remedies that might otherwise be available in the judicial proceeding.

**14.2.9.    Costs of Arbitration.** All costs of arbitration, including the fees and expenses of the Decider Arbitrator, shall initially be borne equally by the parties, but ultimate responsibility for such costs shall be determined by the Decider Arbitrator in the course of his or her Decision and/or award according to the extent to which each party prevailed on the issues subject to the arbitration. Each party shall bear the costs and expenses for the presentation of its case, including the fees of its attorneys and experts.

**14.2.10.    Survival of Remedy** Subsequent to any termination of this Agreement, this Section 14 shall remain available to the parties with respect to Disputes arising out of or relating to this Agreement prior or subsequent to the termination date for the longer of (A) one (1) year, or (B) the conclusion of any proceedings timely initiated pursuant to this Section 14, including the conclusion of any appeals allowed by proceeding hereunder.

**15.    Performance During Disputes.** It is mutually agreed that during any kind of controversy, claim, disagreement or dispute, including a dispute as to the validity of this Agreement or to terminate the Agreement for cause, Company and Servicing Agent shall continue their performance of the provisions of this Agreement and its exhibits, subject to the maintenance of any licenses required to perform such duties. Servicing Agent shall be entitled to seek injunctive relief from such court or other competent authority as contemplated by Section 14 of this Agreement to maintain the status quo in the event of a threatened eviction during any dispute, controversy, claim or disagreement arising out of this Agreement.

**16.    Confidential Information.**

**16.1    Confidential Information.** Each of the parties agree that any information received concerning any other party during the performance of this Agreement, regarding a party's organization, financial matters, marketing plans, or other information of a proprietary nature (the "Confidential Information"), will be treated by both parties in full confidence and except as required to allow Servicing Agent or Company to perform their respective covenants

{00071425.DOCX / 2 }

21

and obligations hereunder, or in response to legal process or appropriate and necessary inquiry, and will not be revealed to any other persons, firms or organizations; provided, however, that a party may disclose such information to such of its officers, employees or agents who need to know the information for purposes of performing services to such party for purposes related to this Agreement and who agree to keep such information confidential and to be bound by this Section to the same extent as if they were signatories to and bound by this Agreement. Servicing Agent agrees that it will ensure that any third-party service provider that is retained by Servicing Agent and that uses information collected regarding the Loans and business of Company, including without limitation names, addresses, demographic information and financial information of borrowers under the Loans, and has access to such information follows applicable law relating to such information and complies with the terms of this Agreement including this Section.

**16.2    Exceptions**.  The obligations not to use or disclose the Confidential Information shall not apply to Confidential Information which (a) has been made previously available to the public by Company or Servicing Agent or Servicing Agent's Affiliates or becomes generally available to the public other than as a result of a breach of this Agreement; (b) prior to disclosure to Company or Servicing Agent or Servicing Agent's Affiliates, was already rightfully in any such person's possession; or (c) is obtained by Company or Servicing Agent or Servicing Agent's Affiliates from a third party who is lawfully in possession of such information, and not in violation of any contractual, legal or fiduciary obligation to Company or Servicing Agent or Servicing Agent's Affiliates, with respect to such Confidential Information and who does not require Company or Servicing Agent or Servicing Agent's Affiliates to refrain from disclosing such Confidential Information to others.

### 17.    General Provisions.

**17.1.    Notice.**  All notices and other communications hereunder shall be in writing, and shall be deemed to have been duly given (a) upon hand delivery thereof, (b) upon facsimile and written confirmation of transmission, (c) upon receipt of any overnight deliveries, or (d) on the third (3rd) business day after mailing United States registered or certified mail, return receipt requested, postage prepaid, addressed to each party at the following addresses:

|  |  |
|---|---|
| If to Company: | Niiwin, LLC<br>418 Little Pines Road<br>P.O. Box 221<br>Lac du Flambeau, WI  54538 |
| If to Servicing Agent: | VIVUS SERVICING LTD<br>1320 Cornwall Road, Suite 204<br>Oakville, ON, L6J 7W5<br>Attention:  Mark Bettiol |

or to such other different address(es) as Servicing Agent or Company may specify in writing using the notice procedure called for in this Section.

{00071425.DOCX / 2 }

22

**17.2.** **Authorization**.  Company and Servicing Agent represent and warrant to each other that they each have full power and authority to execute this Agreement and to be bound by and perform the terms hereof. On request, each party shall furnish the other evidence of such authority.

**17.3.** **No Present Lien, Lease or Joint Venture.**  The parties agree and expressly warrant that neither this Agreement nor any exhibit thereto is a mortgage or lease and, consequently, does not convey any present interest whatsoever in Company or its assets, nor any proprietary interest in Company itself. The parties further agree and acknowledge that it is not their intent, and that this Agreement shall not be construed, to create a joint venture between Company and Servicing Agent; rather, Servicing Agent shall be deemed to be an independent contractor for all purposes hereunder. Servicing Agent and Company shall not have the power to bind or obligate the other except as set forth in this Agreement.

**17.4.** **Servicer's Contractual Authority in the Performance of this Agreement.**  Subject to the provisions of Section 4.2.5, and applicable law, Servicing Agent is authorized to make, enter into and perform in the name of and for the account of Company such contracts authorized by Company to perform the obligations of Servicing Agent under this Agreement.

**17.5.** **Further Assurances**.  Each of the parties agrees to execute, deliver and, if necessary, record any and all additional instruments, certifications, amendments, modifications and other documents as may be reasonably required by the other party in order to effectuate, complete, perfect, continue or preserve the respective rights, obligations, liens and interests of the parties hereto to the fullest extent permitted by law; provided, that any such additional instrument, certification, amendment, modification or other document shall not materially change the respective rights, remedies or obligations of Company or Servicing Agent under this Agreement or any other agreement or document related hereto.

**17.6.** **Tribal Taxes.**  The Tribe has agreed, pursuant to the Management Agreement entered into between and among Manager, BDC and LDF ("Management Agreement"), that neither it nor any agent, agency, affiliate or representative of the Tribe will impose any taxes, fees, assessments, or other charges of any nature whatsoever on payments of the Servicing Fee to Servicing Agent, or any repayment of debt by Company to Lender or borrowers under the Loans to Company; provided, however, the Tribe may assess a tax upon Servicing Agent in the nature of a business license and occupation tax or other tax assessed against Servicing Agent by any state or tribal regulatory authority, but only to the extent that same is a dollar for dollar set off against the state tax or tribal license processing fee. The Tribe has further agreed, pursuant to the Management Agreement, that neither it nor any agent, agency, affiliate or representative will impose any taxes, fees, assessments or other charges of any nature whatsoever on the salaries or benefits, or dividends paid to, any of Servicing Agent's stockholders, officers, directors, or employees or any of the employees of Company.  The Tribe has further agreed under the terms of the Management Agreement that the amount of any tax, fee, assessment or other charge of any nature whatsoever that may be subsequently imposed contrary to this Section shall be deducted from the amount that is otherwise owed and to be paid to Company pursuant to Section 5.1. Nothing herein shall limit the Tribe's ability to tax its members.

{00071425.DOCX / 2 }

23

Confidential-Subject to Protective Order

Niwiin_000188

**17.7.  Situs of the Contracts.**  This Agreement, as well as all contracts entered into between Company and any person or any entity providing services to Company or to Servicing Agent on behalf of Company, shall be deemed entered into at the Executive Office of BDC on the Tribal Reservation in Wisconsin, and shall be subject to all Legal Requirements of the Tribe and federal law, except as otherwise expressly provided herein.

**17.8.  Defense.**  Company shall have the right to bring and/or defend and/or settle any claim or legal action brought against Company, individually or jointly or severally with Servicing Agent or Lender, in connection with the operation of Company.  Company shall retain and supervise legal counsel, accountants and such other professionals, consultants and specialists as Company deems appropriate to defend and/or settle any such claim or cause of action; provided, however, that in the event that Servicing Agent is a party to any such proceedings, then legal counsel selected by Company shall be subject to the prior written consent of Servicing Agent, which consent shall not be unreasonably withheld or delayed. Servicing Agent acknowledges that in all claims or legal actions bringing claims against Company involving questions of jurisdiction, tribal sovereignty or sovereign immunity issues, Company shall consult with BDC concerning the presentation and defense of such actions.  All liabilities, reasonable costs, and expenses, including attorneys' fees and disbursements, incurred in defending and/or settling any such claim or legal action which are not covered by insurance shall be subject to Section 4.5.  Nothing contained herein is a grant to Manager of the right to waive tribal sovereign immunity of the Tribe, BDC, LDF or of Company.

**17.9.  Waivers.**  No failure or delay by Servicing Agent or Company to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition.  No covenant, agreement, term, or condition of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument.  No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

**17.10.  Captions.**  The captions for each Section are intended for convenience only.

**17.11.  Severability.**  If any of the terms and provisions hereof shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof.  If, however, any material part of a party's rights under this Agreement shall be declared invalid or unenforceable, the party whose rights have been declared invalid or unenforceable shall have the option to terminate this Agreement upon thirty (30) days written notice to the other party, without liability on the part of the terminating party.

**17.12.  Interest.**  Any amount payable to Servicing Agent or Company by the other which has not been paid as provided herein shall accrue interest as may be agreed upon by the parties or if no rate was agreed upon then at fifteen percent (15%) per annum.

**17.13.  Third Party Beneficiary.**  This Agreement is exclusively for the benefit of the

{00071425.DOCX / 2 }

24

Confidential-Subject to Protective Order                    **Niwiin_000189**

parties hereto and it may not be enforced by any party other than the parties to this Agreement and shall not give rise to liability to any third party other than the authorized successors and assigns of the parties hereto.

**17.14. Brokerage or Other Fees.**  Other than Manager acting on behalf of Company, Servicing Agent and Company represent and warrant to each other that neither has sought the services of a broker, finder or agent in this transaction, and neither has employed, nor authorized, any other person to act in such capacity.  Servicing Agent and Company each hereby agrees to indemnify and hold the other harmless from and against any and all claims, loss, liability, damage or expenses (including reasonable attorneys' fees) suffered or incurred by the other party as a result of a claim brought by a person or entity engaged or claiming to be engaged as a finder, broker or agent by the indemnifying party.

**17.15. Survival of Covenants.**  Any covenant, term or provision of this Agreement which, in order to be effective, must survive the termination or expiration of this Agreement, specifically including the obligations set forth in Section 7.5 of this Agreement, shall survive any such termination or expiration.

**17.16. Estoppel Certificate.**  Servicing Agent and Company agree to furnish to the other party, from time to time upon request, an estoppel certificate in such reasonable form as the requesting party may request stating whether there have been any defaults under this Agreement known to the party furnishing the estoppel certificate and such other information relating to Company as may be reasonably requested.

**17.17. Periods of Time.**  Whenever any determination is to be made or action is to be taken on a date specified in this Agreement, if such date shall fall on a Saturday, Sunday or any holiday observed by the Tribe, then in such event, said date shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

**17.18. Time is of the Essence**.    Time is of the essence in the performance of this Agreement.

**17.19. Governing Law**.  The interpretation, validity and performance of this Agreement shall be governed by the laws of the State of Delaware, without regard to the conflicts of law rules of the Tribe, or such State, or any other sovereign.  If any of the terms and provisions of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof, all such other terms and provisions to be valid and enforceable to the fullest extent permitted by law.

**17.20. Preparation of Agreement.**  This Agreement shall not be construed more strongly against either party regardless of who is responsible for its preparation.

**17.21. Entire Agreement**.  This Agreement, including any exhibits referred to herein and attached hereto, constitutes the entire understanding and agreement of the parties hereto and supersedes all other prior agreements and understandings, written or oral, between the parties.

**17.22. Exhibits.**  All exhibits attached hereto are incorporated herein by reference and

{00071425.DOCX / 2 }

25

Confidential-Subject to Protective Order

made a part hereof as if fully rewritten or reproduced herein.

**17.23. Successors, Assigns, and Subcontracting.** The benefits and obligations of this Agreement shall inure to and be binding upon the parties hereto and their respective successors and assigns. Company's prior written consent shall be required for Servicing Agent to assign or subcontract any of its rights, interests or obligations as Servicing Agent hereunder to any successor or assign, including any parent, subsidiary or affiliate of Servicing Agent. Company shall, without the consent of the Servicing Agent, have the right to assign this Agreement and the assets of Company to an instrumentality of the Tribe, including a corporation or entity wholly owned, directly or indirectly, by the Tribe organized to conduct the business of Company for the Tribe that assumes all obligations herein. Any assignment by Company shall not prejudice the rights of the Servicing Agent under this Agreement. No assignment authorized hereunder shall be effective until all necessary government approvals, if any, have been obtained.

**17.24. Modification.** Any change to or modification of this Agreement must be in writing signed by all parties hereto.

**17.25. Counterparts.** This Agreement may be executed in counterparts, and exchanged by facsimile or other electronic means such as PDF, all of which executed counterparts shall together constitute a single document. Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document

**[This Space Intentionally Blank]**

**[Signature Page to Follow]**

{00071425.DOCX / 2 }

26

Confidential-Subject to Protective Order

Niwiin_000191

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement on the day and year first above written.

NIIWIN, LLC
By: Triax Management, LLC, its Manager

By: _____
Name:  Devon Cohen
Title:   Manager


VIVUS SERVICING LTD

By: _____
Name:  Mark Bettiol
Title:   President

{00071425.DOCX / 2 }

27

Confidential-Subject to Protective Order

Niiwin_000192

**Exhibit A**
**Guidelines, Policies and Procedures**

The Servicer and any party providing services to the Servicer shall comply with the following Consumer responsible underwriting/ servicing guidelines, as same may be amended from time to time:

Follow all applicable federal laws and the laws of the Lac du Flambeau Tribe (the "Tribe"), including consumer lending laws, disclosure laws, and EFT and collection laws. This includes giving consumers the ability to revoke ACH authorization and to pay by alternative methods. In addition Servicer agrees to adhere to NACHA guidelines.

Servicer agrees to administer installment loan agreements only that properly and adequately disclose the terms and payment schedule that the Consumer is agreeing to. Any changes to the Loan Agreements will be first reviewed by Triax Portfolio Management before being implemented. The Servicer still remains primarily responsible to ensure the Loan Agreements meet all applicable laws.

Charge a maximum finance fee of $30 per $100 loan on a bi-weekly basis.

Require a mandatory partial pay down of at least $10 on principal on the 6th payment and thereafter as measured on a biweekly payment basis.

Provide full and accurate disclosure of fees and APRs on website and in consumer loan documents.

Remain primarily responsible for all third party collections activities. The Servicer must ensure that all third parties used for collections are in compliance with OLA Best Practices.

Require any sub-servicer to agree to follow these prescribed guidelines, as same may be amended from time to time.

Not attempt to garnish wages of consumers who are delinquent or have defaulted on their loans.

Adhere to policies adopted by LDF Holdings LLC, the Tribe or the Tribal Representatives prohibiting any lending in restricted states and/ or territories which shall be subject to change from time to time and will be communicated through the Manager.  Please note, restricted states and/or territories are subject to change from time to time.

Adopt underwriting and marketing policies that will follow guidelines adopted by LDF Holdings LLC, the Tribe or the Tribal Representatives.

{00071425.DOCX / 2 }

28

Confidential-Subject to Protective Order

Niwiin_000193

Immediately submit copies of all regulatory and AG inquiries and responsive correspondence to LDF Holdings LLC and Triax Portfolio Management. Do not respond to any inquiries without Manager's authorization and review of any response you propose to make.

Keep LDF Holdings LLC informed on a timely basis with regard to any communications with any regulatory bodies. Work with the LDF Holdings LLC, via the Manager, to respond to any regulatory bodies in a timely manner. In most cases, it will be appropriate for responses to come from the Tribe or LDF Holdings LLC and not from the Servicer. The Servicer should seek Manager's guidance and authorization before responding to any regulatory body.

Immediately respond to and resolve Better Business Bureau customer complaints, and provide copies of same to LDF Holdings LLC.

Submit to periodic review of the Servicing Company's operations to ensure adherence to these guidelines.

As a condition of any loans, review a consumer's ability to carry and satisfy obligations under its loan.

Work with consumers to offer extended payment plans and due date extensions if consumer is having trouble paying the loan.

Offer loan amounts only up to the advertised maximum loan limit.

Accurately inform consumers when the credit will become available. Clarify and distinguish between time needed to approve and fund the loan.

Identify clearly which states a lender does not do business in.

Send out due date reminders to remind customers of individual amount due and due date.

Where not specifically covered here, follow OLA suggested Best Practices unless otherwise directed by LDF Holdings LLC.

Not lend in excess of $1,000 as a first loan amount, unless directed otherwise by LDF Holdings LLC and agreed in writing.

Employ at least two (2) tribal members within 60 days of program implementation on the reservation through LDF Holdings LLC to fulfill servicer specific activities. The number of tribal members employed may increase to reflect loan volumes.

Not charge an NSF fee in excess of $30 on loans. This fee may be charged once per scheduled payment for installment loans.

{00071425.DOCX / 2 }

29

Confidential-Subject to Protective Order

Not charge a late fee in excess of $30 on loans. This fee may be charged once per scheduled payment for installment loans.

Do not charge an additional late fee simply because a late fee has not yet been paid, or do not pyramid late fees.

Follow all contractual terms as prescribed by any agreement executed by and between the Company and the Servicer.

Amended as of June 19, 2013.

{00071425.DOCX / 2 }

Confidential-Subject to Protective Order

Niwiin_000195

**Exhibit B**
**Servicing Agent Due Diligence Questionnaire and Letter**

{00071425.DOCX / 2 }

Confidential-Subject to Protective Order
**Niwiin_000196**